IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK
_____

DENZEL MORRIS,

        Plaintiff,

    v.                              Civ. Action No.
                                     9:09-CV-0734 (NAM/DEP)


TROY T. PLUMMER,[1] GARY STEINBERG,
and JUSTIN LEESON, Corrections Officers,
Auburn Correctional Facility,

                      Defendants.
_____

APPEARANCES:                   FOR COUNSEL:

FOR PLAINTIFF:

DENZEL MORRIS, *Pro Se*
04-A-2038
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

FOR DEFENDANTS:

HON. ERIC SCHNEIDERMAN        ADELE TAYLOR-SCOTT,ESQ
Attorney General of                    Assistant Attorney General
the State of New York
The Capitol
Albany, NY 12224

_____

     [1]      The court's records mistakenly list this defendant's name as "Plummet". The clerk will therefore be directed to amend the docket sheet to reflect the correct spelling of his name as "Plummer".

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Denzel Morris, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis*, has commenced this action pursuant to 42 U.S.C. §1983, claiming deprivation of his civil rights.  In his complaint, the plaintiff asserts that he was assaulted by the three corrections officer defendants, following his admitted failure to obey a command that he surrender suspected contraband.  Plaintiff further alleges that he was denied proper medical treatment for the injuries he suffered as a result of the assault.

Currently pending before the court is the defendants' motion for summary judgment.  In their motion defendants seek dismissal of plaintiff's claims against them, arguing that they were not personally involved in the plaintiff's medical treatment and that no reasonable factfinder could find in favor of plaintiff on his excessive force claim, additionally asserting qualified immunity as grounds for dismissal.  Having carefully reviewed the record in light of the arguments advanced, for the reasons that follow, I recommend that the defendants' motion, which plaintiff has not opposed, be granted and that the plaintiff's complaint be dismissed.

I.     BACKGROUND[2]

        The facts giving rise to plaintiff's claim are relatively uncomplicated

and for the most part not controverted.   The parties' dispute centers upon

the amount of force employed by the defendants to gain control of the

plaintiff during a brief encounter involving plaintiff's suspected possession

of drugs.

        The plaintiff is a prison inmate entrusted to the care and custody of

the New York State Department of Correctional Services ("DOCS").   *See*

Complaint (Dkt. No. 1).   At the times relevant to his complaint, Morris was

housed at the Auburn Correctional Facility ("Auburn"), located in Auburn,

New York.   *Id.*

        On June 27, 2006, based on confidential information provided to

prison authorities to the effect that Morris was in possession of drugs or

other contraband, Corrections Officers Gary Steinberg and Justin Leeson

were directed by a supervising corrections officer to perform a search of

the plaintiff's cell.   Scott Decl. (Dkt. No. 20-2) Exh. A at p. 133

(unnumbered)[3] (Unusual Incident Report); Steinberg Decl. (Dkt. No. 20-3)

---

        [2]     In light of the procedural posture of the case the following recitation is
derived from the record now before the court, with all inferences drawn and
ambiguities resolved in favor of the plaintiff.  *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d
Cir. 2003).

        [3]     The pages of the exhibits attached to the Scott Declaration are not
consecutively numbered.  For ease of reference the court will refer to the page

¶ 3. Upon their arrival at the plaintiff's cell they found him sitting on his bed with headphones in his ears, and it appeared that Morris did not hear or observe the officers approach until his cell door began to open.  Scott Decl. (Dkt. No. 20-2) Exh. A at pp. 30; *see also* Defendant's Local Rule 7.1(a)(3) Statement (Dkt. No. 20-1) ¶¶ 3-4.[4]

When Morris appeared to notice Steinberg and Leeson at the entrance to his cell he ignored their directive that he exit, reached for a package later found to contain marijuana and cash located on the desk adjacent to his bed, and placed it into his mouth, apparently intending to swallow it.  Scott Decl. (Dkt. No. 20-2) Exh. A at pp. 29; Steinberg Decl. (Dkt. No. 20-3) ¶ 7; Leeson Decl. (Dkt. No. 20-4) ¶ 7.  Corrections Officer Steinberg immediately moved toward Morris and attempted to take control of his right arm, unaware of the contents of the package and concerned for the safety of both the corrections officers as well as Morris.  Steinberg Decl. (Dkt. No. 20-3) ¶ 8. As Leeson stepped in to assist Steinberg in gaining control of Morris a scuffle ensued, during which Steinberg lost control of plaintiff's right hand and was struck in the face by plaintiff's fist.

---

numbers as reflected in the filing of these exhibits on the court's docket.

[4]    As will be seen, in failing to oppose defendants' motion plaintiff has admitted the facts set forth in defendants' Local Rule 7.1(a)(3) Statement.  *See* pp. 11 - 12, *post.*

Steinberg Decl. (Dkt. No. 20-3) ¶¶ 9-10; Leeson Decl. (Dkt. No. 20-4) ¶ 7.

All three toppled onto the cell bed, with Morris laying face down, with his

hands underneath his body, and continuing to try to swallow the

contraband.  Scott Decl. (Dkt. No. 20-2) Exh. A at p. 42; Steinberg Decl.

(Dkt. No. 20-3) ¶ 9;  Leeson Decl. (Dkt. No. 20-4) ¶ 10.

At some point during the incident, while corrections officers

Steinberg and Leeson were attempting to gain control of the plaintiff and

place him in restraints, Corrections Officer Troy Plummer responded to

the scene.  Steinberg Decl. (Dkt. No. 20-3) ¶ 11; Plummer Decl. (Dkt. No.

20-5) ¶¶ 3, 4.  At the time of defendant Plummer's arrival Steinberg had

control of plaintiff's lower body, and Plummer assisted Leeson in

restraining Morris' wrists and placing them in restraints.  Defendant's Rule

7.1(a)(3) Statement (Dkt. No. 20-1) ¶ 11; Steinberg Decl. (Dkt. No. 20-3) ¶

11; Plummer Decl. (Dkt. No. 20-5) ¶¶12-13; Scott Decl. (Dkt. No. 20-3) pp.

43-44.  From the time the corrections officers entered the cell, it took less

than two minutes for them to gain control of the plaintiff and place him in

restraints.  Steinberg Decl. (Dkt. No. 20-3) ¶ 19; Leeson Decl. (Dkt. No.

20-4) ¶ 12.   Plaintiff claims that even after the officers gained control over

him they continued to beat him.  Complaint (Dkt. No. 1) at p. 5.

Once the plaintiff was fully restrained, the corrections officers pulled

him off the bed and removed him from the cell.  Steinberg Decl. (Dkt. No.

20-3) ¶ 13; Leeson Decl. (Dkt. No. 20-4) ¶ 13; Plummer Decl. (Dkt. No.

20-5) ¶ 6.  Morris persisted in his refusal to comply with the officers'

directives as they endeavored to escort him away from his cell.  Steinberg

Decl. (Dkt. No. 20-3) ¶ 14; Leeson Decl. (Dkt. No. 20-4) ¶ 15; Plummer

Decl. (Dkt. No. 20-5) ¶ 9.  As they were attempting to move the plaintiff

down the corridor, Corrections Officer Plummer observed Morris spit an

object from his mouth into an adjoining cell.  Leeson Decl. (Dkt. No. 20-4)

¶ 15; Plummer Decl.(Dkt. No. 20-5) ¶ 9.  Plummer directed the two

inmates in that cell not to move or touch the object, and recovered the

item without incident.[5]  Leeson Decl. (Dkt. No. 20-4) ¶ 16; Plummer Decl.

(Dkt. No. 20-5) ¶¶ 10-11.  A different set of officers, none of whom are not

parties to this action, subsequently accompanied the plaintiff to the

facility's special housing unit ("SHU") while Lesson, Plummer, and

Steinberg reported to the prison infirmary for examination.  Steinberg

Decl. (Dkt. No. 20-3) ¶ 16; Leeson Decl. (Dkt. No. 20-4) ¶ 19; Plummer

Decl. (Dkt. No. 20-5) ¶ 13-14.

---

[5]        The package retrieved by defendant Plummer was later determined to contain money, three and one-tenth grams of marijuana, and what was believed to be gang-related correspondence.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 20-1) ¶ 21; Steinberg Decl. (Dkt. No. 20-3) ¶ 17.

Once secured in the SHU, Morris was examined by medical personnel, who reported that the plaintiff complained of pain in his right leg and shoulder.   Scott Decl. (Dkt. No. 20-2) Exh. A at p. 135 (Use of Force Report).   In addition, the treating nurse noted that plaintiff had small abrasions on his left and right wrists, right middle finger, right ankle, right knee, and the right side of his face.   *Id.*   At the time, it was  determined that no further treatment was necessary.   *See* Ambulatory Health Record ("AHR") 6-27-06.[6]   The plaintiff returned for medical treatment the following day, claiming that he was "beat up"  and complaining of pain in his right ankle, wrist, and elbow.   AHR 6-28-06.   Upon examination the treating nurse noted that there was no bruising and little to no swelling of the allegedly affected areas of the plaintiff's body.   *Id.*   Defendants Steinberg, Leeson, and Plummer were neither involved in nor responsible for plaintiff's medical care.   Steinberg Decl. (Dkt. No. 20-2) ¶ 16; Lesson Decl. (Dkt. No. 20-4) ¶ 19; Plummer Decl. (Dkt. No. 20-5) ¶¶ 13-14.

On the day of the incident, plaintiff was issued a misbehavior report charging him with assault on staff, possession of drugs and money, refusing a direct order, refusing to permit a search, and participating in

---

[6]      Plaintiff's Ambulatory Health Records  were submitted to the court by traditional means and under seal, in accordance with an order issued on September 10, 2009, in order to protect their confidentiality.  *See* Dkt. No. 8.

unauthorized organizational activities.  Scott Decl. (Dkt. No. 20-2) Exh. A

at p. 120.  At the ensuing Tier III disciplinary hearing conducted to

address the misbehavior report, Morris admitted possessing drugs and

money, but was found not guilty of the assault on staff, refusing a direct

order, and unauthorized organizational activities.[7]  *See id.* at pp. 63, 64,

117.   Based upon that determination Morris was sentenced to a period of

270 days of disciplinary SHU confinement, with a corresponding loss of

commissary, packages, and telephone privileges.  *See id.* at p. 117.

The plaintiff sought medical treatment several times over the two

months following the incident, complaining of various ailments, including

pain in his right ankle.  *See* AHR 7-3-06, 7-06-06, 7-19-06, 7-24-06, 8-8-

06, 8-27-06.  X-rays taken of the plaintiff's right ankle on July 6, 2006, a

week after the encounter, and a second performed on August 31, 2006,

revealed no evidence of a fracture or soft tissue abnormality.  *See* AHR 7-

06-06 and radiology report of 8/31/06. The results of the July 6, 2006 X-

---

[7]        The DOCS conducts three types of inmate disciplinary hearings.  See 7 N.Y.C.R.R. § 270.3.  Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges.  Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU.  Tier III hearings concern the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits.  *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied*, 525 U.S. 907, 119 S. Ct. 246 (1998).

rays indicated only mild swelling.[8]  *Id.*  The radiology report of the August 31, 2006 x-ray showed a "normal examination."  Scott Decl.  (Dkt. No. 20-2) Exh. A at p. 113.

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on June 6, 2009.  Dkt. No. 1. Plaintiff's complaint names as defendants the three corrections officers involved in the incident, including Troy T. Plummer, Gary Steinberg, and Justin Leeson, and asserts claims of excessive force and the denial of adequate medical care, in violation of the Eighth Amendment.  *Id.*  As relief, plaintiff requests an award of compensatory damages in the amount of $120,000 and an additional sum of $115,000 in punitive damages.  *Id.*

On May 19, 2010, following the joinder of issue and completion of pretrial discovery, defendants moved for summary judgment dismissing plaintiff's complaint.  Dkt. No. 20.  In their motion, defendants argue that 1) they were not personally involved in any alleged refusal to provide adequate medical treatment for plaintiff's injuries; 2) no reasonable factfinder could conclude that excessive force was used against the plaintiff when considering circumstances surrounding the incident; and 3)

---

[8]        Due to complaints of pain, X-rays were also taken of plaintiff's right hand on July 11, 2006, and of his right shoulder on August 17, 2006;  both revealed normal findings.  *See* Scott Decl. (Dkt. No. 20-2) Exh. B.

in any event they are entitled to qualified immunity from suit.  Defendants'

motion, which plaintiff has not opposed, is now ripe for determination and

has been referred to me for the issuance of a report and recommendation,

pursuant to 28 U.S.C. § 636(b)(1)(B) and North District of New York Local

Rule 72.3(c).  *See also* Fed. R. Civ. P. 72(b).

III.    DISCUSSION

    A.    Plaintiff's Failure to Oppose Defendants' Motion

    Under the court's rules, plaintiff's response to defendants' motion,

which was filed on May 19, 2010, was due to be received by June 7,

2010.  Despite this, the court has received neither papers in opposition to

defendants' motion nor a request for an extension of that deadline.  As a

result, before turning to the merits of plaintiff's claims, a threshold issue to

be addressed is the legal significance, if any, of Morris' failure to oppose

defendants' summary judgment motion, and specifically whether that

failure automatically entitles defendants to summary judgment dismissing

plaintiff's complaint.[9]

    This court's rules provide that

> [w]here a properly filed motion is unopposed and the
> Court determines that the moving party has met its

---

[9]     Defendants' notice of motion was accompanied by a notification to the plaintiff of the consequences associated with his failing to respond to the motion, as required under this court's local rules.  *See* N.D.N.Y.L.R. 56.2.

burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown.

N.D.N.Y.L.R. 7.1(b)(3).  Undeniably, *pro se* plaintiffs are entitled to some measure of forbearance when defending against summary judgment motions.  *See Jemzura v. Public Serv. Comm'n,* 961 F. Supp. 406, 415 (N.D.N.Y. 1997) (McAvoy, C.J.).  The deference owed to *pro se* litigants, however, does not extend to relieving them of the ramifications associated with Local Rule 7.1(b)(3).  *Robinson v. Delgado*, No. 96-CV-169, 1998 WL 278264, at *2 (N.D.N.Y. May 22, 1998) (Pooler, J. & Hurd, M.J.)[10]; *Cotto v. Senkowski*, No. 95-CV-1733, 1997 WL 665551, at *1 (N.D.N.Y. Oct. 23, 1997) (Pooler, J. & Hurd, M.J.); *Wilmer v. Torian*, 980 F. Supp.106, 106-07 (N.D.N.Y. 1997) (Pooler, J. & Hurd, M.J.).  Accordingly, absent a showing of good cause defendants' unopposed summary judgment motion should be granted, if determined to be facially meritorious. *See Allen v. Comprehensive Analytical Group, Inc*., 140 F. Supp.2d 229, 231-32 (N.D.N.Y. 2000) (Scullin, C.J.); *Leach v. Dufrain*, 103 F. Supp. 2d 542, 545-46 (N.D.N.Y. 2000) (Kahn, J.).

It should also be noted that the plaintiff's failure to properly oppose

---

[10]   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

defendants' summary judgment motion is not without further consequences.  By failing to submit papers in opposition to their motion, plaintiff has left the facts set forth in defendants' Local Rule 7.1(a)(3) Statements unchallenged, thus permitting the court to deem facts set forth in the defendants' statement of material facts not in dispute to have been admitted based upon his failure to properly respond to that statement.[11] *See Elgamil v. Syracuse Univ.*, No. 99-CV-611, 2000 WL 1264122, at *1 (N.D.N.Y. Aug. 22, 2000) (McCurn, S.J.) (listing cases); *see also Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 292 (2d Cir. 2000) (discussing district courts' discretion to adopt local rules like 7.1(a)(3)).

In view of plaintiff's failure to oppose defendants' motion, I recommend that the motion be reviewed for facial sufficiency and, if deemed meritorious that it be granted, and that the facts alleged in defendants' Local Rule 7.1(a)(3) Statement be deemed admitted for purposes of the pending motion.

B.    Summary Judgment Motion Standard

Summary judgment motions are governed by Rule 56 of the Federal

---

[11]    Local Rule 7.1(a)(3) provides, in relevant part, that "[t]he Court shall deem admitted any facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."  N.D.N.Y.L.R. 7.1(a)(3) (emphasis in original).

Rules of Civil Procedure.  Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004).  A fact is "material", for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion.  *Anderson*, 477 U.S. at 250 n.4, 106 S. Ct. at 2511 n.4; *Security Ins.*, 391 F.3d at 83.  In

the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324, 106 S. Ct. at 2553; *Anderson*, 477 U.S. at 250, 106 S. Ct. at 2511.  Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986); *but see Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 620-21 (2d Cir. 1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences from the facts, in a light most favorable to the nonmoving party.  *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998).  The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party.  *See Building Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S. Ct. at 2511 (summary judgment is appropriate only when "there can be

14

but one reasonable conclusion as to the verdict").

    C.    <u>Plaintiff's Medical Indifference Claim: Personal Involvement</u>

One of the two principal claims contained within the plaintiff's complaint is that he was denied medical treatment following his alleged assault at the hands of the defendant corrections officers.  *See generally* Complaint (Dkt. No. 1).  In their motion defendants affirmatively state that following the incident they had no involvement in providing plaintiff with medical treatment, and therefore lack the requisite personal involvement to support a finding of liability against him in connection with that claim.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Gatson v. Coughlin,* 249 F.3d 156, 164 (2d Cir. 2001); *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)).  As the Supreme Court has noted, a defendant may only be held accountable for his or her actions under section 1983.  *Ashcroft v. Iqbal*, 556 U.S. __, 129 S. Ct. 1937, 1952 (2009).  In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular

defendant.  *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

In this instance the record establishes, without contradiction, that defendants' involvement in the incident ended when plaintiff was escorted to the facility's SHU by other officers.  Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 20-1) ¶ 20.  From that point on the defendants had no involvement in, nor were they responsible for, plaintiff's medical care.  *Id.* at ¶ 30.  Accordingly, based upon the record now before the court, there is no basis upon which a reasonable factfinder could conclude that defendants bear responsibility for alleged deliberate indifference to any medical condition of the plaintiff growing out of the incident in question.

D.    Plaintiff's Excessive Force Claim and the *Jeffreys* Exception

Plaintiff alleges that during the course of the incident in which he was physically subdued, restrained, and removed from his cell by the defendants following his refusal to obey their command to surrender suspected contraband, he was assaulted with a baton and beaten and kicked by those corrections officers.  *See* Complaint (Dkt. No. 1) p. 5.  The full record now before the court, however, fails to support plaintiff's claim. Accordingly, relying upon the Second Circuit's decision in *Jeffreys v City of New York,* 426 F.3d 549, defendants argue that they are entitled to judgment on plaintiff's excessive force claim, asserting that based upon

the evidence in the record no reasonable factfinder could credit the

plaintiff's version of the relevant events.

>    1.    Excessive Force Generally

Plaintiff's complaint asserts a cause of action for excessive use of

force brought under the Eighth Amendment, which proscribes

punishments that involve the "unnecessary and wanton infliction of pain"

and are incompatible with "the evolving standards of decency that mark

the progress of a maturing society."  *Estelle v. Gamble,* 429 U.S. 97, 102,

104, 97 S. Ct. 285, 290, 291 (1976); *see also Whitley v. Albers,* 475 U.S.

312, 319, 106 S. Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle*).  While

the Eighth Amendment does not mandate comfortable prisons, neither

does it tolerate inhumane treatment of those in confinement; thus, the

conditions of an inmate's confinement are subject to Eighth Amendment

scrutiny.  *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S. Ct. 1970, 1976

(1994) (citing *Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S. Ct. 2392,

2400 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment

is violated by an "unnecessary and wanton infliction of pain."  *Whitley,* 475

U.S. at 319, 106 S. Ct. at 1084 (citations and quotations omitted); *Griffen

v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).  The lynchpin inquiry in

deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S. Ct. 995, 998-999 (1992) (applying *Whitley* to all excessive force claims); *Whitley*, 475 U.S. at 320-21, 106 S. Ct. at 1085 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom.*, *John v. Johnson*, 414 U.S. 1033, 94 S.Ct. 462 (1973)).

Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S. Ct. at 999 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy*, however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. __ U.S. __, 130 S. Ct. 1175, 1179 (2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a

finding of wantonness since, as the Supreme Court has noted,

> [w]hen prison officials maliciously and sadistically
> use force to cause harm, contemporary standards
> of decency always are violated . . . . This is true
> whether or not significant injury is evident.
> Otherwise, the Eighth Amendment would permit
> any physical punishment, no matter how diabolic or
> inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v.*

*O'Keefe*, 899 F. Supp. 972, 973 (N.D.N.Y. 1995) (McAvoy, C.J.) (quoting

*Hudson*, 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140

F. Supp. 2d 204, 211 (N.D.N.Y. 2001) (Kahn, J.).  Even a *de minimis* use

of physical force can constitute cruel and unusual punishment if it is

"repugnant to the conscience of mankind."  *Hudson*, 503 U.S. at 9-10, 112

S.Ct. 1000 (citations omitted).

    With its focus on the harm done, the objective prong of the inquiry is

contextual and relies upon "contemporary standards of decency."  *Wright*,

554 F.3d at 268 (quoting  *Hudson*, 503 U.S. at 8, 112 S. Ct. at 1000)

(internal quotations omitted)).  When addressing this component of an

excessive force claim under the Eighth Amendment calculus, the court

can consider the extent of the injury suffered by the inmate plaintiff.  While

the absence of significant injury is certainly relevant, it is not dispositive.

*Hudson*, 503 U.S. at 7, 112 S.Ct. at 999.  The extent of an inmate's injury

19

is but one of the factors to be considered in determining a prison official's

use of force was "unnecessary and wanton"; courts should also consider

the need for force, whether the force was proportionate to the need, the

threat reasonably perceived by the officials, and what, if anything, the

officials did to limit their use of force. *Whitley*, 475 U.S. at 321, 106 S.Ct.

at 1085 (citing *Johnson*, 481 F.2d at 1033). "But when prison officials use

force to cause harm maliciously and sadistically, 'contemporary standards

of decency are always violated . . . . This is true whether or not significant

injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S.

at 9, 112 S Ct. at 1000).

That is not to say that "every malevolent touch by a prison guard

gives rise to a federal cause of action." *Griffen*, 193 F.3d at 91 (citing

*Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir. 1993)); *see also Johnson*,

481 F.2d at 1033 ("Not every push or shove, even if it later may seem

unnecessary in the peace of a judge's chambers, violates a prisoner's

constitutional rights"). Where a prisoner's allegations and evidentiary

proffers, if credited, could reasonably allow a rational factfinder to find that

corrections officers used force maliciously and sadistically, however,

summary judgment dismissing an excessive use of force claim is

inappropriate. *Wright*, 554 F.3d at 269 (citing *Scott v. Coughlin*, 344 F.3d

20

282, 291 (2d Cir. 2003) (reversing summary dismissal of prisoner's complaint, though suggesting that prisoner's evidence of an Eighth Amendment violation was "thin" as to his claim that a corrections officer struck him in the head, neck, shoulder, wrist, abdomen, and groin, where the "medical records after the . . . incident with [that officer] indicated only a slight injury")) (other citations omitted).

Addressing the objective prong of the Eighth Amendment analysis, in a rather sparse complaint plaintiff alleges only that he was beaten about his body after being handcuffed without identifying any specific injury he is alleged to have sustained.  *See generally*, Complaint (Dkt. No. 1).  In a grievance regarding the incident, which is included in the record now before the court, plaintiff provides slightly more elaboration, claiming that he was "brutally assaulted" and beaten non-stop on the right foot while he was being held down and consequently suffered a "slash" on his face, seven cuts throughout his body, and a swollen right foot.  Scott Decl. (Dkt No. 20-2) Exh. A at p. 112.  When credited and liberally construed, these allegations could potentially provide sufficient objective evidence to satisfy the first prong of the governing test.

With regard to the subjective prong, the plaintiff's version of events as alleged in the complaint, standing alone, would seem to establish that

the defendants' actions contravened contemporary standards of decency. Morris alleges that he was beaten while restrained by handcuffs.  It thus appears to be plaintiff's claim that an exercise in physical restraint resulted in an unprovoked assault upon his defenseless body.  Upon these facts as alleged by the plaintiff, it would appear that plaintiff has also satisfied the subjective prong of the Eighth Amendment Test.

### 2.    Application of *Jeffreys v. City of New York*

It is uncontroverted that the events leading up to the need for defendants to exert force against Morris were set in motion by his actions; plaintiff acknowledges that it was his conduct in possessing contraband and not immediately complying with the directives of Corrections Officers Steinberg and Leeson that he step outside of his cell, and instead attempting to swallow the contraband, that caused the encounter between him and the defendants.  Defendants confirm that as a result of the plaintiff's failure to comply they were required to exert force in order to physically restrain the plaintiff, remove him from his cell, and recover the contraband.  *See* Steinberg Decl. (Dkt. No. 20-3) ¶¶7-13, 19; Leeson Decl. (Dkt. No. 20-4) ¶¶ 7, 10-14, 21; Plummer Decl. (Dkt. No. 20-5) ¶¶ 4-8, 15.

It is true, as in many excessive force cases, that the focus in this

instance is upon the amount of force used to subdue the plaintiff and whether it was reasonably necessary, or instead excessive and applied malicious and sadistic purposes. *Blyden*, 186 F.3d at 263 n.4.  Each corrections officer defendant has submitted a sworn statement, affirming that the force used was only the amount necessary to gain control of and apply restraints to the plaintiff so that he could be removed from his cell, and denying plaintiff's claims that he was punched, kicked, slapped, or beaten with a baton.  *See* Steinberg Decl. (Dkt. No. 20-3) ¶ 19; Leeson Decl. (Dkt. No. 20-4) ¶¶ 14, 21; Plummer Decl. (Dkt. No. 20-5) ¶ 15.

The seemingly conflicting renditions of the amount of force applied by the defendants would, in the usual case, raise an issue of credibility, thus presenting a question of fact for resolution by a jury and inappropriate for determination by the court on a motion for summary judgement.  *Rule v. Brine, Inc*. 85 F.3d 1002, 1011 (2d Cir. 1996) (citing, *inter alia*, *Anderson*, 477 U.S. at 255, 106 S. Ct. 2513).  On the facts presented, however, it appears that this case falls within a very narrow exception to this well-established principle created by the Second Circuit in *Jeffreys v. City of New York*.  *Slacks v. Gray,* No. 9:07-CV-510, 2009 WL 3164782, at *13 (N.D.N.Y. Sept. 29, 2009)(Mordue, C.J.).

In *Jeffreys*, a case heavily relied upon by the defendants, the

Second Circuit held that summary judgement may be awarded in the rare circumstance where there is nothing in the record to support the plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in a light most favorable to the plaintiff, the court determines that "no reasonable person" could credit the plaintiff's testimony. *Jeffreys*, 426 F.3d at 54-55. The *Jeffreys* court cited, with approval, the district court's opinion in *Shabazz v. Pico*, 994 F. Supp. 460 (S.D.N.Y. 1998), which granted summary judgement in an excessive force case based upon the absence of any evidence in the record to corroborate the plaintiff's version of the events, highlighting the "many inconsistencies and contradictions within the plaintiff's deposition testimony and affidavits." *Slacks*, 2009 WL 3164782, at 13* (citing *Jeffreys*, 426 F.3d at 555 and quoting *Shabazz*, 994 F. Supp. at 470).[12]

The *Jeffreys* exception applies when 1) the plaintiff relies "almost

---

[12]     The court in *Shabazz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim.'" *Shabazz*, 994 F. Supp. at 470 (quoting *Denton v. Hernandez*, 504 U.S. 25, 32, 33, 112 S. Ct. 1728 (1990)). While approving of the lower court's reasoning in *Shabazz*, the *Jeffreys* court was careful to distinguish *Fischl v. Armitage*, 128 F.3d.50, 56 (2d Cir. 1997), another case previously decided by that court, wherein it reversed the grant of summary judgment in an excessive force case. *Jeffreys*, 426, F.3d at 554-55. In doing so, the court emphasized that in *Fischl*, the plaintiff's testimony that he was beaten was supported by the photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Id*

exclusively on his own testimony,"; 2) the plaintiff's testimony is "contradictory or incomplete"; and 3) the plaintiff's testimony is contradicted by the evidence produced by the defense. *Benitez v. Ham*, No. 9:04-CV-1159, 2009 WL 3486379, at *20-21 (N.D.N.Y. Oct. 21, 2009) (Mordue, C.J. and Lowe, M.J.) (citing and quoting *Jeffreys*).

Based upon a careful review of the entire record, I conclude that the facts of this case present one of the unusual circumstances in which the narrow *Jeffreys* exception should apply. In this instance, the plaintiff's allegations are conclusory, and his various accounts of what occurred are vastly inconsistent. Indeed, when closely examined, plaintiff's deposition testimony does not support the claims in his complaint and contradicts his earlier versions of what occurred; equally importantly, Morris' testimony is not significantly at odds with defendants' sworn statements, and in many respects is entirely consistent with those statements..

Plaintiff's complaint, filed on June 26, 2009 – three years after the incident – alleges that he was "repeatedly beaten" while in handcuffs, and that "Plummer struck him multiple times with a baton, while Steinberg and Leeson and punch [sic], slapped and kicked [him] in the stomach, ribs and back." Complaint (Dkt. No. 1) p. 5. The complaint is at odds , however, with the grievance filed by the plaintiff the day after the incident, in which

he states that

> on 6/27/06 while in my cell (B-8-4) I was <u>brutally</u> assaulted by
> three officers.  While two pined [sic] down my top half &
> continued to hit me, the third beat my right foot none-stop [sic]
> (that's the pain I felt the most).  When it was over I was left
> with a slash in my face, seven cuts covering my body, & a
> swollen right foot I can bearly [sic] walk on.

Scott Decl. (Dkt. No. 20-2) Exh. A at p. 112 [Emphasis in original].

Noticeably absent from the grievance is any claim of being beaten with a

baton, or punched, slapped, or kicked about the body.  On the other hand,

in his complaint Morris makes no reference to a non-stop assault on his

right foot, but claims he was pummeled about the stomach, back, and

ribs.

During his deposition testimony, when discussing the incident

plaintiff seemed to focus on an injury to his ankle.  Placing the events that

occurred in context, at his deposition plaintiff estimated that the cell to

which he was assigned at the time of the incident was approximately eight

by ten feet; plaintiff, who is 5' 10" and weighed 205 pounds, could stretch

his arms across the width of the cell and reach both walls.  Scott Decl.

(Dkt. No. 20-2) Exh. A at pp. 24, 35.  The cell, which plaintiff describes as

a "very small space," has three walls and bars across the front, and

contains a toilet and a sink; it is furnished with a metal bed and a metal

desk to the left of the bed.  *Id.* at pp. 24-25, 34.   As defendant Plummer

notes in this declaration, because of the size of plaintiff's cell and the furnishings within it, there would have been no way for him to have wielded a baton, as alleged by the plaintiff, without fear of injuring one of the other two officers engaged in attempting to subdue the plaintiff. Plummer Decl. (Dkt. No. 20-5) ¶ 7.

According to the plaintiff, after entering his cell the corrections officers grabbed him by the neck and were trying to choke him, a claim that neither appeared in his grievance nor was referenced in his complaint.  Scott Decl. (Dkt. No. 20-2) Exh. A at p. 36.  He maintains that initially only one officer had a grip on him, and then the other one grabbed him too; Morris could not see where everyone was positioned in the cell at the time.  *Id.* at pp. 34, 39-40, 42.  Morris admitted that he was directed to spit out the contraband and failed to do so.  *Id.* at p. 39.  He claimed that he did not struggle with the corrections officers, but admits that he continued to try to swallow the contraband.  Morris also claimed that he does not recall his fist coming into contact with a corrections officer's face, although he qualified this statement, adding that,  "however, it's a small quarter."  *Id.* at pp. 39, 43.  In plaintiff's own words, they "all went tumbling to the bed", and he landed on his stomach facing forward toward the cell door.  *Id.* at pp. 40-41.  Though he felt the weight of someone on top of

him, he could not tell who it was.  *Id.*  Morris testified that "somebody was on his feet . . beating [them] with a club", and the two corrections officers were trying to get his hands, which were under his body, in order to place them in handcuffs.  *Id.* at p. 42.

Plaintiff described both corrections officers as being on top of his back, each facing the opposite direction.  He testified further that he did not see but assumed that a corrections officer was using a baton to beat his foot; he felt the corrections officer was using something to beat him, employing what felt like "long swings", and admitting they could not be too long given the size of the cell.  *Id.* at pp. 64-65.  Additionally, Morris stated "once I got cuffed and I was drug up and he had his stick out in his hand and then he holstered it. . . ."  *Id.*  Plaintiff approximated the number of blows to his foot as more than ten, but could not be any more precise.  *Id.* at p. 66.

After they succeeded in handcuffing Morris, the corrections officers pulled Morris up and dragged him out of the cell.  Scott Decl. (Dkt. No. 1) Exh. A at pp. 42-43.  Plaintiff testified that he thought there were three officers in the cell at the time.  *Id.* at pp. 43, 49.  Plaintiff estimated that from the time he fell on the bed, it took about a minute for the corrections officers to get him into handcuffs; though he denied trying to keep his

hands from the corrections officer, he admitted that he was moving around and trying to swallow the contraband at the time.  *Id.* at pp. 44-45. When asked how long the entire incident took place, plaintiff said that he did not know.  *Id.* at p. 47.   When directed to guess, plaintiff responded, "I would say no more than ten minutes, ma'am."  *Id.*  Morris stated further, "[p]robably like the whole incident start to finish, ma'am, probably was like eight minutes, ma'am, seven minutes for the whole incident to go down." *Id*. at p. 48.

After Morris was removed from his cell, the corrections officers put his clothes on him and took him downstairs to the officers' station, where they waited for the arrival of a video camera and an escort to SHU.  Scott Decl. (Dkt. No. 20-2) Exh. A at p. 52.  Once in the SHU, plaintiff was visited and examined by a nurse.  *Id*. at p. 53.  Plaintiff stated that his right ankle was swollen as a result of the incident, but he did not have a scrape on his ankle.  *Id.* at pp. 46-47.  At his deposition, plaintiff identified his injuries as scratches on his wrists, knee, and face as well as the injury to his ankle; he made no mention of a "slash" on his face.  *Id.* at p. 48. Plaintiff testified that the photograph taken on the day of the incident and included in the record accurately depicts the injuries to his ankle, which included a laceration and swelling.  *Id.* at pp. 59-60.  Apparently in

explanation for the obvious discrepancy between his testimony and the statements in his grievance, plaintiff stated that to his knowledge "the foot is from your ankle down to your toes" and that his statement in his grievance meant that he was beaten on the ankle. *Id.* at p. 56.

At the conclusion of his deposition, when given the opportunity to make a statement, plaintiff admitted that he would have experienced pains just from the restraint, stating that "because injuries are going to come sometimes with restraint due to it has to be physical.. . .  I've been restrained a couple of times and you're going to get hurt sometimes during restraint because of the physicality of the restraint." *Id.* at p. 71.  In this case, however, plaintiff claims that his injuries were not merely the product of defendants' legitimate efforts to restrain him, but instead resulted from the use of excessive force. *Id.*

Defendants' rendition is largely consistent with Morris' deposition testimony.  Defendant Steinberg states that when Morris reached to grab something off of the desk with his right hand, the officer immediately tried to take control of the plaintiff's right arm.  Steinberg Decl. (Dkt. No. 20-3) ¶¶ 7-8.  Steinberg recounts that plaintiff pulled his right arm free, and Morris' fist hit him on the right side of the face.  *Id.* at ¶ 8.  Steinberg observed plaintiff place the object into his mouth and alerted Officer

Leeson, who immediately took control of the plaintiff's left arm.  *Id.*

Steinberg states further that together he and Leeson pushed plaintiff's

face first onto the bed and attempted to gain control of his arms in order to

apply restraints.  *Id.* at ¶ 10.  Plaintiff continued to resist, according to

Steinberg, and as they were trying to keep his head and upper torso

down, Steinberg again lost control of Morris' right arm.  *Id.* at ¶ 10.  At that

time, Plummer arrived and assisted Lesson in placing handcuffs on

Morris, while Steinberg maintained control of his lower body.  *Id.* at ¶ 11.

Similar to the plaintiff's approximation, Steinberg estimates that the entire

incident, from the time they entered the cell to the time plaintiff was placed

in restraints, lasted less than two minutes.  Steinberg Decl. (Dkt. No. 20-3)

¶ 19.  Noting that Auburn is a maximum security facility with a large

percentage of inmates incarcerated for violent felonies, Steinberg

emphasizes that the corrections officers had no way of knowing what

Morris had grabbed and placed in his mouth, and that the force used was

intended solely to bring him under control and minimize potential injury to

Morris and the officers involved.  *Id.* at ¶ 20.

Defendants Leeson and Plummer corroborate defendant Steinberg's

version of the events that transpired.  Leeson adds that he did not see

Morris place an object into his mouth, but Corrections Officer Steinberg

alerted him to that fact.  Leeson Decl. (Dkt. No. 2-04) ¶ 8.  Leeson

explains that not knowing the nature of the item, which could have been

drugs or a weapon, his first concern was to secure the safety of the

officers and prevent the plaintiff from creating a medical emergency.  *Id.* at

¶ 9.

Defendant Plummer confirms that when he arrived at the cell,

defendants Leeson and Steinberg were endeavoring to keep Morris

pinned down on the bed and gain control of his arms.  Plummer Dec. (Dkt.

No. 20-5) ¶ 4.  When Plummer entered the cell, Leeson had plaintiff's

wrists under control, and Plummer handcuffed him.  *Id.* at ¶ 6.  As the

defendant corrections officers exited the cell with plaintiff, he started to

resist by collapsing and pulling his weight down.  *Id.* at ¶ 9.  When the

officers and Morris passed the next cell, Plummer observed plaintiff spit a

small package into to the cell, which was later confirmed to contain three

and one-tenth grams of marijuana, four twenty-dollar bills, and what was

believed to be gang-related correspondence folded up into small

packages.  *Id.; see also* Leeson Decl. (Dkt. No. 20-4) ¶ 17.

The record is devoid of any evidence, including Morris' deposition

testimony, that would support the conclusory assertion in his complaint

that during the course of the relatively brief incident he was beaten with a

baton, and kicked, slapped, and punched by the defendant corrections officers.  Similarly, there is no evidence to corroborate plaintiff's claim that he was severely beaten on his right foot, as claimed in plaintiff's grievance.  To the contrary, plaintiff's deposition testimony is consistent in almost all respects with the statements of the defendant corrections officers, including that it took only a minute or so to handcuff plaintiff.  The only significant point of divergence is plaintiff's unsubstantiated testimony that he was struck on his right ankle ten times with a baton after he was handcuffed.  There is nothing in the record to support this conclusory assertion, and the objective medical evidence in the record not only contradicts plaintiff's claim, but wholly supports the defendants' recitation of the events.

As plaintiff virtually conceded toward the conclusion of his deposition, any force required to subdue the plaintiff and secure his compliance with defendants' lawful directives under the circumstances would have likely resulted in minor injuries. [13]  Indeed, the medical evidence in the record, including photographs of plaintiff's injuries, is

---

[13]     By failing to oppose defendants' motion, plaintiff has admitted defendants allegation that they "took only such action as was necessary to bring plaintiff under control and remove him from his cell. . .." and that their actions "were not wanton, malicious or sadistic. . .." Defendants' Local Rule 7.1(a)(3) Statement (Dkt. No. 20-1) ¶¶ 31-32.

consistent with the type of injuries that could be expected to result from an inmate resisting restraint in a confined area containing a metal bed and metal desk.  *See* Scott Decl. (Dkt. No. 20-2) Exhs. B, D.  The SHU entrance examination sheet dated June 27, 2006, which plaintiff was shown and did not dispute at his deposition, notes two abrasions to his left wrist approximately one centimeter in length and three small abrasions of the same size on this right hand on the second joint of the middle finger as well as on his right ankle, knee, and face.  AHR 6/27/06 (SHU Entrance Exam Form).  It was also noted that the skin on Morris' right shoulder was intact, and that no treatment was needed.  *Id.*  The AHR for the next day shows that plaintiff was complaining of discomfort, but there were no specific complaints noted, and plaintiff was given Motrin.  AHR 6/28/06.  A note of July 3, 2006 indicates that upon plaintiff's complaints of right ankle pain, an examination revealed moderate edema; an X-ray was order, and plaintiff was provided with an ace bandage.  AHR 7/03/06.  The X-ray revealed no abnormality.  AHR 7/06/06 (report of x-ray).

In sum, when considering the record as a whole against plaintiff's inconsistent assertions, it seems clear that no reasonable juror could credit plaintiff's testimony that he was brutally beaten by the defendants. Accordingly, I recommend that the court invoke the *Jeffreys* exception to

"pierce the veil of the complaint's factual allegations" and grant the defendants' motion for summary judgement with regard to the claim for excessive use of force.  *Shabazz*, 994 F. Supp. at 470.

III.    SUMMARY AND RECOMMENDATION

The record in this case is devoid of any evidence of personal involvement by the defendants in the plaintiff's medical treatment. Moreover, the evidence in the record before this court provides no basis on which a reasonable factfinder could conclude that the defendants utilized excessive force in restraining the plaintiff, in violation of his Eighth Amendment rights.  I therefore recommend that the defendants' motion for summary judgment be granted in its entirety.[14]

Accordingly, it is hereby respectfully

RECOMMENDED that the defendants' motion for summary judgment (Dkt. No. 20) be GRANTED and that plaintiff's complaint be DISMISSED in its entirety, with prejudice; and it is further

ORDERED, that the clerk amend the court's record to reflect the correct spelling of defendant Troy T. Plummer's name.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed

---

[14]    In view of my recommendation on the merits I do not find it necessary to address defendants' claim that they are entitled to qualified immunity.

with the Clerk of the Court within FOURTEEN days of service of this

report.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d),

72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).


Dated:      March 2, 2011
            Syracuse, NY

David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

**C** Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Lisa ELGAMIL, Plaintiff,
v.
SYRACUSE UNIVERSITY, Defendant.
**No. 99-CV-611 NPMGLS.**

Aug. 22, 2000.

Joch & Kirby, Ithaca, New York, for Plaintiff, Joseph Joch, of counsel.

Bond, Schoeneck & King, LLP, Syracuse, New York, for Defendant, John Gaal, Paul Limmiatis, of counsel.

MEMORANDUM-DECISION AND ORDER

MCCURN, Senior J.

INTRODUCTION

*1 Plaintiff brings suit against defendant Syracuse University ("University") pursuant to 20 U.S.C. § 1681 *etseq.* ("Title IX") claiming hostile educational environment, and retaliation for complaints of same. Presently before the court is the University's motion for summary judgment. Plaintiff opposes the motion.

LOCAL RULES PRACTICE

The facts of this case, which the court recites below, are affected by plaintiff's failure to file a Statement of Material Facts which complies with the clear mandate of Local Rule 7.1(a)(3) of the Northern District of New York. This Rule requires a motion for summary judgment to contain a Statement of Material Facts with specific citations to the record where those facts are established. A similar obligation is imposed upon the non-movant who

shall file a response to the [movant's] Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises.... *Any facts set forth in the [movant's] Statement of material Facts shall be deemed admitted unless specifically controverted by the opposing party.*

L.R. 7.1(a)(3) (emphasis in original).

In moving for summary judgment, the University filed an eleven page, twenty-nine paragraph Statement of Material Facts, replete with citations to the record in every paragraph. Plaintiff, in opposition, filed a two page, nine paragraph statement appended to her memorandum of law which failed to admit or deny the specific assertions set forth by defendant, and which failed to contain a single citation to the record. Plaintiff has thus failed to comply with Rule 7.1(a)(3).

As recently noted in another decision, "[t]he Local Rules are not suggestions, but impose procedural requirements upon parties litigating in this District." *Osier v. Broome County,* 47 F.Supp.2d 311, 317 (N.D.N.Y.1999). As a consequence, courts in this district have not hesitated to enforce Rule 7.1(a)(3) and its predecessor, Rule 7.1(f) [FN1] by deeming the facts asserted in a movant's proper Statement of Material Facts as admitted, when, as here, the opposing party has failed to comply with the Rule. *See,e.g., Phipps v. New York State Dep't of Labor,* 53 F.Supp.2d 551, 556-57 (N.D.N.Y.1999); *DeMar v. Car-Freshner Corp.,* 49 F.Supp.2d 84, 86 (N.D.N.Y.1999); *Osier,* 47 F. Supp .2d at 317; *Nicholson v. Doe,* 185 F.R.D. 134, 135 (N.D.N.Y.1999); *TSI Energy,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Inc. v. Stewart and Stevenson Operations, Inc.,* 1998 WL 903629, at *1 n. 1 (N.D. N.Y.1998); *Costello v.. Norton,* 1998 WL 743710, at *1 n. 2 (N.D.N.Y.1998); *Squair v. O'Brien & Gere Engineers, Inc.,* 1998 WL 566773, at *1 n. 2 (N.D.N.Y.1998). As in the cases just cited, this court deems as admitted all of the facts asserted in defendant's Statement of Material Facts. The court next recites these undisputed facts.

FN1. Amended January 1, 1999.

BACKGROUND

*2 Plaintiff became a doctoral student in the University's Child and Family Studies ("CFS") department in the Spring of 1995. Successful completion of the doctoral program required a student to (1) complete 60 credit hours of course work; (2) pass written comprehensive examinations ("comp.exams") in the areas of research methods, child development, family theory and a specialty area; (3) after passing all four comp. exams, orally defend the written answers to those exams; (4) then select a dissertation topic and have the proposal for the topic approved; and (5) finally write and orally defend the dissertation. Plaintiff failed to progress beyond the first step.

Each student is assigned an advisor, though it is not uncommon for students to change advisors during the course of their studies, for a myriad of reasons. The advisor's role is to guide the student in regard to course selection and academic progress. A tenured member of the CFS department, Dr. Jaipaul Roopnarine, was assigned as plaintiff's advisor.

As a student's comp. exams near, he or she selects an examination committee, usually consisting of three faculty members, including the student's advisor. This committee writes the questions which comprise the student's comp. exams, and provides the student with guidance and assistance in preparing for the exams. Each member of the committee writes one exam; one member writes two. Two evaluators grade each exam; ordinarily the faculty member who wrote the question, and one other faculty member

selected by the coordinator of exams.

Roopnarine, in addition to his teaching and advising duties, was the coordinator of exams for the entire CFS department. In this capacity, he was generally responsible for selecting the evaluators who would grade each student's comp. exam, distributing the student's answer to the evaluators for grading, collecting the evaluations, and compiling the evaluation results.

The evaluators graded an exam in one of three ways: "pass," "marginal" or "fail." A student who received a pass from each of the two graders passed that exam. A student who received two fails from the graders failed the exam. A pass and a marginal grade allowed the student to pass. A marginal and a fail grade resulted in a failure. Two marginal evaluations may result in a committee having to decide whether the student would be given a passing grade. In cases where a student was given both a pass and a fail, a third evaluator served as the tie breaker.

These evaluators read and graded the exam questions independently of each other, and no indication of the student's identity was provided on the answer. FN2 The coordinator, Roopnarine, had no discretion in compiling these grades-he simply applied the pass or fail formula described above in announcing whether a student passed or failed the comp. exams. Only after a student passed all four written exam questions would he or she be permitted to move to the oral defense of those answers.

FN2. Of course, as mentioned, because one of the evaluators may have written the question, and the question may have been specific to just that one student, one of the two or three evaluators may have known the student's identity regardless of the anonymity of the examination answer.

*3 Plaintiff completed her required course work and took the comp. exams in October of 1996. Plaintiff passed two of the exams, family theory and specialty, but failed two, child development and research methods. On each of the exams she failed, she had one marginal grade, and one failing grade. Roopnarine, as a member of her committee,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

authored and graded two of her exams. She passed one of them, specialty, and failed the other, research methods. Roopnarine, incidently, gave her a pass on specialty, and a marginal on research methods. Thus it was another professor who gave her a failing grade on research methods, resulting in her failure of the exam. As to the other failed exam, child development, it is undisputed that Roopnarine neither wrote the question, nor graded the answer.

Pursuant to the University's procedures, she retook the two exams she failed in January of 1997. Despite being given the same questions, she only passed one, child development. She again failed research methods by getting marginal and fail grades from her evaluators. This time, Roopnarine was not one of the evaluators for either of her exam questions.

After this second unsuccessful attempt at passing research methods, plaintiff complained to the chair of the CFS department, Dr. Norma Burgess. She did not think that she had been properly prepared for her exam, and complained that she could no longer work with Roopnarine because he yelled at her, was rude to her, and was otherwise not responsive or helpful. She wanted a new advisor. Plaintiff gave no indication, however, that she was being sexually harassed by Roopnarine.

Though plaintiff never offered any additional explanation for her demands of a new advisor, Burgess eventually agreed to change her advisor, due to plaintiff's insistence. In March of 1997, Burgess and Roopnarine spoke, and Roopnarine understood that he would no longer be advising plaintiff. After that time period, plaintiff and Roopnarine had no further contact. By June of that year, she had been assigned a new advisor, Dr. Mellisa Clawson.

Plaintiff then met with Clawson to prepare to take her research methods exam for the third time. Despite Clawson's repeated efforts to work with plaintiff, she sought only minimal assistance; this was disturbing to Clawson, given plaintiff's past failures of the research methods exam. Eventually, Clawson was assigned to write plaintiff's third research methods exam.

The first time plaintiff made any mention of sexual harassment was in August of 1997, soon before plaintiff made her third attempt at passing research methods. She complained to Susan Crockett, Dean of the University's College of Human Development, the parent organization of the CFS department. Even then, however, plaintiff merely repeated the claims that Roopnarine yelled at her, was rude to her, and was not responsive or helpful. By this time Roopnarine had no contact with plaintiff in any event. The purpose of plaintiff's complaint was to make sure that Roopnarine would not be involved in her upcoming examination as exam coordinator. Due to plaintiff's complaints, Roopnarine was removed from all involvement with plaintiff's third research methods examination. As chair of the department, Burgess took over the responsibility for serving as plaintiff's exam coordinator. Thus, Burgess, not Roopnarine, was responsible for receiving plaintiff's answer, selecting the evaluators, and compiling the grades of these evaluators; [FN3] as mentioned, Clawson, not Roopnarine, authored the exam question.

> [FN3.] Plaintiff appears to allege in her deposition and memorandum of law that Roopnarine remained the exam coordinator for her third and final exam. *See* Pl.'s Dep. at 278; Pl.'s Mem. of Law at 9. The overwhelming and undisputed evidence in the record establishes that Roopnarine was not, in fact, the coordinator of this exam. Indeed, as discussed above, the University submitted a Statement of Material Facts which specifically asserted in paragraph 18 that Roopnarine was removed from all involvement in plaintiff's exam, including the role of exam coordinator. *See* Def.'s Statement of Material Facts at ¶ 18 (and citations to the record therein). Aside from the fact that this assertion is deemed admitted for plaintiff's failure to controvert it, plaintiff cannot maintain, without any evidence, that Roopnarine was indeed her exam coordinator. Without more than broad, conclusory allegations of same, no genuine issue of material fact exists on this question.

**\*4** Plaintiff took the third research methods examination

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

in September of 1997. Clawson and another professor, Dr. Kawamoto, were her evaluators. Clawson gave her a failing grade; Kawamoto indicated that there were "some key areas of concern," but not enough for him to deny her passage. As a result of receiving one passing and one failing grade, plaintiff's research methods exam was submitted to a third evaluator to act as a tie breaker. Dr. Dean Busby, whose expertise was research, was chosen for this task. Busby gave plaintiff a failing grade, and began his written evaluation by stating that

[t]his is one of the most poorly organized and written exams I have ever read. I cannot in good conscience vote any other way than a fail. I tried to get it to a marginal but could not find even one section that I would pass.

Busby Aff. Ex. B.

The undisputed evidence shows that Clawson, Kawamoto and Busby each evaluated plaintiff's exam answer independently, without input from either Roopnarine or anyone else. Kawamoto and Busby did not know whose exam they were evaluating. [FN4] Importantly, it is also undisputed that none of the three evaluators knew of plaintiff's claims of sexual harassment.

> FN4. Clawson knew it was plaintiff's examination because she was plaintiff's advisor, and wrote the examination question.

After receiving the one passing and two failing evaluations, Burgess notified plaintiff in December of 1997 that she had, yet again, failed the research methods exam, and offered her two options. Although the University's policies permitted a student to only take a comp. exam three times (the original exam, plus two retakes), the CFS department would allow plaintiff to retake the exam for a fourth time, provided that she took a remedial research methods class to strengthen her abilities. Alternatively, Burgess indicated that the CFS department would be willing to recommend plaintiff for a master's degree based on her graduate work. Plaintiff rejected both offers.

The second time plaintiff used the term sexual harassment in connection with Roopnarine was six months after she was notified that she had failed for the third time, in May of 1998. Through an attorney, she filed a sexual harassment complaint against Roopnarine with the University. This written complaint repeated her allegations that Roopnarine had yelled at her, been rude to her, and otherwise had not been responsive to her needs. She also, for the first time, complained of two other acts:

1. that Roopnarine had talked to her about his sex life, including once telling her that women are attracted to him, and when he attends conferences, they want to have sex with him over lunch; and

2. that Roopnarine told her that he had a dream in which he, plaintiff and plaintiff's husband had all been present.

Prior to the commencement of this action, this was the only specific information regarding sexual harassment brought to the attention of University officials.

The University concluded that the alleged conduct, if true, was inappropriate and unprofessional, but it did not constitute sexual harassment. Plaintiff then brought this suit. In her complaint, she essentially alleges two things; first, that Roopnarine's conduct subjected her to a sexually hostile educational environment; and second, that as a result of complaining about Roopnarine's conduct, the University retaliated against her by preventing her from finishing her doctorate, mainly, by her failing her on the third research methods exam.

**\*5** The University now moves for summary judgment. Primarily, it argues that the alleged conduct, if true, was not sufficiently severe and pervasive to state a claim. Alternatively, it argues that it cannot be held liable for the conduct in any event, because it had no actual knowledge of plaintiff's alleged harassment, and was not deliberately indifferent to same. Finally, it argues that plaintiff is unable to establish a retaliation claim. These contentions are addressed below.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

DISCUSSION

The principles that govern summary judgment are well established. Summary judgment is properly granted only when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When considering a motion for summary judgment, the court must draw all factual inferences and resolve all ambiguities in favor of the nonmoving party. See Torres v. Pisano, 116 F.3d 625, 630 (2d Cir.1997). As the Circuit has recently emphasized in the discrimination context, "summary judgment may not be granted simply because the court believes that the plaintiff will be unable to meet his or her burden of persuasion at trial." Danzer v. Norden Sys., Inc., 151 F.3d 50, 54 (2d Cir.1998). Rather, there must be either an absence of evidence that supports plaintiff's position, see Norton v. Sam's Club, 145 F.3d 114, 117-20 (2d Cir.), cert. denied, 525 U.S. 1001 (1998), "or the evidence must be so overwhelmingly tilted in one direction that any contrary finding would constitute clear error." Danzer, 151 F.3d at 54. Yet, as the Circuit has also admonished, "purely conclusory allegations of discrimination, absent any concrete particulars," are insufficient to defeat a motion for summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985). With these principles in mind, the court turns to defendant's motion.

*I. Hostile Environment*

Title IX provides, with certain exceptions not relevant here, that

[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a).

Recently, the Supreme Court reiterated that Title IX is enforceable through an implied private right of action, and that monetary damages are available in such an action.

See Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, , 118 S.Ct. 1989, 1994 (1998) (citing Cannon v. University of Chicago, 441 U.S. 677 (1979) and Franklin v. Gwinnett County Pub. Sch., 503 U.S. 60 (1992)).

A. Severe or Pervasive

Provided that a plaintiff student can meet the requirements to hold the school itself liable for the sexual harassment,[FN5] claims of hostile educational environment are generally examined using the case law developed for hostile work environment under Title VII. See Davis, 119 S.Ct. at 1675 (citing Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986), a Title VII case). Accord Kracunas v. Iona College, 119 F.3d 80, 87 (2d Cir.1997); Murray v. New York Univ. College of Dentistry, 57 F.3d 243, 249 (2d Cir.1995), both abrogated on other grounds by Gebser, 118 S.Ct. at 1999.

FN5. In Gebser, 118 S.Ct. at 1999, and Davis v. Monroe County Bd. of Educ., 526 U.S. 629, , 119 S.Ct. 1661, 1671 (1999), the Supreme Court explicitly departed from the respondeat superior principles which ordinarily govern Title VII actions for purposes of Title IX; in a Title IX case it is now clear that a school will not be liable for the conduct of its teachers unless it knew of the conduct and was deliberately indifferent to the discrimination. Defendant properly argues that even if plaintiff was subjected to a hostile environment, she cannot show the University's knowledge and deliberate indifference. This argument will be discussed below.

It bears noting that courts examining sexual harassment claims sometimes decide first whether the alleged conduct rises to a level of actionable harassment, before deciding whether this harassment can be attributed to the defendant employer or school, as this court does here. See, e.g., Distasio v. Perkin Elmer Corp., 157 F.3d 55 (2d Cir.1998). Sometimes, however, courts first examine whether the defendant can be held liable for the conduct,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

and only then consider whether this conduct is actionable. *See,e.g.,Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 767 n. 8 (2d Cir.1998). As noted in *Quinn,* the Circuit has not instructed that the sequence occur in either particular order. *Seeid.*

**\*6** In *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21-22 (1993), the Supreme Court stated that in order to succeed, a hostile environment claim must allege conduct which is so "severe or pervasive" as to create an " 'objectively' hostile or abusive work environment," which the victim also "subjectively perceive[s] ... to be abusive." *Richardson v. New York State Dep't of Corr. Servs .,* 180 F.3d 426, 436 (alteration in original) (quoting *Harris,* 510 U.S. at 21-22). From this court's review of the record, there is no dispute that plaintiff viewed her environment to be hostile and abusive; hence, the question before the court is whether the environment was "objectively" hostile. *Seeid.* Plaintiff's allegations must be evaluated to determine whether a reasonable person who is the target of discrimination would find the educational environment "so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victim['s] educational experience, that [this person is] effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

Conduct that is "merely offensive" but "not severe or pervasive enough to create an objectively hostile or abusive work environment-an environment that a reasonable person would find hostile or abusive" is beyond the purview of the law. *Harris,* 510 U.S. at 21. Thus, it is now clear that neither "the sporadic use of abusive language, gender-related jokes, and occasional testing," nor "intersexual flirtation," accompanied by conduct "merely tinged with offensive connotations" will create an actionable environment. *Faragher v. City of Boca Raton,* 524 U.S. 775, 787 (1998). Moreover, a plaintiff alleging sexual harassment must show the hostility was based on membership in a protected class. *SeeOncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 77 (1998). Thus, to succeed on a claim of sexual harassment, a plaintiff "must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted discrimina[tion] ... because of ... sex." *Id.* at 81 (alteration

and ellipses in original).

The Supreme Court has established a non-exclusive list of factors relevant to determining whether a given workplace is permeated with discrimination so severe or pervasive as to support a Title VII claim. *SeeHarris,* 510 U.S. at 23. These include the frequency of the discriminatory conduct, its severity, whether the conduct was physically threatening or humiliating, whether the conduct unreasonably interfered with plaintiff's work, and what psychological harm, if any, resulted from the conduct. *Seeid.;Richardson,* 180 F.3d at 437.

Although conduct can meet this standard by being either "frequent" or "severe," *Osier,* 47 F.Supp.2d at 323, "isolated remarks or occasional episodes of harassment will not merit relief [ ]; in order to be actionable, the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive." ' *Quinn,* 159 F.3d at 767 (quoting *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995)). Single or episodic events will only meet the standard if they are sufficiently threatening or repulsive, such as a sexual assault, in that these extreme single incidents "may alter the plaintiff's conditions of employment without repetition." *Id.AccordKotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("[t]he incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

**\*7** The University quite properly argues that the conduct plaintiff alleges is not severe and pervasive. As discussed above, she claims that she was subjected to behavior by Roopnarine that consisted primarily of his yelling at her, being rude to her, and not responding to her requests as she felt he should. This behavior is insufficient to state a hostile environment claim, despite the fact that it may have been unpleasant. *See,e.g.,Gutierrez v. Henoch,* 998 F.Supp. 329, 335 (S.D.N.Y.1998) (disputes relating to job-related disagreements or personality conflicts, without more, do not create sexual harassment liability); *Christoforou v. Ryder Truck Rental, Inc.,* 668 F.Supp. 294, 303 (S.D.N.Y.1987) ("there is a crucial difference between personality conflict ... which is unpleasant but legal ... [and sexual harassment] ... which is despicable and illegal."). Moreover, the court notes that plaintiff has

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

failed to show that this alleged behavior towards her was sexually related-an especially important failing considering plaintiff's own testimony that Roopnarine treated some males in much of the same manner. *See,e.g.,* Pl.'s Dep. at 298 ("He said that Dr. Roopnarine screamed at him in a meeting"). As conduct that is "equally harsh" to both sexes does not create a hostile environment, *Brennan v. Metropolitan Opera Ass'n, Inc.,* 192 F.3d 310, 318 (2d Cir.1999), this conduct, while demeaning and inappropriate, is not sufficiently gender-based to support liability. *See Osier,* 47 F.Supp.2d at 324.

The more detailed allegations brought forth for the first time in May of 1998 are equally unavailing. These allegations are merely of two specific, isolated comments. As described above, Roopnarine told plaintiff of his sexual interaction(s) with other women, and made a single, non-sexual comment about a dream in which plaintiff, plaintiff's husband, and Roopnarine were all present. Accepting as true these allegations, the court concludes that plaintiff has not come forward with evidence sufficient to support a finding that she was subject to abuse of sufficient severity or pervasiveness that she was "effectively denied equal access to an institution's resources and opportunities." *Davis,* 119 S.Ct. at 1675.

*Quinn,* a recent Second Circuit hostile work environment case, illustrates the court's conclusion well. There, plaintiff complained of conduct directed towards her including sexual touching and comments. She was told by her supervisor that she had been voted the "sleekest ass" in the office and the supervisor deliberately touched her breasts with some papers he was holding. 159 F.3d at 768. In the Circuit's view, these acts were neither severe nor pervasive enough to state a claim for hostile environment. *See id.* In the case at bar, plaintiff's allegations are no more severe than the conduct alleged in *Quinn,* nor, for that matter, did they occur more often. Thus, without more, plaintiff's claims fail as well.

**\*8** Yet, plaintiff is unable to specify any other acts which might constitute sexual harassment. When pressed to do so, plaintiff maintained only that she "knew" what Roopnarine wanted "every time [she] spoke to him" and that she could not "explain it other than that's the feeling [she] had." Pl.'s Dep. at 283-85, 287, 292. As defendant

properly points out, these very types of suspicions and allegations of repeated, but unarticulated conduct have been shown to be insufficient to defeat summary judgment. *See Meiri,* 759 F.2d at 998 (plaintiff's allegations that employer " 'conspired to get of [her];' that he 'misconceived [her] work habits because of his subjective prejudice against [her] Jewishness;' and that she 'heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us,' ' are conclusory and insufficient to satisfy the demands of Rule 56) (alterations and ellipses in original); *Dayes v. Pace Univ.,* 2000 WL 307382, at *5 (S.D.N.Y.2000) (plaintiff's attempts to create an appearance of pervasiveness by asserting "[t]he conduct to which I was subjected ... occurred regularly and over many months," without more "is conclusory, and is not otherwise supported in the record [and] therefore afforded no weight"); *Quiros v. Ciba-Geigy Corp.,* 7 F.Supp.2d 380, 385 (S.D.N.Y.1998) (plaintiff's allegations of hostile work environment without more than conclusory statements of alleged discrimination insufficient to defeat summary judgment); *Eng v. Beth Israel Med. Ctr.,* 1995 U.S. Dist. Lexis 11155, at *6 n. 1 (S.D.N.Y.1995) (plaintiff's "gut feeling" that he was victim of discrimination was no more than conclusory, and unable to defeat summary judgment). As plaintiff comes forward with no proper showing of either severe or pervasive conduct, her hostile environment claim necessarily fails.

B. Actual Knowledge / Deliberate Indifference

Even if plaintiff's allegations were sufficiently severe or pervasive, her hostile environment claim would still fail. As previously discussed, *see supra* note 5, the Supreme Court recently departed from the framework used to hold defendants liable for actionable conduct under Title VII. *See Davis,* 119 S.Ct. at 1671; *Gebser,* 118 S.Ct. at 1999. Pursuant to these new decisions, it is now clear that in order to hold an educational institution liable for a hostile educational environment under Title IX, it must be shown that "an official who at minimum has authority to address the alleged discrimination and to institute corrective measures on the [plaintiff's] behalf *has actual knowledge of [the] discrimination* [.]" *Gebser,* 118 S.Ct. at 1999 (emphasis supplied). What's more, the bar is even higher: after learning of the harassment, in order for the school to be liable, its response must then "amount to deliberate

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

indifference to discrimination[,]" or, "in other words, [ ] *an official decision by the [school] not to remedy the violation."Id.* (Emphasis supplied). *Accord Davis,* 119 S.Ct. at 1671 ("we concluded that the [school] could be liable for damages only where the [school] itself intentionally acted in clear violation of Title IX by remaining deliberately indifferent to acts of teacher-student harassment of which it had actual knowledge."). This requires plaintiff to show that the school's "own deliberate indifference effectively 'cause[d]' the discrimination." *Id.* (alteration in original) (quoting *Gebser,* 118 S.Ct. at 1999). The circuits that have taken the question up have interpreted this to mean that there must be evidence that actionable harassment continued to occur *after* the appropriate school official gained actual knowledge of the harassment. *See Reese v. Jefferson Sch. Dist.,* 208 F.3d 736, 740 (9th Cir.2000); *Soper v. Hoben,* 195 F.3d 845, 855 (6th Cir.1999); *Murreel v. School Dist. No. 1, Denver Colo.,* 186 F.3d 1238, 1246 (10th Cir.1999); *Wills v. Brown Univ.,* 184 F.3d 20, 26-27 (1st Cir.1999). There is no serious contention that plaintiff can satisfy this requirement.

**\*9** By the time plaintiff complained to Dean Crockett of sexual harassment in August of 1997, it is uncontested that her alleged harasser had no contact with her. Nor, for that matter, did he ultimately have any involvement in the third retake of her exam. She had a new advisor, exam committee and exam coordinator. Quite simply, by that point, Roopnarine had no involvement with her educational experience at all.[FN6] This undisputed fact is fatal to plaintiff's claim. As discussed above, the Supreme Court now requires some harm to have befallen plaintiff *after* the school learned of the harassment. As there have been no credible allegations of subsequent harassment, no liability can be attributed to the University.[FN7] *See Reese,* 208 F.3d at 740 ("There is no evidence that any harassment occurred after the school district learned of the plaintiffs' allegations. Thus, under *Davis,* the school district cannot be deemed to have 'subjected' the plaintiffs to the harassment.").

FN6. Of course, plaintiff contends that the University had notice of the harassment prior to this time, through her complaints to Burgess that she no longer could work with Roopnarine, because he yelled at her, was rude to her, and

refused to assist her with various requests. But it is undisputed that she never mentioned sexual harassment, and provided no details that might suggest sexual harassment. Indeed, as pointed out by defendant, plaintiff *herself* admits that she did not consider the conduct sexual harassment until another person later told her that it might be, in June of 1997. *See* Pl.'s Dep. at 258-59, 340. As a result, plaintiff can not seriously contend that the University was on notice of the alleged harassment before August of 1997.

FN7. As mentioned previously, *see supra* note 3, plaintiff maintains without any evidentiary support that Roopnarine played a role in her third exam. This allegation is purely conclusory, especially in light of the record evidence the University puts forward which demonstrates that he was not, in fact, involved in the examination.

As plaintiff's allegations of harassment are not severe or pervasive enough to state a claim, and in any event, this conduct can not be attributed to the University, her hostile environment claim is dismissed.

*II. Retaliation*

Plaintiff's retaliation claim must be dismissed as well. She cannot establish an actionable retaliation claim because there is no evidence that she was given failing grades due to complaints about Roopnarine. *See Murray,* 57 F.3d at 251 (retaliation claim requires evidence of causation between the adverse action, and plaintiff's complaints of discrimination). The retaliation claim appears to be based exclusively on plaintiff's speculative and conclusory allegation that Roopnarine was involved in or influenced the grading of her third research methods exam.[FN8] In any event, the adverse action which plaintiff claims to be retaliation must be limited to her failing grade on the third research methods exam, since plaintiff made no complaints of sexual harassment until August of 1997, long after plaintiff failed her second examination. *See Murray,* 57 F.3d at 251 (retaliation claim requires proof that defendant had knowledge of plaintiff's protected activity at the time of the adverse reaction); *Weaver v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)
(Cite as: 2000 WL 1264122 (N.D.N.Y.))

*Ohio State Univ.*, 71 F.Supp.2d 789, 793-94 (S.D.Ohio) ("[c]omplaints concerning unfair treatment in general which do not specifically address discrimination are insufficient to constitute protected activity"), *aff'd,* 194 F.3d 1315 (6th Cir.1999).

FN8. As properly noted by defendant, *see* Def. Mem. of Law at 28 n. 14, plaintiff's complaint alleges that a number of individuals retaliated against her, but in her deposition she essentially conceded that she has no basis for making a claim against anyone other than Roopnarine and those who graded her third exam. *See* Pl.'s Dep. at 347-53.

The undisputed evidence establishes that Roopnarine had no role in the selection of who would grade plaintiff's exam. Nor, for that matter, did he grade the exam; this was done by three other professors. Each of these professors has averred that they graded the exam without any input or influence from Roopnarine. More importantly, it is undisputed that none of the three had any knowledge that a sexual harassment complaint had been asserted by plaintiff against Roopnarine, not surprising since two of the three did not even know whose exam they were grading. Plaintiff's inability to show that her failure was causally related in any way to her complaint of harassment is fatal to her retaliation claim.[FN9]

FN9. Plaintiff's claim also fails to the extent that the school's refusal to let her take the research methods exam for a fourth time was the retaliatory act she relies upon. It is undisputed that the University's policies for CFS department students only allow a comp. exam to be given three times. *See* Gaal Aff. Ex. 53. Plaintiff cannot claim that the University's refusal to depart from its own policies was retaliation without some concrete showing that its refusal to do so was out of the ordinary, i.e., that it had allowed other students to take the exam a fourth time without a remedial course, when these other students had not engaged in some protected activity. *See Murray,* 57 F.3d at 251 (there is "no allegation either that NYU selectively enforced its academic standards, or that the decision in

[plaintiff's] case was inconsistent with these standards.").

CONCLUSION

*10 For the aforementioned reasons, Syracuse University's motion for summary judgment is GRANTED; plaintiff's claims of hostile environment and retaliation are DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2000.
Elgamil v. Syracuse University
Not Reported in F.Supp.2d, 2000 WL 1264122 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court, N.D. New York.
Marcus COTTO, Plaintiff,
v.
Daniel SENKOWSKI, Superintendent of Clinton
Annex; T.J. Howard, Hearing Officer; J. Maggy,
Sergeant; Byron Wind, Officer; Barry Rock, Officer;
and Philip Coombe, Jr., Acting Commissioner,
Defendants.
**No. 95-CV-1733 (RSP/DNH).**

Oct. 23, 1997.

Marcus Cotto, Plaintiff, pro se, Auburn Correctional
Facility, Auburn, New York.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, New York,
Darren O'Connor, Esq., Asst. Attorney General, of
Counsel.

MEMORANDUM DECISION AND ORDER

POOLER, D.J.

**\*1** This matter comes to me following a
report-recommendation by Magistrate Judge David N.
Hurd, duly filed on the 29th of August, 1997. Following
ten days from the service thereof, the Clerk has sent me
the entire file, including any and all objections filed by the
parties herein.

In his *pro se* complaint, Cotto alleges that in August 1995,
he and some other inmates were attacked while
incarcerated at Clinton Correctional Facility. Compl., Dkt.
No. 1, ¶ 2. Cotto alleges that as a result of this incident he

was charged with engaging in violent conduct and conduct
which disturbed the order of the facility. *Id.* Although
Cotto was found guilty of these charges and sentenced to
a term of one year in the Special Housing Unit and loss of
six months good time, his sentence was reversed on
administrative appeal. *Id.* Cotto brought this action
pursuant to 42 U.S.C. § 1983, alleging various violations
of his rights under the Eighth and Fourteenth
Amendments. *Id.*

By motion filed March 3, 1997, defendants sought
summary judgment. Dkt. No. 17. Plaintiff filed no papers
in opposition to the motion. In his report-recommendation,
the magistrate judge recommended that I grant defendants'
motion pursuant to Local Rule 7.1(b)(3), which provides
that, absent a showing of good cause, failure to respond to
a motion shall be deemed consent to the relief requested.
Dkt. No. 19, at 2. Cotto has filed no objections to the
report-recommendation.

After careful review of all of the papers herein, including
the magistrate judge's report-recommendation, it is

ORDERED that the report-recommendation is hereby
approved, and it is further

ORDERED that defendants' motion for summary
judgement is GRANTED and the complaint against them
dismissed in its entirety, and it is further

ORDERED that the Clerk of the Clerk serve a copy of this
order on the parties by regular mail.

IT IS SO ORDERED.
DAVID N. HURD, United States Magistrate Judge.

*REPORT-RECOMMENDATION*

This matter was referred to the undersigned by the
Honorable   Rosemary   S.   Pooler,   for

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)
(Cite as: 1997 WL 665551 (N.D.N.Y.))

Report-Recommendation pursuant to the Local Rules of the Northern District of New York.

Plaintiff commenced the above § 1983 action making various allegations regarding violations of his civil rights under the United States Constitution. Pursuant to Fed.R.Civ.P. 56, the defendants have moved for summary judgment alleging that there is no genuine issue as to any material fact and that as a matter of law they are entitled to judgment.

The defendants have filed a motion pursuant to Fed.R.Civ.P. 56 granting summary judgment in favor of the defendants on grounds including that there is no genuine issue as to any material fact, and that the defendant is entitled to judgment as a matter of law.

It is now more than ninety days beyond the date when the response papers were due, and the plaintiff has not filed any papers in opposition to the motion. "Failure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." Rules of U.S. Dist. Ct. for Northern Dist. of N.Y., L .R. 7.1(b)(3).

**\*2** NOW, upon careful consideration of the notice of motion, statement pursuant to Local Rule 7.1(F), with exhibits attached, and the memorandum of law submitted in support of the defendants' motion; and there being no opposition to the motion, it is

RECOMMENDED that the motion be granted and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(I), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(I);

Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Report-Recommendation, by regular mail, upon the parties to this action.

N.D.N.Y.,1997.
Cotto v. Senkowski
Not Reported in F.Supp., 1997 WL 665551 (N.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, N.D. New York.

Anthony ROBINSON, Plaintiff,

v.

Jane DELGADO, Hearing Officer and Lieutenant; and
Donald Selsky, Director of Inmate Special Housing
Program, Defendants.

No. 96-CV-169 (RSP/DNH).

May 22, 1998.

Anthony Robinson, Veterans Shelter, Brooklyn, for
Plaintiff, Pro Se.

Hon. Dennis C. Vacco, Attorney General of the State of
New York, Attorney for Defendants, Albany, Ellen Lacy
Messina, Esq., Assistant Attorney General, of Counsel.

ORDER

POOLER, D.J.

*1 Anthony Robinson, a former inmate incarcerated
by the New York State Department of Corrections
("DOCS"), sued two DOCS employees, alleging that they
violated his right to due process in the course of a
disciplinary proceeding and subsequent appeal. On
September 9, 1997, defendants moved for summary
judgment. Defendants argued that plaintiff failed to
demonstrate that the fifty days of keeplock confinement
that he received as a result of the hearing deprived him of
a liberty interest within the meaning of the Due Process
Clause. Plaintiff did not oppose the summary judgment
motion, and Magistrate Judge David N. Hurd
recommended that I grant it in a report-recommendation
filed April 16, 1998. Plaintiff did not file objections.

Because plaintiff did not file objections, I "need only
satisfy [myself] that there is no clear error on the face of
the record in order to accept the recommendation."
Fed.R.Civ.P. 72(b) advisory committee's note. After
reviewing the record, I conclude that there is no clear error
on the face of the record. After being warned by
defendants' motion that he must offer proof in admissible
form that his disciplinary confinement imposed an
"atypical and significant hardship on the inmate in relation
to the ordinary incidents of prison life," Robinson failed
to offer any such proof. Sandin v. Conner, 515 U.S. 472,
115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995).
Consequently, he cannot maintain a due process challenge.
Id. Therefore, it is

ORDERED that the report-recommendation is
approved; and it is further

ORDERED that defendants' motion for summary
judgment is granted and the complaint dismissed; and it is
further

ORDERED that the Clerk of the Court serve a copy

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

of this order on the parties by ordinary mail.

HURD, Magistrate J.

REPORT-RECOMMENDATION

The above civil rights action has been referred to the undersigned for Report and Recommendation by the Honorable Rosemary S. Pooler, pursuant to the local rules of the Northern District of New York. The plaintiff commenced the above action pursuant to 42 U.S.C. § 1983 claiming that the defendants violated his Fifth, Eighth, and Fourteenth Amendment rights under the United States Constitution. The plaintiff seeks compensatory and punitive damages.

Presently before the court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. However:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P 56(e).

In addition, "[f]ailure to file any papers as required by this rule shall, unless for good cause shown, be deemed by the court as consent to the granting or denial of the motion, as the case may be." L.R. 7.1(b)(3).

*2 The defendants filed their motion on September 9, 1997. The response to the motion was due on October 23, 1997. It is now five months beyond the date when the plaintiff's response was due, and he has failed to file any papers in opposition to defendants' motion.

Therefore, after careful consideration of the notice of motion, affirmation of Ellen Lacy Messina, Esq., with exhibits attached, and the memorandum of law; and there being no opposition to the motion; it is

RECOMMENDED that the motion for summary judgment be GRANTED and the complaint be dismissed in its entirety.

Pursuant to 28 U.S.C. § 636(b)(l), the parties have ten days within which to file written objections to the foregoing report. *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696(1992). Such objections shall be filed with the Clerk of the Court with a copy to be mailed to the chambers of the undersigned at 10 Broad Street, Utica, New York 13501. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(l); Fed.R.Civ.P. 72, 6(a), 6(e); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of HHS,* 892 F.2d 15, 16 (2d Cir.1989); and it is

ORDERED, that the Clerk of the Court serve a copy of this Order and Report-Recommendation, by regular mail, upon the parties to this action.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

(Cite as: 1998 WL 278264 (N.D.N.Y.))

N.D.N.Y.,1998.

Robinson v. Delgado

Not Reported in F.Supp., 1998 WL 278264 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

▷

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Ruben SLACKS, Plaintiff,
v.
GRAY, Correctional Officer, Eastern N.Y. Correctional
Facility; C.O. Farrell; C.O. Hauck; Sgt. Fischer; R.N.
Anthony, Defendants.
No. 9:07-CV-510 (NAM/GJD).

Sept. 29, 2009.
West KeySummary**Prisons 310** ⟜ **192**

310 Prisons

310II Prisoners and Inmates
310II(D) Health and Medical Care
310k191 Particular Conditions and Treatments
310k192 k. In General. Most Cited Cases
**Sentencing and Punishment 350H** ⟜ **1546**

350H Sentencing and Punishment

350HVII Cruel and Unusual Punishment in General
350HVII(H) Conditions of Confinement
350Hk1546 k. Medical Care and Treatment.
Most Cited Cases
    A prison nurse was not deliberately indifferent to
an inmate's medical needs as there was no evidence that
his medical needs were serious. The prison record stated
that the inmate would not answer any of the nurse's
questions, and that she did not observe any abrasions,
contusions, or lacerations. U.S.C.A. Const.Amend. 8; 42
U.S.C.A. § 1983.
Ruben Slacks, Napanoch, NY, pro se.

Andrew M. Cuomo, Attorney General of the State of New
York, Shoshanah V. Bewlay, Christina L. Roberts-Ryba,
Asst. Attorneys General, Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Hon. NORMAN A. MORDUE, Chief Judge.
    **\*1** Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services, brought this
action under 42 U.S.C. § 1983 for civil rights violations
stemming from an alleged assault by defendants Gray,
Farrell, and Fischer. Plaintiff claims that defendant Hauck
was present during the assault but failed to intervene.
Plaintiff also claims he was denied medical care by
defendant Nurse Anthony, was deprived of clothing and
toilet paper overnight, and was later improperly charged
with misbehavior to cover up the assault.

    Defendants moved (Dkt. No. 48) for summary
judgment dismissing the action. Upon referral pursuant to
28 U.S.C. § 636(b)(1)(B) and Local Rule 72.3(c), United
States Magistrate Judge Gustave J. DiBianco issued a
Report and Recommendation (Dkt. No. 52) recommending
that the motion be granted in its entirety.

    Plaintiff has submitted an objection (Dkt. No. 53). In
view of the breadth of plaintiff's objections, the Court
conducts a *de novo* review of all issues pursuant to 28
U.S.C. § 636(b)(1)(C).

    A party moving for summary judgment bears the
initial burden of demonstrating that there is no genuine
issue of material fact and that it is entitled to judgment as
a matter of law. Fed.R.Civ.P. 56(c); *see Celotex Corp. v.
Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d
265 (1986)*. If the Court, viewing the evidence in the light
most favorable to the nonmovant and drawing all
reasonable inferences in nonmovant's favor, determines
that the movant has satisfied this burden, the burden then
shifts to the nonmovant to adduce evidence establishing
the existence of a genuine issue of material fact requiring
a trial. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248-49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)*. A
genuine issue of material fact exists if the evidence is such
that "a reasonable [factfinder] could return a verdict for
the nonmoving party." *Id. at 248.* If the nonmovant fails to
carry this burden, summary judgment is appropriate. See
*Celotex, 477 U.S. at 323-24.*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

Through consistent evidence, including medical records and defendants' declarations, defendants have carried their initial burden of showing that there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Although plaintiff disputes some of defendants' evidence, the Court agrees with Magistrate Judge DiBianco that this is one of the rare cases in which plaintiff's allegations throughout the record are so inconsistent that no reasonable factfinder could find in his favor. Plaintiff gives multiple versions of the events-in his disciplinary hearing testimony, his grievance, his interview in connection with the grievance investigation, his complaint in the instant action, his deposition in the instant action, and his interview with a psychologist from the Office of Mental Health-which are so inconsistent and contradictory that no reasonable juror could believe them. Further, plaintiff's allegations are contradicted by the portions of the medical records that plaintiff does not dispute. Viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor, the Court determines that no reasonable juror could return a verdict for plaintiff. Thus, plaintiff has failed to adduce evidence establishing the existence of a genuine issue of material fact requiring a trial.

*2 It is therefore

ORDERED that the Report and Recommendation of United States Magistrate Judge Gustave J. DiBianco (Dkt. No. 52) is adopted in full; and it is further

ORDERED that defendants' motion (Dkt. No. 48) for summary judgment is granted and the action is dismissed with prejudice.

IT IS SO ORDERED.

### REPORT-RECOMMENDATION

GUSTAVE J. DiBIANCO, United States Magistrate Judge.

This matter has been referred to the undersigned for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that he was assaulted by defendants Gray, Farrell, and Fischer, while defendant Hauck watched, but failed to intervene. Plaintiff also claims that he was denied medical care by defendant Nurse Anthony, and that plaintiff was deprived of clothing and toilet paper over night. Plaintiff also alleges that he was later improperly charged with misbehavior to cover up the assault. Compl. (Dkt. No. 1). Plaintiff seeks substantial monetary relief.

Presently before the court is defendants' motion for summary judgment pursuant to FED. R. CIV. P. 56. (Dkt. No. 48). Plaintiff has responded in opposition to the motion, and defendants have filed a reply. (Dkt.Nos.49, 51). For the following reasons, this court will recommend granting the summary judgment motion and dismissing plaintiff's complaint in its entirety as against all defendants.

### DISCUSSION

**1. Summary Judgment**

Summary judgment may be granted when the moving party carries its burden of showing the absence of a genuine issue of material fact. FED. R. CIV. P. 56; Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "Ambiguities or inferences to be drawn from the facts must be viewed in the light most favorable to the party opposing the summary judgment motion." Id. However, when the moving party has met its burden, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In meeting its burden, the party moving for summary judgment bears the initial responsibility of informing the court of the basis for the motion and identifying the portions of " 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-movant bears the burden of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

proof at trial, the moving party may show that he is entitled to summary judgment by either (1) pointing to evidence that negates the non-movant's claims or (2) identifying those portions of the non-movant's evidence that demonstrate the absence of a genuine issue of material fact. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006) (citing *Celotex Corp.,* 477 U.S. at 23). The second method requires identifying evidentiary insufficiency, not merely denying the opponent's pleadings. *Id.*

**\*3** The Local Rules of the Northern District of New York provide that a motion for summary judgment shall include a Statement of Material Facts, "containing each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established." LOCAL RULES NDNY 7.1(a)(3). The "record" for purposes of the Statement of Material Facts includes the "pleadings, depositions, answers to interrogatories, admissions, and affidavits." *Id.* The Second Circuit has held, however, that in determining whether the moving party has met its burden, the court may not rely solely on the statement of undisputed facts, it must be satisfied that the citation to evidence in the record supports the assertion. *Vermont Teddy Bear Co. v. 1-800 BEARGRAM Co.,* 373 F.3d 241, 244 (2d Cir.2004). If the moving party fails to meet its burden, the court must deny summary judgment even if the opposing party does not present any opposing evidentiary matter. *Id.* (citation omitted).

However, if the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Id.* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Additionally, while a court " 'is not required to consider what the parties fail to point out,' " the court may in its discretion opt to conduct "an assiduous view of the record" even where a party fails to

respond to the moving party's statement of material facts. *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 73 (2d Cir.2001) (citations omitted).

**2. Facts**[FN1]

> [FN1.] On August 27, 2008, Chief Judge Mordue denied plaintiff's motion for summary judgment. (Dkt. No. 47). This court has adopted the facts as stated in Judge Mordue's order and has added the evidence that has been presented in the defendants' papers.

Plaintiff, an inmate in the custody of the New York Department of Correctional Services ("DOCS"), claims that on December 3, 2006, he was on his way to the yard at Eastern Correctional Facility (Eastern), when Corrections Officer (CO) True stopped plaintiff and told him that he was going to be "pat-frisked." Compl. ¶ 1. Plaintiff states that after the frisk was completed by Officers True and Olszewski, plaintiff noticed that one of his bags was not returned to him. Compl. ¶ 2. When plaintiff inquired about the bag, CO True told plaintiff that the bag was contraband. *Id.* Plaintiff states that when he questioned CO True's statement, plaintiff was told that he had "too much of an attitude" and was going to be sent back to his cell. *Id.* Plaintiff states that he was escorted back to his cell by CO True. *Id.* Plaintiff claims that when they got back to the cell block, CO True told plaintiff that he was going to be keeplocked,[FN2] however, the block officer told CO True that he was going to have to "lock [plaintiff] in himself because there were no other officers on the block to do so." Compl. ¶ 3. As a result, plaintiff states that he was taken "up the stairs" to a different area and "locked in" by CO True. *Id.* Plaintiff claims that at approximately 10:20 a.m., the cell door opened, he was handcuffed, and escorted to the Special Housing Unit (SHU) by defendant Fisher and three other officers who have not been named as defendants. *Id.*

> [FN2.] The term "keeplock" refers to disciplinary or administrative confinement in which an inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

**\*4** Plaintiff claims that when they arrived at SHU, he

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

saw various officers, including defendants Gray, Farrell, and Hauck. *Id.* Plaintiff states that he noticed that defendant Gray was putting on, what appeared to be, leather gloves. *Id.* Plaintiff states he was then told to follow defendant Gray into the "frisk room," accompanied by defendants Fisher and Farrell while defendant Hauck stood in the doorway. *Id.* Once inside the "frisk room," plaintiff claims that he was told to place his hands up against the wall, and his glasses were taken away from him by defendant Gray. Compl. ¶ 4. Plaintiff then describes how defendant Gray began punching plaintiff until plaintiff fell to the ground, where plaintiff was "slapped in [the] head and kicked in [the] back, buttocks, and leg area" by defendants Fisher and Farrell. *Id.* Defendant Hauck allegedly stood by and watched the assault without intervening to stop the abuse.

Plaintiff claims that when the beating stopped, defendant Fisher told plaintiff to get up, but plaintiff could not comply with the order because the beating aggravated plaintiff's back injury. Compl. ¶ 5. Plaintiff claims that defendant Fisher stated that defendant Nurse Anthony told him that there was nothing wrong with plaintiff's back, and then defendant Fisher kicked plaintiff in the back again. *Id.* Plaintiff claims that the abuse continued as defendant Farrell dragged plaintiff on the floor and then picked plaintiff up and "slammed" him against the wall. *Id.* Plaintiff claims that defendant Nurse Anthony was called, but that she did not give plaintiff any medical care, rather, she just looked at him and stated "that's a refusal." *Id.*

Plaintiff states that ultimately his clothes were taken away from him and he was forced to spend the night with no clothes and no toilet paper. Plaintiff states that after the incident on December 3, 2006, Nurse Nordé visited plaintiff and asked if he was injured. Compl. ¶ 4. Plaintiff claims that he told Nurse Nordé that he was injured, and although she asked if he wanted medication for the pain, plaintiff told the nurse that he already had a prescription for pain medication, so she only gave him Bacitracin for the laceration on his elbow. *Id.*

Plaintiff states that the next day, someone from "Mental Health" came to visit plaintiff to interview him. Compl. ¶ 6. Plaintiff claims that this individual told plaintiff that defendant Fisher reported that plaintiff was going to kill himself. *Id.* Plaintiff claims that when he told the mental health professional that the statement was a lie, the clinician told the officer to immediately give plaintiff back his clothes. *Id.* Plaintiff states that despite this order, he did not get his clothes, mattress, sheets, and blanket back until approximately five hours later. *Id.* Plaintiff also claims that he told Superintendent Brown about the incident, but that Superintendent Brown told plaintiff that his officers did not "beat up on inmates." Compl. ¶ 7.

**\*5** Plaintiff states that Sergeant Green came to take photographs of his injuries. Plaintiff claims that he was given two fabricated misbehavior reports, one of which alleged that plaintiff banged his own head against the wall during the frisk. *Id.* Plaintiff names CO George Gray; CO Thomas Farrell; Sergeant Ronald D. Fisher; Lt. Raymond Hauck; and Nurse Nancy Anthony as defendants.

Defendants' description of the events of December 3, 2006 is very different than plaintiff's statement. The defendants all agree that plaintiff was escorted to the SHU on December 3, 2006 [FN3] (Fisher Decl. ¶ 7; Farrell Decl. ¶ 4; Gray Decl. ¶ 7). Defendant Gray states that when inmates are admitted to SHU, they are "strip frisked" and searched with a metal detector. (Gray Decl. ¶ 6). Defendant Gray explains that the

> FN3. Defendant Gray's declaration states that plaintiff was escorted to the SHU on December 3, 2008. (Gray Decl. ¶ 7). This incorrect date appears to be a typographical error. There is no debate that plaintiff's allegations relate to events that occurred on December 3, 2006.

purpose of the strip frisk is to maintain security and insure that there are no weapons or contraband on the inmate. A strip frisk involves the inmate placing their hands on the wall and then following the directions to remove clothing. After the strip frisk is conducted, a nurse is called into the room in order to examine the inmate.

*Id.* Defendant Fisher states that when inmates are admitted to SHU, they are also screened for Suicide Prevention. (Fisher Decl. ¶ 6). The screening consists of asking the inmate a series of questions. (Fisher Decl. ¶

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

6).

**A. Defendant Gray**

Defendant Gray states that upon plaintiff's arrival in SHU, plaintiff was taken to the SHU frisk room, and his restraints were removed. (Gray Decl. ¶ 8). Plaintiff was then ordered to place his hands on the order. *Id.* Plaintiff refused to comply with the order, claiming that he could not comply because of a back injury. (Gray Decl. ¶ 9; Fisher Decl. ¶ 8). Plaintiff was again ordered to place his hands on the wall, but instead, he started to bang his head on the wall and fell to the floor. (Gray Decl. ¶ 10). Plaintiff was ordered to stand up and comply with the frisk procedure, but he refused. (Gray Decl. ¶ 11). Defendant Gray states that defendant Hauck then ordered the plaintiff to comply with the order to get up and place his hands on the wall, and plaintiff complied. (Gray Decl. ¶ 12). Defendant Gray states that defendant Nurse Anthony came to SHU to examine the plaintiff, but the plaintiff refused to speak to her. (Gray Decl. ¶ 13).

Defendant Gray states that he did not kick or hit plaintiff at any time during the incident. (Gray Decl. ¶ 16). Defendant Gray also states that if he had witnessed "any sort of assault on the plaintiff," an unusual incident report would have been filed. (Gray Decl. ¶ 17). Defendant Gray states that "there was no assault on the plaintiff whatsoever." (Gray Decl. ¶ 18).

**B. Defendant Fisher**

Defendant Fisher states that he heard plaintiff refuse to comply with the strip frisk because of a "bad back." (Fisher Decl. ¶ 8). Plaintiff "continued to refuse the strip frisk and he began to bang his head against the wall." (Fisher Decl. ¶ 9). Defendant Fisher states that he observed plaintiff fall to the floor, and then refuse several orders to comply with the frisk procedures. (Fisher Decl. ¶ 10). Defendant Fisher then ordered plaintiff to comply with proper procedures, while the other officers attempted to help plaintiff get on his feet. (Fisher Decl. ¶ 11). Defendant Fisher observed defendant Hauck order the plaintiff to stand up, and plaintiff complied. (Fisher Decl. ¶ 12-13). Defendant Fisher then questioned the plaintiff about whether he had any injuries "from banging his head on the fall to the floor." (Fisher Decl. ¶ 14). Defendant Fisher claims that plaintiff stated that he had no injuries. (Fisher Decl. ¶ 15).

**\*6** Defendant Fisher then completed the "Suicide Prevention Screening Guidelines-SHU Admission Form." (Fisher Decl. ¶ 17 & Ex. A). Defendant Fisher states that "[i]n response to questions such as, 'Are you feeling suicidal' or 'Do you feel there is nothing to look forward to in the future', plaintiff responded, 'Yes.' " (Fisher Decl. ¶ 18). Defendant Fisher noted on the form "that plaintiff appeared to be under the influence of alcohol or drugs, was incoherent or otherwise acting in an abnormal manner." (Fisher Decl. ¶ 19). Plaintiff was placed on suicide watch "due to his claims of possible harm," and that the Mental Health Unit was notified. (Fisher Decl. ¶ 20). Plaintiff remained on suicide watch until December 4, 2006. (Fisher Decl. ¶ 21(a) [FN4]). Defendant Fisher states plaintiff continued to behave abnormally throughout the evening. (Fisher Decl. ¶ 21(b)).

> [FN4.] Defendant Fisher's Declaration includes two paragraphs labeled Number 21. For purposes of this Order, the court labels the first one "(a)", and the second one "(b)".

Plaintiff reported injuries to a nurse at approximately 7:30 p.m. on December 3, 2006. (Fisher Decl. ¶ 22). Plaintiff claimed that he had injuries to his right rib cage and right elbow, inflicted by C.O. Gray. [FN5] (Fisher Decl. ¶ 23). Defendant Fisher states that he notified another corrections officer, who then attempted to photograph plaintiff's injuries, but plaintiff refused to leave his cell. (Fisher Decl. ¶¶ 25, 26). The photographs were taken the following day. (Fisher Decl. ¶ 27). Defendant Fisher states that he was present for the entire strip frisk procedure on December 3, 2006, and that plaintiff was never hit by defendant Gray or any other corrections officer. (Fisher Decl. ¶ 29).

> [FN5.] In his declaration, defendant Fisher states that plaintiff complained of injuries "sustained *by* C.O. Gray," (Fisher Decl. ¶ 23) however, it is clear that plaintiff was complaining about his own injuries. There is no indication that defendant Gray suffered any injuries.

**C. Defendant Farrell**

Defendant Farrell states that plaintiff was taken to the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

strip frisk room, and that plaintiff refused to place his hands on the wall after the restraints were removed. (Farrell Decl. ¶ 5-6). Defendant Farrell states that plaintiff stated he could not put his hands on the wall because of a back injury. (Farrell Decl. ¶ 6). Defendant Farrell agrees with the other defendants that plaintiff refused a second order to comply, began banging his head on the wall, fell to the floor, and then began banging his head on the floor. (Farrell Decl. ¶ 7). Plaintiff continued to refuse orders to stand up until defendant Hauck gave the order to do so. (Farrell Decl. ¶ 8-9). Defendant Farrell states that plaintiff refused to speak with defendant Nurse Anthony when she arrived to examine plaintiff. (Farrell Decl. ¶ 10).

Defendant Farrell wrote a misbehavior report against plaintiff, charging him with "violating direct orders and frisk procedures." (Farrell Decl. ¶ 11). At the Tier III disciplinary hearing, plaintiff admitted that he banged his head on the floor and the wall. (Farrell Decl. ¶ 15). Defendant Farrell states that he never hit or kicked the plaintiff during the incident, and that "there was no assault on the plaintiff whatsoever." (Farrell Decl. ¶¶ 21, 22).

**D. Defendant Hauck**

**\*7** Defendant Hauck has been a Corrections Lieutenant at Eastern Correctional Facility since 2003 and has been employed by DOCS for over 25 years. (Hauck Decl. ¶¶ 2, 3). Defendant Hauck's duties include supervising all lower-ranking uniformed officers, serving as a Watch Commander, and supervising all Sergeants and Officers on a given shift. (Hauck Decl. ¶ 4). On December 3, 2006, defendant Hauck was working the day-shift at the facility. (Hauck Decl. ¶ 6). Defendant Hauck states that in order to refresh his recollection regarding this incident, he reviewed a memorandum he wrote to Captain Leghorn regarding plaintiff. *Id.* & Ex. B.[FN6] Defendant Hauck recalls that on arrival at the SHU, plaintiff "was very argumentative, [and] refused to comply with the strip frisk claiming he had back problems." (Hauck Decl. ¶ 8). Defendant Hauck states that

> FN6. Exhibit B to defendant Hauck's declaration is a copy of the memorandum that he wrote to Captain Leghorn.

At the time the plaintiff was admitted to SHU, no staff struck him. In fact the staff stopped the plaintiff from

banging his head on the wall. The plaintiff then let himself fall to the floor, claiming his back went out. Once on the floor he began banging his head on the floor. The Officers attempted to stop him from doing this.

(Hauck Decl. ¶ 9). Defendant Hauck states that if he witnessed an assault on an inmate, he would immediately intervene to stop the assault. (Hauck Decl. ¶ 10). Defendant Hauck states that "at no time was the plaintiff assaulted by Correction Officers." (Hauck Decl. ¶ 11). Defendant Hauck asserts that any injuries that the plaintiff sustained on December 3, 2006 were related to his own "destructive behavior." (Hauck Decl. ¶ 12).

**E. Defendant Nurse Anthony**

Defendant Anthony is a registered nurse, who has been employed by DOCS for 18 years. (Anthony Decl. ¶ 2). Some of defendant Anthony's duties include examining inmates when they are admitted to SHU if requested to do so by the security staff. (Anthony Decl. ¶ 4). Defendant Anthony states when an inmate is being admitted to SHU, he is first strip-frisked by the officers, and then if there is no incident, the inmate is routinely examined by a nurse that is working the evening shift. (Anthony Decl. ¶¶ 5-6). Sometimes, however, a nurse is called into SHU during the day in order to examine an inmate. *Id.* ¶ 6.

When defendant Anthony examines an inmate admitted to SHU, she asks a series of questions regarding the inmate's general health, whether the inmate has allergies, whether he is taking any medications, and whether he has any injuries. (Anthony Decl. ¶ 7). Defendant Anthony states that if she notices that an inmate has injuries or claims that he has been physically assaulted, she notes the injuries in the inmate's Ambulatory Health Record (AHR). *Id.* ¶ 8.

In this case, defendant Anthony states that she examined plaintiff on December 3, 2006 at approximately 11:05 a.m. (Anthony Decl. ¶ 10). Defendant Anthony states that plaintiff refused to answer any of her questions. (Anthony Decl. ¶ 11). The excerpt of plaintiff's AHR submitted with defendant Anthony's declaration shows that defendant Anthony documented plaintiff's examination, noting "no abrasions, contusions, or lacerations." (Anthony Decl. ¶¶ 11-12 & Ex. A) (AHR entry dated

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

12/3/06 at 11:05 a.m.). The AHR shows that Nurse Nordé examined plaintiff at approximately 7:10 p .m. (Anthony Decl. ¶ 13 & Ex. A) (AHR entry of 12/3/06 at 7:10 p.m.). Nurse Nordé documented a "small laceration R elbow," and stated that plaintiff complained of pain in his right ribs. *Id.* Nurse Nordé cleansed the laceration with iodine and issued plaintiff some bacitracin ointment. *Id.* She also wrote that she would order an x-ray for plaintiff the following morning. *Id.* She noted that although plaintiff had no history of hypertension, his blood pressure was 140/102, and she would be checking the blood pressure two times per week while he was in SHU. *Id.*

**\*8** On December 4, 2006, a DOCS employee photographed plaintiff. (Fisher Decl. Ex. C at 1). The first four photographs show plaintiff standing in boxer shorts. (Fisher Decl. Ex. C at 2). The last two photographs are close-up photographs of the small laceration on plaintiff's left elbow, and a view of plaintiff's right side. (Fisher Decl. Ex. C at 3). The photograph of plaintiff's right side show plaintiff pointing at some red marks on his upper right rib cage. *Id.*

A form titled "X-Ray Requisition and Report" shows that Nurse Nordé ordered an x-ray of plaintiff's right ribs. (Anthony Decl. Ex. C). On December 12, 2006, the radiologist wrote that three views of the right rib cage "show[ ] no recent displaced right rib fracture. Right lung expanded & no right pleural effusion. IMP: NO RECENT DISPLACED RIGHT RIB FRACTURE SEEN." *Id.*

Defendant Anthony concludes that plaintiff caused his own injuries while he was in the SHU cell on December 3, 2006. (Anthony Decl. ¶ 18). Defendant Anthony bases her opinion on the fact that plaintiff had no injuries when defendant Anthony examined him at 11:05 a.m., but when Nurse Nordé examined him again at 7:10 p.m., he had a small laceration on his elbow. *Id.*

**3. Medical Care**

In order to state an Eighth Amendment claim based on constitutionally inadequate medical treatment, the plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183-84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id. at 184* (citing inter alia *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)).

In order to meet the first element of the standard, plaintiff must show that he has a sufficiently serious illness or injury. *Id.* (citing *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). A medical condition has been considered "sufficiently serious" when there is a "condition of urgency," one that may result in death, degeneration, or extreme pain. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The seriousness of a plaintiff's medical need may also be determined by reference to the effect of denying the particular treatment. *Sonds v. St. Barnabas Hosp. Correctional Health Services,* 151 F.Supp.2d 303, 310 (S.D.N.Y.2001) (citation omitted). Thus, if unnecessary and wanton infliction of pain results from the denial of treatment, or if the denial of treatment causes the inmate to suffer a lifelong handicap or permanent loss, the condition may be considered "sufficiently serious." *Id.* (citing *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000)).

In order to meet the second element, plaintiff must demonstrate more than an "inadvertent" or negligent failure to provide adequate medical care. *Id.* (citing *Estelle,* 429 U.S. at 105-106). Instead, plaintiff must show that the defendants were "deliberately indifferent" to that serious medical condition. *Id.* In order to rise to the level of deliberate indifference, the defendants must have known of and disregarded an excessive risk to the inmate's health or safety. *Id.* (citing *Chance,* 143 F.3d at 702). The defendants must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and they must draw that inference. *Chance,* 143 F.3d at 702 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)).

**\*9** Disagreement with prescribed treatment does not rise to the level of a constitutional claim. Sonds, 151 F.Supp.2d at 311. Prison officials have broad discretion in

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

determining the nature and character of medical treatment afforded to inmates. *Id.* (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). The fact that plaintiff might have preferred an alternative treatment or believes that he did not get the medical attention he desired does not rise to the level of a constitutional violation. *Id.*

Disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment. *Sonds,* 151 F.Supp.2d at 312 (citing *Estelle,* 429 U.S. at 107). Even if those medical judgments amount to negligence or malpractice, malpractice does not become a constitutional violation simply because the plaintiff is an inmate. *Id. See also Daniels v. Williams,* 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (negligence not actionable under Section 1983). Thus, any claims of malpractice, or disagreement with treatment are not actionable under Section 1983.

In this case, plaintiff's only claim against defendant Anthony is that she did not give him any medical care after the alleged assault. Compl. ¶ 5. The entire claim consists of one sentence in the complaint, stating that when defendant Anthony finally arrived in the room, she looked at plaintiff, stated "that's a refusal," and left. *Id.* Defendant Anthony states that plaintiff refused to answer any questions regarding his condition which would be consistent with her making the comment that plaintiff attributes to her. The medical records are also consistent with defendant Anthony's statement. The AHR entry for 11:05 a.m. on December 3, 2006 merely states that defendant Anthony was asked by "security" to examine plaintiff, but he refused to answer any questions. (Anthony Decl. Ex. A). Her "assessment" was that she observed no abrasions, contusions, or lacerations. *Id.*

In his response to defendants' motion, plaintiff claims that to the extent that the medical records show that Nurse Anthony provided plaintiff medical attention on December 3, 2006, defendant Anthony must have falsified this information.[FN7] (Dkt. No. 49 at ¶ 5). It is unclear what plaintiff means by "medical attention," but defendant

Anthony only recorded what she observed. Assuming that she made the observation that there were no abrasions, contusions, or lacerations, then no "medial attention" was required. There is no claim by defendant Anthony that she did anything else.[FN8] Thus, plaintiff's accusation that defendant Anthony must have falsified records is completely unfounded.

FN7. The court notes that in defendants' reply, they argue that plaintiff failed to properly respond to the defendants' motion. (Dkt. No. 51). They argue that plaintiff did not match his numbered paragraphs to the paragraphs in defendants' statements, and that plaintiff did not cite to specific portions of the record. *Id.* Defendants stated that for this reason, the defendants' Statement of Material Facts" should be deemed admitted. *Id.* The court need not decide this issue, particularly since plaintiff is *pro se,* the court has considered plaintiff's response, and finds that even considering his response, he has not raised a genuine issue of material fact.

FN8. Plaintiff seizes upon one of the statements in defendant Anthony's declaration that plaintiff believes indicates that defendant Anthony claims to have visited plaintiff again at 7:10 p.m. (Anthony Decl. ¶ 18). Defendant Anthony states that "[d]ue to the fact that when I examined plaintiff at 11:05 AM on December 3, 2006, the plaintiff had no injuries and *subsequent to my examination the same day at 7:10 PM,* the record indicates that plaintiff had a small laceration to his elbow...." Plaintiff interprets the highlighted words as defendant Anthony's claim that *she* examined plaintiff at 7:10 p.m. Although the sentence could be interpreted this way because the sentence itself is unclear, *there is no claim by defendant Anthony that she examined plaintiff at 7:10 p.m.* Nurse Anthony has stated, and the documents attached to her declaration confirm, that it was Nurse Nordé who examined plaintiff at 7:10 p.m. (Anthony Decl. ¶ 13 & Ex. A).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

In his response to defendants' motion, plaintiff also states that defendant Anthony's behavior was "way below professional" and was in violation of DOCS regulations governing the administration of treatment to inmates. *Id.* ¶ 11. Even assuming that defendant Anthony's behavior was "unprofessional," negligent, or in violation of DOCS rules,[FN9] this would not rise to the level of a constitutional claim. As stated above, negligence is not actionable under section 1983. *Estelle,* 429 U.S. at 107.

FN9. This court makes no such finding.

**\*10** Based on the evidence in plaintiff's medical records and by plaintiff's own testimony, this court does not find that there was any "serious medical need" to satisfy the first prong of the Eighth Amendment analysis. During his deposition, plaintiff stated that his claim against defendant Anthony is that she denied him medical attention because "she come there, look at me, didn't ask me any questions and leave." Deposition Transcript (DT) at 103 (Dkt. No. 48, Roberts-Ryba Aff. Ex. A). Plaintiff stated that as far as he was concerned, the cut on his elbow was a "serious medical need" because he was bleeding. (DT at 103). Plaintiff later stated that he believed that his elbow laceration was serious because "if a person stay bleeding, he die." (DT at 105).

Although plaintiff claims that defendant Anthony did not give him "medical attention" when she saw him at 11:05 a.m. on December 3, 2006, he admitted during his deposition that at 7:10 p.m. the same day, Nurse Nordé gave him proper medical care. (DT at 104). This "proper medical care" consisted of cleansing a "small laceration" with iodine, issuing plaintiff some bacitracin ointment, and ordering x-rays [FN10] based on plaintiff's complaint of pain in his right rib area. (Anthony Decl. Ex. A). There is no notation by Nurse Nordé that plaintiff had been bleeding extensively or bleeding at all. The laceration was ***small*** and required only cleansing and antibiotic ointment.

FN10. The x-ray requisition report shows that the x-rays were ordered on "12/3/06," the same date as the incident. (Anthony Aff. Ex. C).

The SHU Entrance Form, completed by Nurse Nordé shows that plaintiff had a history of back pain, and he was

already receiving prescription pain medication for his back. (Anthony Decl. Ex. B). Plaintiff testified that Nurse Nordé asked him whether he needed some pain medication for the pain in his rib, but plaintiff refused, stating that he did not need any more pain medication since he already had some for his preexisting "back problem." (DT at 104). Plaintiff had x-rays taken on December 12, 2006, and the x-ray report stated that there were no fractures, the right lung was expanded, and there was no right pleural effusion.[FN11] (Anthony Decl. Ex. C).

FN11. Pleural effusion is an accumulation of excess liquid in the lung, which can be caused by trauma. THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 489-93 (18th Ed.2006).

While plaintiff argues that x-rays would not show if the consistent punching had bruised plaintiff, he stated at his deposition that did not sustain any internal injuries. (DT at 105). Plaintiff stated that he knew that his ribs were "bruised" because there was a "red mark." (DT at 112). However, he also stated that although the red mark lasted two to three days, it never "bruised" at all. (DT at 112). Photographs taken of plaintiff on December 4, 2006 confirm that there was no serious bruising. (Fisher Decl. Ex. C at 3).

In *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir.2006), the Second Circuit held that the objective prong of the Eighth Amendment standard requires the court to examine how the defendant's conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the plaintiff. In this case, there is no evidence that defendant Anthony's conduct was "inadequate." However, it is also clear that a condition of urgency did ***not*** exist for which the denial of medical treatment could have resulted in further significant injury or the unnecessary and wanton infliction of pain.

**\*11** Despite plaintiff's statement that if one continues to bleed, one will die, there is no indication that plaintiff's bleeding, if any, was so severe. Neither the painful rib area, for which plaintiff himself admits he had sufficient pain medication, nor the laceration on his elbow were conditions that could produce death, degeneration or

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

extreme pain. The medical records and plaintiff's own testimony support this finding. Plaintiff testified that after the x-rays, he did not request any follow-up medical care for his injuries, his "red mark" lasted only a couple of days. (DT at 95, 112).

Thus, plaintiff has failed to produce any evidence to contradict the sworn statement of defendant Anthony, corroborated by the clear medical evidence showing that plaintiff did not sustain more than a *de minimis* injury. The medical evidence includes the report of Nurse Nordé, who plaintiff admits gave plaintiff "proper medical care." If the "proper medical care" consisted of cleansing the minor laceration on plaintiff's elbow and issuing some bacitracin ointment, then plaintiff did not have a "serious medical need" within the meaning of the Eighth Amendment.

Finally, regarding the alleged rib injury, the most that Nurse Anthony could have done was schedule x-rays, which were still scheduled for plaintiff the same day by Nurse Nordé. The x-rays confirmed that plaintiff had no rib injury, and no injury to his lung. Plaintiff testified that he had no internal injuries, and the "red mark" disappeared in approximately two days. There is absolutely no evidence to show that plaintiff had a "serious medical need" to which defendant Anthony could have been "deliberately indifferent." Because the court has determined that plaintiff did not have a serious medical need, it need not reach the second prong [FN12] of the Eighth Amendment analysis, and the complaint may be dismissed as against defendant Anthony.

FN12. Defendant Anthony's alleged actions, consisting of her statement that plaintiff's behavior constituted a "refusal" of care, justifying her failure to afford him proper medical care, would be part of the second prong of the Eighth Amendment test. If plaintiff had no "serious medical need," then defendant Anthony's attitude is no longer relevant to the analysis. Having said this, however, the court would point out that at plaintiff's disciplinary hearing, he testified that after the incident, the defendant officers told plaintiff that they had called the nurse, and plaintiff said "nothing's wrong. ***I refuse.***" (Farrell Decl. Ex. B at 10)

(Transcript of Disciplinary Hearing of Dec. 14, 2006) (emphasis added). Plaintiff then stated that when the nurse entered, "she just looked at me and said I refuse to talk to him and walked off." *Id.* It is clear from plaintiff's own testimony that shortly before defendant Anthony came into the room, plaintiff was telling the guards that "nothing" was wrong, and he did not need to see the nurse. It is thus, possible that when defendant Anthony came into the room, plaintiff did refuse to speak with her or answer her questions.

**4. *Excessive Force***

The Second Circuit has recently discussed the analysis of a claim for use of excessive force. *Wright v. Goord,* 554 F.3d 255, 268-69 (2d Cir.2009). The court must first identify the constitutional right that was infringed by the "challenged application of force." *Id.* at 268 (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). After determining that the constitutional right involved is the Eighth Amendment ban on cruel and unusual punishment, the court must judge the validity of the plaintiff's claim by reference to the "specific constitutional standard," and not to "some generalized excessive force standard." *Id.* (quoting *Graham,* 490 U.S. at 394)) (internal quotation marks omitted).

An Eighth Amendment claim of cruel and unusual punishment has two components, one subjective and one objective. *Id.* The subjective component focuses on the ***motive*** for defendants conduct, and requires a showing that the defendant had the necessary "level of culpability," shown by actions that exhibit "wantonness" in light of the particular circumstances surrounding the challenged conduct. *Id.* (citing *inter alia Hudson v. McMillian,* 503 U.S. 1, 7-8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992); *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). The determination of whether action is "wanton" turns upon whether the force "was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson,* 503 U.S. at 7; *Whitely v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.), *cert. denied,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

(1973)).

**\*12** The objective component focuses on the harm done, and the defendants' conduct must be " 'inconsistent with the contemporary standards of decency' and 'repugnant to the conscience of mankind.' " *Whitely,* 475 U.S. at 327. The court must ask itself whether the alleged conduct was objectively "harmful enough to establish a constitutional violation." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8) (internal quotation marks omitted). However, where the defendants' use force maliciously and sadistically, the "contemporary standards of decency" are always violated, whether or not a "significant injury" occurs. *Id.* at 268-69 (quoting *Hudson,* 503 F.3d at 9).

Thus, where a prisoner's claims, together with his evidentiary proffers could "reasonably, if credited, allow a rational fact finder to find that corrections officers used force maliciously and sadistically," then summary dismissal is not appropriate. *Id.* at 269. The court in *Wright* emphasized that the prohibition against cruel and unusual punishment does **not** extend to *de minimis* uses of physical force, provided that the use of force is not "repugnant to the conscience of mankind." *Id.* (quoting *Hudson,* 503 U.S. at 10).

The lack of a serious injury is "relevant," but does not end the inquiry. *Hudson,* 503 U.S. at 7. The extent of the injury must be considered "in context. *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir.2003). The court must determine the need for the force, the relationship between the need and the amount of force used, the extent of the injury suffered, the extent of the threat to the safety of staff and inmates, and any efforts made to temper the severity of a forceful response. *Whitely,* 475 U.S. at 321.

In this case, plaintiff has alleged an excessive use of force in the SHU on December 3, 2006 by defendants Gray, Fisher, and Farrell, while defendant Hauck stood by and watched the assault. Defendants admit that they were present during plaintiff's admission to the SHU, but they deny that they used any force whatsoever against plaintiff.

**A. Defendant Hauck**

Defendants first argue that the case should be dismissed against defendant Hauck because plaintiff has not shown that this defendant was "personally involved" in the alleged incident, even though plaintiff claims that defendant Hauck stood at the doorway and watched the alleged assault. (Def. Memorandum of Law at 12-13) (Dkt .No. 48). Defendants argue that plaintiff has failed to show that defendant Hauck participated in, encouraged, condoned, or was even present during the alleged assault. *Id.* at 12. Defendants cite plaintiff's deposition testimony during which he stated that defendant Hauck watched the assault, but when asked whether defendant Hauck left the doorway at any time, plaintiff stated that he did not "think" that defendant Hauck left. *Id.* (citing DT at 102).

Plaintiff has not accused defendant Hauck of participating in the alleged beating. Plaintiff claims that defendant Hauck watched the assault from the door of the strip-frisk room. However, plaintiff does not need to "establish" that defendant Hauck was present during plaintiff's admission to SHU because defendant Hauck himself *admits* that he was present. (*See* Hauck Dec'l). Defendant Hauck describes in detail observing plaintiff bang his head on the wall, fall to the floor, and bang his head on the floor. (Hauck Decl. ¶ 9). The other defendants state that plaintiff did not get up until defendant Hauck ordered him to do so. (Farrell Decl. ¶¶ 8-9; Gray Decl. ¶ 12; Fisher Decl. ¶¶ 12-13). Thus, it is clear that defendant Hauck was present throughout the incident.

**\*13** While plaintiff does not claim that defendant Hauck participated in the alleged excessive use of force, he claims that defendant Hauck failed to intervene while the other officers were using excessive force. "A law enforcement officer has an affirmative duty to intercede on the behalf of a citizen whose constitutional rights are being violated in his presence by other officers." *Ricciuti v. N. Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997); *O'Neill v. Krzeminski,* 839 F.2d 9 (2d Cir.1988) (citations omitted).

An officer who fails to intervene is liable for the harm that could have been prevented, caused by the actions of the other officers, where that officer observes or has reason to know that excessive force is being used. *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). Liability attaches where there was a "realistic opportunity to intervene to prevent the harm from occurring." *Id.* This

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

rule for law enforcement officers extends to corrections officers. *Parker v. Fogg,* 85-CV-0177, 1994 U.S. Dist. LEXIS 1696, at *8 (N.D.N.Y. Feb. 17,1994) (McCurn, J.). An officer is excused from liability, despite his presence, if the assault is "sudden and brief," such that there is no real opportunity to prevent it. *Ricciuti,* 124 F.3d at 129; *Fogg,* 1994 U.S. Dist. LEXIS 1696, at *8.

Because plaintiff alleges that defendant Hauck was at the door of the strip-frisk room during the incident, and defendant Hauck admits being present during the incident, *if* excessive force had been used against plaintiff, then defendant Hauck would have been responsible for failure to intervene. Thus, this court will not recommend dismissal based on the lack of personal involvement of defendant Hauck and will proceed to consider the merits of the plaintiff's excessive force claim.

**B. Defendants Gray, Farrell, and Fisher**

As stated above, the defendants' version of the incidents of December 3, 2006 is very different from plaintiff's description. Credibility determinations and choices between conflicting versions of the events are matters for a jury and not for the court on summary judgment. *Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996) (citing *inter alia Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 255). There is a very narrow exception to the rule as stated by the Second Circuit in *Jeffreys v. City of New York,* 426 F.3d 549, 553-55 (2d Cir.2005). In *Jeffreys,* the court held that a court may grant summary judgment in the rare circumstance where there is nothing in the record to support plaintiff's allegations, other than his own contradictory and incomplete testimony, and even after drawing all inferences in the light most favorable to the plaintiff, the court determines that "no reasonable person" could believe the plaintiff's testimony. *Id.* at 554-55.

In *Jeffreys,* the Second Circuit cited with approval the district court's opinion in *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 468-71 (S.D.N.Y.1998). *Jeffreys,* 426 F.3d at 555. In *Aziz,* then-District Judge Sonia Sotomayor granted summary judgment in an excessive force case, relying upon the absence of any evidence in the record that corroborated the plaintiff's version of the events, and highlighting the "many inconsistencies and contradictions

within the plaintiff's deposition testimony and affidavits." 994 F.Supp. at 470. The court in *Aziz* found that when the facts alleged by the plaintiff are "so contradictory that doubt is cast upon their plausibility," the court may "pierce the veil of the complaint's factual allegations ... and dismiss the claim." *Id.*

**\*14** The court in *Jeffreys* also distinguished a case in which the Second Circuit reversed the grant of summary judgment in a case in which plaintiff's testimony that he was beaten was supported by photographs showing severe bruises, hospital records showing that he had fractures of the head; by a physician's opinion that plaintiff's injuries were consistent with having been kicked in the head; and that the plaintiff's eye socket fracture could not have been self-inflicted. *Jeffreys,* 426 F.3d at 554-55 (distinguishing *Fischl v. Armitage,* 128 F.3d 50, 56 (2d Cir.1997)).

This court finds that this case is one of those rare exceptions in which plaintiff's allegations are inconsistent throughout the record; there is absolutely no medical evidence to corroborate plaintiff's multiple versions of the events; and a review of the entire record shows that no reasonable person could believe plaintiff's allegations. Plaintiff's multiple versions of the events include his disciplinary hearing testimony, during which he states that defendant Gray punched plaintiff once, causing plaintiff to fall to the floor, and then defendant Gray punched plaintiff once more after plaintiff got up off the floor, causing plaintiff to fall again. (Farrell Decl. Ex. B at 9). However, plaintiff states that when he got up the second time, he complied with the frisk procedure, and that is when defendant Anthony was called. *Id.* at 10. There were no claims of any additional beating.

During the December 14, 2006 disciplinary hearing, plaintiff also admitted banging his head against the wall and on the floor. *Id.* He did state, however, that he engaged in this behavior so that the defendants would stop beating him. In his response to defendants' motion for summary judgment, plaintiff strenuously denies that he ever banged his head on the wall or the floor, stating that if he had done so, there would have been swelling or bruising to his head. (Dkt. No. 49-2 ¶ 3; 49-3 ¶ 5; 49-4 ¶ 4; 49-6 ¶ 3; 49-7 ¶ 3).[FN13] Plaintiff now claims that the tape of the disciplinary hearing was "erroneously" transcribed

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

to the extent that it contradicts his statement that he did not bang his head on the wall or the floor. (Dkt. No. 49-3 ¶ 5).

FN13. Plaintiff has responded in opposition to each defendant's declaration. These citations are to plaintiff's affidavits in response that are all filed under docket number 49.

The court notes, however, that plaintiff's claim that the disciplinary hearing was "erroneously" transcribed is completely implausible because his testimony at the hearing regarding the issue of him banging his head is not simply one sentence that could have been misheard. (Farrell Decl. Ex. B at 10-11). Plaintiff told the hearing officer an entire story regarding the reason that plaintiff banged his head, and even stated that "it didn't hurt because they stopped beating on me and then took me back to my cell." *Id.* at 11. Defendant Farrell testified at the disciplinary hearing, and plaintiff simply asked him "wasn't [sic] you the one that slapped me on my head when I was on the wall." *Id.* at 22. Defendant Farrell denied slapping plaintiff, but plaintiff never asked about any another conduct by defendant Farrell.

**\*15** By the time that plaintiff filed his grievance on December 15, 2006, he alleged that defendant Gray physically attacked plaintiff and defendants Farrell and Fisher kicked and slapped plaintiff while he was "on the floor." (Farrell Decl. Ex. C at 5).FN14 However, when plaintiff was interviewed by Lieutenant Schaller for the grievance investigation, plaintiff stated that he was struck once in the rib area by defendant Gray, but "he was not struck by any other staff members however Sgt. Fisher and Officer Farrell were also present in the room and ... Lt. Hauck was located in the doorway...." (Farrell Decl. Ex. D at 16) (grievance materials). The grievance was denied by the Superintendent because no evidence of physical force was found.FN15 *Id.* at 6.

FN14. Defendants have not numbered the pages of Exhibit C of the Farrell Declaration. Thus, the page referred to by the court is simply the fifth page of the exhibit, not counting the certification of the documents.

FN15. In a memorandum from Captain Leghorn to K. Lucas, the Inmate Grievance Resolution Committee Supervisor, Captain Leghorn points out the inconsistency between plaintiff's written grievance and his interview with Lieutenant Schaller. (Farrell Decl. Ex. D at 15).

By the time that plaintiff filed his complaint in this federal action, he stated that before the alleged assault, defendant Gray put on a pair of leather gloves, plaintiff was punched twice by defendant Gray, and that after plaintiff fell to the floor, he was slapped in the head and kicked in his back, buttocks and leg area by defendants Farrell and Fisher. Compl. ¶ 4. In the complaint, plaintiff added that when defendant Fisher told plaintiff to get up, plaintiff stated that he could not get up because of his back injury, but that defendant Fisher told plaintiff he did not have a back injury and kicked plaintiff again. Comp. ¶ 5. Defendant Fisher told defendant Farrell to make plaintiff stand up, and defendant Farrell dragged plaintiff across the floor causing his elbow to be bruised and "slammed" plaintiff against the wall. *Id.* The complaint continues, stating that after plaintiff put on his SHU clothes, defendant Farrell "yanked my underpants ... up so hard that it bruised my tail bone and slapped me in the back of the head." *Id.*

By the time that plaintiff was deposed in this action, plaintiff claimed that defendant Gray also had kicked plaintiff. (DT at 60, 66). Plaintiff testified that "other people" started kicking him, and that they kicked him in his back and shoulders. (DT at 62-63). Plaintiff stated that defendants Gray, Farrell, and Fisher kicked and punched plaintiff while he was on the floor. (DT at 64). Plaintiff testified that defendant Gray kicked plaintiff more than five times. (DT at 65). Plaintiff stated that defendant Fisher hit plaintiff on the head while he was down on the floor, and that the defendants kicked plaintiff hard for "two or three minutes." (DT at 68). Defendant Fisher also slapped plaintiff on the head and told him to get up. (DT at 69).

At plaintiff's deposition, he did not mention the bruised tail bone. He simply stated that defendant Farrell dragged plaintiff out of the corner, lifted him up by the waist of his pants and his shirt, and pushed plaintiff up

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

against the wall. (DT at 71). At his deposition, plaintiff also elaborated further on the beginning of the story. (DT at 52-56). Plaintiff testified that after defendant Gray punched plaintiff the first time, defendant Farrell told plaintiff to put his hands back up on the wall, and plaintiff told defendant Farrell that "if CO Gray hit me again, I'm going to take my hands back off the wall." (DT at 54-55). Plaintiff stated that he was coming back off the wall and that he was not going to "be on the wall while he keep [sic] punching me like I'm a punching bag." (DT at 55). Plaintiff stated that he intended to defend himself, with his fists if necessary. *Id.* Then plaintiff states that he put his hands back up on the wall, and defendant Gray punched him again. *Id.* Plaintiff did not make any of these statements earlier.

**\*16** As an exhibit, defendants have also included the confidential testimony of the psychologist from the Office of Mental Health (OMH), Ed Rudder, who recommended placing plaintiff on the suicide watch on December 3, 2006 after he was told that plaintiff had told the officers that he would be attempting to commit suicide that night.[FN16] (Roberts-Ryba Aff. Ex. C). Psychologist Rudder interviewed plaintiff on December 4, 2006. *Id.* Plaintiff states in his complaint that when he was interviewed by Psychologist Rudder, plaintiff told him that the officers lied when they reported that plaintiff was threatening suicide. Compl. ¶ 6. Psychologist Rudder testified that plaintiff denied making the suicidal statements, said that he was fine, but that "there must be *some misunderstanding* of some nature." *Id.* (emphasis added). Later plaintiff told Psychologist Rudder that the suicide statement was either a "misunderstanding" or "perhaps it was a fabrication." *Id.*

> FN16. Psychologist Rudder states that he was called at home on Sunday, December 3, 2006, and recommended one-on-one suicide watch until the next morning when Psychologist Rudder went to plaintiff's cell to interview him regarding plaintiff's alleged statement. (Roberts-Ryba Aff. Ex. C at 2).

Psychologist Rudder also testified that he asked the plaintiff about the notation in the log book, stating that plaintiff was banging his head and later that night, was

hiding under his bed. *Id.* Psychologist Rudder testified that plaintiff "reported that he was probably feeling frustrated and wanted to get a little attention and stated he was probably just being a *little dramatic* with his behavior to get some attention...." *Id.* (emphasis added). Plaintiff also told Psychologist Rudder that plaintiff was annoyed that he had been placed in SHU and felt that the placement was unjust. *Id.*

There was absolutely no discussion of an assault or plaintiff being injured. In fact, based on the discussion that plaintiff had with Psychologist Rudder, it appears that plaintiff reacted with frustration and anger about being placed in SHU, but plaintiff attempted to make it clear that there was nothing wrong with him mentally. *Id.* Plaintiff appears to have adjusted his statements based upon the individual to whom he was speaking. Clearly, plaintiff no longer wished to be on suicide watch because that involved a deprivation of clothing and belongings, thus, when he spoke to Psychologist Rudder, he stated that everything was fine and that the "suicide" statement was either a "misunderstanding" or a "fabrication."[FN17] When Psychologist Rudder asked plaintiff why he was banging his head, plaintiff did not tell him that it was so that the defendants would stop beating him as he alleged during the disciplinary hearing, rather, plaintiff stated that he was feeling frustrated and annoyed that he had been placed in SHU unjustly.

> FN17. It is unclear from the testimony who plaintiff is stating fabricated the suicide allegation. However, for purposes of this motion, the court will assume that plaintiff was claiming that one of the defendants fabricated that statement, rather than as an admission that plaintiff fabricated the desire to commit suicide.

All of the above evidence, together with the fact that plaintiff had no injuries other than a scraped elbow, shows that this is one of those actions in which a reasonable jury could *not* find in plaintiff's favor. It is completely implausible that if the events happened as plaintiff currently states, that he would not have had more severe injuries or at least some bruising other than a red mark that disappeared in a few days.[FN18] At his deposition, plaintiff alleged that the defendants kicked him hard and punched

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

him all over his body, from his legs to his back and shoulders, for a period of **two to three minutes.** (DT at 68). Plaintiff claimed that defendant Gray, alone, kicked him more than five times while plaintiff lay on the floor, a claim that plaintiff did not make in the complaint. (DT at 65).

> FN18. The court notes that the SHU Log Book indicates that plaintiff refused to have his pictures taken at 7:50 p.m. on the day of the incident. (Fisher Decl. ¶¶ 24-26 & Ex. B at 7). Defendant Fisher states that after Nurse Nordé informed defendant Fisher that plaintiff was claiming to be injured, defendant Fisher immediately obtained the camera to take pictures, but plaintiff refused. (Fisher Decl. ¶ 24). The pictures were taken on December 4, 2006 at approximately 11:00 a.m. (Fisher Decl. ¶ 27 & Ex. C).

**\*17** Even assuming that plaintiff may have been treated roughly in an attempt to get him up off of the floor as he was hitting his head, causing the scrape on plaintiff's elbow,[FN19] rough treatment does not rise to the level of a constitutional violation. *See Santiago v. Campisi,* 91 F.Supp.2d 665, 674-75 (S.D.N.Y.2000) (citing cases in which *de minimis* uses of force did not rise to the level of constitutional violations). It appears that any conduct that may have resulted in plaintiff's elbow injury was justifiable in an attempt to get plaintiff to stand. Plaintiff's versions of the events are simply at odds with each other and at odds with the medical evidence. Plaintiff's statement to the psychologist is consistent with the statements made by the defendants, that plaintiff behaved the way he did because he was frustrated and angry over being placed in SHU for something that he did not think was justified.[FN20] Thus, based on all of the evidence, this court would recommend dismissal of the complaint as against defendants Gray, Farrell, Fisher, and Hauck.[FN21]

> FN19. It is actually unclear how or when the scrape on plaintiff's elbow was caused, but the court will assume for purposes of this motion that plaintiff's elbow was somehow scraped during the incident.

> FN20. Amazingly enough, plaintiff states in his complaint that the fact that he had no documented mental disorders poses the question why he would "allegedly" bang his head against the wall at numerous times during the pat frisk. Compl. ¶ 7. He refers to this allegation as "utterly ridiculous." *Id.* Plaintiff answered his own question at the disciplinary hearing and in his statement to the psychologist. The court understands that the psychologist testified "confidentially" at the disciplinary hearing, however, the plaintiff cannot use his confidential statements, yet not allow the rest of the statements to be discussed.

> FN21. Since there was no excessive force, defendant Hauck cannot be found liable for failure to intervene.

### 5. *Pattern of Civil Rights Violations*

Plaintiff states that his second cause of action is a "pattern of civil rights violations ..." Compl. at 5. Plaintiff argues that the defendants "made their own Rules on Procedures and Practices which involved a pattern of anti-civil rights activity in the Special housing unit are [sic] causing Plaintiff physical injury and denying Medical attention." *Id.* Defendants argue that the only civil rights violation plaintiff alleges is the incident on December 3, 2006, and that "[b]y definition, on event cannot constitute a pattern." (Dkt. No. 48, Memo. at 24).

Plaintiff has not alleged any facts relating to any alleged constitutional violations other than the incident on December 3, 2006. Plaintiff's allegations of a pattern of civil rights abuses are merely conclusory allegations. *See Kia P. v. McIntyre,* 235 F.3d 749, 763 (2d Cir.2000) ("A plaintiff may not survive a properly asserted motion for summary judgment on the basis of conclusory allegations alone.). Since this court has recommended dismissal of the Eighth Amendment claims for denial of proper medical treatment and excessive force, plaintiff's conclusory claim of a "pattern" of civil rights violations must also be dismissed.

### 7. *Conditions of Confinement*

It is unclear whether plaintiff is claiming that the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3164782 (N.D.N.Y.)

(Cite as: 2009 WL 3164782 (N.D.N.Y.))

conditions of his confinement during the suicide watch were unconstitutional. He states in his complaint that he was placed in a cell with a pad, but no mattress and the lights were very bright.[FN22] Compl. ¶ 5. Plaintiff states that he was given "something like padding" to wear and was refused any toilet paper. Under the Eighth Amendment, an inmate has the right to be free from conditions of confinement that impose an excessive risk to the inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). The Eighth Amendment standard for conditions of confinement is similar to that for medical care.

> FN22. Plaintiff states that they took his tinted glasses away, which made the bright light even more uncomfortable.

**\*18** As in the medical care and excessive force analyses, there is an objective and a subjective prong to the Eighth Amendment analysis with respect to conditions of confinement. *Wilson v. Seiter,* 501 U.S. 294, 297, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Under the objective prong, the plaintiff must show that the deprivation was "sufficiently serious," and the subjective prong is satisfied by showing a sufficiently culpable state of mind on the part of the official responsible for the deprivation. *Id.* In order to be sufficiently serious in a "conditions of confinement" case, the prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities. *Farmer,* 511 U.S. at 834. In order to have the required state of mind, an official must be "deliberately indifferent" to a substantial risk of serious harm to the inmate. *Farmer,* 511 U.S. at 828.

In this case, plaintiff told defendant Fisher that plaintiff would be committing suicide, so plaintiff was placed on a one-on-one suicide watch.[FN23] The suicide watch involves depriving the inmate of his regular clothing and belongings. Even assuming that plaintiff's allegations regarding the conditions are completely true, the deprivation that he suffered would not rise to the level of a constitutional violation. Plaintiff was deprived of the regular mattress and his clothing overnight.[FN24] Plaintiff himself states that his belongings, including a mattress, sheets, and a blanket were returned to him the next day, although not as quickly as he would have liked. Compl. ¶ 7. The hours that plaintiff was without these materials

simply did not deny plaintiff the "minimal civilized measure of life's necessities."[FN25] Thus, assuming plaintiff is attempting to make an Eighth Amendment claim regarding the conditions of his confinement for one day, any such claim may be dismissed.

> FN23. It should be noted that it was Psychologist Rudder that recommended the suicide watch, based upon the notification that plaintiff had indicated that he would commit suicide that night. (Fisher Decl. Ex. B at 2) (SHU Log Book for 10:55 a.m. 12/3/06). This is corroborated by the confidential testimony of Psychologist Rudder. (Roberts-Ryba Aff. Ex. C at 2).

> FN24. Plaintiff also alleges that he was denied toilet paper. Even if this were the case, the denial of toilet paper overnight for one night does not rise to the level of a constitutional violation. The SHU Log Book indicates that plaintiff was removed from the "special watch" at 9:00 a.m. on December 4, 2006. Fisher Aff. Ex. B at 4. The Log Book also indicates that "Mental Health" was on the unit to see plaintiff at 9:29 a.m., and that the one-on-one watch for plaintiff was "finished" at 10:28 a.m. on December 4th. *Id.* at 9.

> FN25. In fact, if plaintiff had actually been suicidal, it could have been a substantial risk to leave him in his cell with materials that he could use to harm himself.

**WHEREFORE** it is hereby

**RECOMMENDED,** that defendants' motion for summary judgment (Dkt. No. 48) be **GRANTED,** and the complaint **DISMISSED IN ITS ENTIRETY.**

N.D.N.Y.,2009.

Slacks v. Gray
Slip Copy, 2009 WL 3164782 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**C**

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Henry BENITEZ, Plaintiff,

v.

HAM, et al., Defendant.

No. 9:04-CV-1159.

Oct. 21, 2009.

Henry Benitez, Malone, NY, for Plaintiff.

Hon. Andrew M. Cuomo, Attorney General for the State of New York, Timothy P. Mulvey, Esq., of Counsel, Syracuse, NY, for Defendants.

**ORDER**

NORMAN A. MORDUE, Chief Judge.

**\*1** The above matter comes to me following a Report-Recommendation by Magistrate Judge George H. Lowe, duly filed on the 30th day of September 2009. Following ten days from the service thereof, the Clerk has

sent me the file, including any and all objections filed by the parties herein.

After careful review of all of the papers herein, including the Magistrate Judge's Report-Recommendation, and no objections submitted thereto, it is

ORDERED that:

1. The Report-Recommendation is hereby adopted in its entirety.

2. Defendants' motion for summary judgment (Dkt. No. 92) is GRANTED IN PART AND DENIED IN PART. The following claims are dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet.

It is further ordered that the following claims are

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

dismissed sua sponte pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against Defendants Weissman and Richards; and (2) the claim against Defendant Selsky.

It is further ordered that the following claims survive summary judgment and sua sponte review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello.

3. The Clerk of the Court shall serve a copy of this Order upon all parties and the Magistrate Judge assigned to this case.

**IT IS SO ORDERED.**

***REPORT-RECOMMENDATION AND ORDER***

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Norman A. Mordue, Chief United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Henry Benitez alleges that 21 employees of the New York Department of Correctional Services ("DOCS") violated his constitutional rights by subjecting him to excessive force, denying him medical care, falsifying misbehavior reports, denying him assistance to prepare for a

disciplinary hearing, and imposing a loaf diet on him as punishment. Currently pending before the Court is Defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. (Dkt. No. 92.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

**I. FACTUAL AND PROCEDURAL SUMMARY**

**\*2** Unless otherwise noted, the facts in this summary are taken from Plaintiff's verified complaint [FN1]. Plaintiff, a New York state prisoner, was transferred to Upstate Correctional Facility on September 14, 2002. (Dkt. No. 1 ¶ 8.) Plaintiff alleges that he was suffering from "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage." (Dkt. No. 1 ¶ 9.) From the time he arrived at Upstate, he made "numerous requests" to Defendant Drs. Evelyn Weissman and Richards to receive a medication called Atarax that had been prescribed to him previously at Auburn Correctional Facility, an MRI of his left wrist and right ankle, and a referral to an orthopedist. (Dkt. No. 1 ¶ 12.) Plaintiff alleges that Defendants Weissman and Richards refused his requests for Atarax, the MRI, and the referral "in retaliation for his having filed numerous formal grievances against them [and other Upstate medical staff members] within a period of two years, and for the purpose of preventing [Plaintiff] from demonstrating in a civil rights action against prison officials the extent of the injuries of his left hand and right foot." (Dkt. No. 1 ¶ 12-13.) Plaintiff alleges that, as a result, he continues to experience severe pain in his left wrist and right ankle, numbness in different areas of his left hand and right foot, an inability to walk or stand for longer than ten minutes, and ongoing severe body itch. (Dkt. No. 1 ¶ 14.)

FN1. Only two of the named Defendants filed affidavits supporting Defendants' motion for summary judgment. Only one of those affidavits-the affidavit of Defendant Dr. Evelyn Weissman-contradicts Plaintiff's version of events.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Regarding Plaintiff's requests for Atarax, Dr. Weissman declares that Atarax is

non-formulary, which means we do not regularly stock that medication, and special approval must be obtained to issue that medication. However, Vistaril and Hydroxyzine is the substitute we use for the same purpose as Atarax. Hydroxyzine is the generic form of Atarax. I prescribed Vistaril for [P]laintiff on October 2, 2002 ... Dr. Richards requested approval for Atarax in April 2004 and it was suggested that [P]laintiff try Claritin, which had become a formulary (regularly stocked) drug. Dr. Richards requested approval for Atarax again in June 2004, and the response was that if the generic (Hydroxyzine) had not worked, it was unclear that the branded drug Atarax would work ... Plaintiff's complaints of itching were not ignored, and he [was] constantly given medication for itching.

(Weissman Aff. ¶¶ 4-10.)

As to Plaintiff's other claims, Dr. Weissman declares:

Regarding [P]laintiff's claim that his request for an MRI was denied, Dr. Richards and I felt, in our medical judgment, an MRI was not warranted. However, because his pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003. Regarding [P]laintiff's claim that his request for an orthopedic consult was denied, that is incorrect. Dr. Richards requested an orthopedic consult for [P]laintiff on August 19, 2003 and [P]laintiff saw an orthopedist on September 4, 2003. The orthopedist ... did not suggest an MRI and determined that [P]laintiff was

improving and "... there is not much else that I can suggest for Henry to improve or accelerate his healing. For the time being, I am just going to suggest that he be patient."

**\*3** (Weissman Aff. ¶¶ 11-13.)

Plaintiff was transferred to Elmira Correctional Facility Reception Center on November 7, 2002, for a court appearance. Upon arrival, Plaintiff informed Defendant Correction Officer Ham that he suffered "ongoing severe pain in his left hand wrist and right foot ankle due to nerve damage, and that the handcuffs and leg irons ... were too tight and causing him swelling and enormous pain." Ham observed that Plaintiff's hands were swollen. However, he refused to remove or loosen the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred to Five Points Correctional Facility three hours later. (Dkt. No. 1 ¶ 9.)

Plaintiff was returned to the Elmira Correctional Facility Reception Center on November 14, 2002. At that time, Plaintiff again informed Defendant Ham that the restraints were too tight and were causing him swelling and extreme pain. Defendant Ham "again verbally acknowledged that [Plaintiff]'s hands were ... swollen" but refused to remove the restraints. Plaintiff remained in the restraints, suffering enormous pain and swelling, until he was transferred out of the facility three hours later. (Dkt. No. 1 ¶ 10.)

On January 2, 2003, Defendant Correction Officers Nephew and Desotelle strip-frisked Plaintiff [FN2] in preparation for transferring Plaintiff for a court appearance. Defendant Sgt. Snyder was also in the room. When they had completed the search, Defendant Nephew ordered Plaintiff to put on his coat. Plaintiff told Nephew

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

that wearing the coat would "severely aggravate his continuing body itch stemming from his hepatitis virus." (Dkt. No. 1 ¶ 15.) Defendant Snyder called Plaintiff a "spick" and threatened to forcibly put the coat on Plaintiff. Plaintiff told Defendants Snyder, Nephew, and Desotelle that he would sue them if they used force. (Dkt. No. 1 ¶ 15.)

> FN2. Plaintiff does not allege that the strip-frisk violated his constitutional rights. Even if he did, I would find that such a claim would not survive *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B). Strip searches conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner. *Frazier v. Ward,* 528 F.Supp. 80, 81 (N.D.N.Y.1981). "However, a strip search is unconstitutional if it is unrelated to any legitimate penological goal or if it is designed to intimidate, harass, or punish. *See, e.g., Iqbal v. Hasty,* 490 F.3d 143, 172 (2d Cir.2007) (pretrial detainee alleged Fourth Amendment violation where he was subjected to repeated strip and body cavity searches that were not related to legitimate government purposes and designed to punish); *Covino,* 967 F.2d at 80 (strip search accompanied by physical and verbal abuse is unconstitutional); *Hodges v. Stanley,* 712 F.2d 34, 35-36 (2d Cir.1983) (second strip search performed soon after a first strip search served no legitimate interest when prisoner was under continuous escort); *Jean-Laurent v. Wilkerson,* 438 F.Supp.2d 318, 323 (S.D.N.Y.2006)." *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, at *1, 2008 WL 1787692, at *9 (E.D.N.Y. Apr. 17, 2008). Plaintiff does not allege, and the evidence does not show, that Defendants conducted the strip-frisk with an intent to intimidate, harass, or punish Plaintiff.

Shortly thereafter, Defendant Lt. Wright approached

Plaintiff and asked him if he had spit at staff. Before Plaintiff could respond, Defendant Wright ordered several guards to get a video camera and put a "spittle mask" on Plaintiff. After the guards did so, Defendant Wright escorted Plaintiff to his cell. He asked Plaintiff to explain what had happened in the frisk room. Plaintiff said that Defendant Wright would not believe his account of the incident, accused Defendant Wright of interfering with his court trip and unjustifiably putting a spittle mask on him, and said he would sue Defendants Wright and Snyder. Defendant Wright told Plaintiff that "transportation vans don't have cameras. You're going to learn not to spit ... [at] staff and ... threaten us with lawsuits." (Dkt. No. 1 ¶ 16.)

After Defendant Wright left Plaintiff's cell, Defendant Capt. Bezio approached and asked Plaintiff to explain what happened in the frisk room. Plaintiff told Defendant Bezio what had happened, denied that he had threatened to spit at a staff member, and asked Defendant Bezio to protect him while he was being transported to court. Defendant Bezio told Plaintiff to be "up and ready to go to court" and that "people don't like to get spat ... on."[FN3] (Dkt. No. 1 ¶ 19.)

> FN3. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Bezio for these statements because (1) Plaintiff did not exhaust his administrative remedies regarding the statements; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Bezio based on the statements. Rather, he included this allegation in his complaint to provide relevant information for his failure to intervene claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**\*4** On January 3, 2003, Defendant Correction Officer Duprat escorted Plaintiff to the transportation van. Defendant Duprat told Plaintiff to "remember what we told you about the van." [FN4] As they were walking, Plaintiff saw Defendant Bezio and told him that Defendant Duprat had threatened to "employ physical abuse" against him in the van. Defendant Bezio shrugged his shoulders. (Dkt. No. 1 ¶ 20.) Defendant Duprat drove Plaintiff in a van to a different building, where he called Defendant Snyder "to arrange a beating" of Plaintiff. After the phone call, Defendant Duprat drove Plaintiff back to the first building. When they arrived, Defendant Snyder entered the rear section of the van and told Plaintiff that "you like ... suing us. Wright, my boss, doesn't like that and sent this as a reminder." Defendant Snyder then punched and slapped Plaintiff, who was in handcuffs and leg irons, in the face and the back of his head, knocking him unconscious. When Plaintiff revived, Defendants Duprat and Correction Officer Bogett entered the rear section of the van and punched and slapped Plaintiff several times in the head, chest, and right ear. When Plaintiff began to bleed from his right inner ear, Defendants Duprat and Bogett tied a spittle mask on Plaintiff's head. (Dkt. No. 1 ¶¶ 21-22.)

FN4. In their motion for summary judgment, Defendants argue that Plaintiff cannot maintain a claim against Defendant Duprat for this statement because (1) Plaintiff did not exhaust his administrative remedies regarding the statement; and (2) threats are not actionable constitutional violations. (Dkt. No. 92-10 at 35-36.) In his opposition to the motion, Plaintiff states that he did not intend to maintain a separate claim against Defendant Duprat based on the statement. Rather, he included it in his complaint to provide relevant information for his excessive force claim. (Dkt. No. 109 at 48.) Therefore, I will not address Defendants' arguments regarding these statements.

When Plaintiff arrived at Five Points Correctional

Facility later that day, he notified Defendant Nurse Hensel that he had been bleeding from his inner right ear due to a beating by Upstate officials, that he was suffering severe pain in his head and right ear, and that he wanted to be examined by a doctor. Defendant Hensel refused to examine Plaintiff, made no record of his complaints, and refused to schedule Plaintiff to see a doctor.[FN5] (Dkt. No. 1 ¶ 23.)

FN5. The medical records produced by Defendants in support of their motion for summary judgment do not reflect that Plaintiff saw Nurse Hensel on January 3, 2003. However, as the Court has noted previously (Dkt. No. 99 at 3), a SHU log book entry for January 3, 2003, indicates that Plaintiff was "taken to strip frisk room for pictures and to be assessed by R/N Hensel." (Defs.' Resp. to P.'s 1st Req. for Prod. of Docs., Ex. E at 11.) This document corroborates Plaintiff's claim that he saw Defendant Hensel on January 3, 2003. I note, however, that none of the parties included the log book entry in their moving or opposing papers.

Plaintiff's medical record from Five Points indicates that on January 3, 2003, the day he arrived, Plaintiff was seen by Nurse Nancy O'Connor Ryerson. She noted that Plaintiff arrived via van with cuffs and chains and spit net, and that he complained of pain and itching. "It was noted that he takes Naprosyn and Benadryl, and he was escorted to 12 Building. Apparently Naprosyn was not sent with him and it is a medication for which he would need a prescription from a doctor. Since this was not an emergency, the procedure is to place the inmate on the regular physician call-out list for an appointment. Nurse Ryerson also noted that he was Hepatitis C positive." (Bannister Aff. ¶ 5.)

On January 4, 2003, Plaintiff notified Defendant Nurse Goodwin [FN6] that he needed emergency medical

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

treatment because of severe pain in his liver, left wrist, and right ear, and that he wanted medicine for his severe body itch. Defendant Goodwin refused to examine Plaintiff, made no record of his complaints, and did not provide any treatment to Plaintiff. (Dkt. No. 1 ¶ 24.)

> FN6. The complaint refers to this defendant as Nurse "Good." However, Defendants state that her name is actually Goodwin. (Dkt. No. 92-10 at 1 n. 1.) I will refer to her as Nurse Goodwin.

Plaintiff's medical records from Five Points indicate that on January 4, 2003, Plaintiff was seen by Nurse "Goon" at his cell after security staff told the nurse that Plaintiff stated his asthma was acting up. Nurse "Goon" 's note indicated that Plaintiff never acknowledged shortness of breath and that she checked Plaintiff's transfer form and the computer and found that he had no history of asthma. (Bannister Aff. ¶ 6.)

**\*5** On January 5, 2003, Plaintiff alleges that he informed Defendant Nurse Kuhlman [FN7] that he had been bleeding from his inner right ear and that he was suffering from an ongoing, extreme body itch due to his hepatitis C and B virus. Defendant Kuhlman told Plaintiff that she would review his medical chart and return to him. Defendant Kuhlman refused to examine Plaintiff, made no record of his medical complaints, and refused to provide treatment. (Dkt. No. 1 ¶ 25.)

> FN7. The complaint refers to this defendant as Nurse Coleman. As discussed further below, Plaintiff did not serve this defendant. In his opposition to the motion for summary judgment, Plaintiff states that he ultimately learned through discovery that her name is actually Nurse Kuhlman. (Dkt. No. 109 at 6 n. 2.) I will refer to this defendant as Nurse Kuhlman.

Plaintiff's medical records from Five Points show that Defendant Kuhlman saw Plaintiff on January 5, 2003. Her note indicates that she went to his cell for his 4:00 p.m. medications and he complained about the way she distributed the medication [FN8]. He stated that the nurse would be getting a grievance. He was uncooperative and argumentative. (Bannister Aff. ¶ 7.)

> FN8. It is not clear what medications Nurse Kuhlman was distributing, since the Affidavit of Linda Bannister establishes that "nurses cannot give medications until they verify allergies and prescription orders" and that as of January 6, the day after Nurse Kuhlman saw Plaintiff, this verification had not been completed. (Bannister Aff. ¶ 8.)

On January 6, 2003, Plaintiff informed Defendant Nurse Costello that he needed treatment due to great pain in his right ear and his ongoing severe body itch. Defendant Costello refused to examine Plaintiff's right ear, made no record of his medical complaint, and refused to promptly provide medical treatment. (Dkt. No. 1 ¶ 26.)

Plaintiff's medical records from Five Points show that Defendant Costello saw him on January 6, 2003. She noted that he was complaining that he needed an emergency prescription for severe headache and severe itching. She noted that he requested a prompt examination by a physician. She instructed him that she would have to find the chart or the transfer paperwork because nurses cannot give medications until they verify allergies and prescription orders. (Bannister Aff. ¶ 8.)

Plaintiff's medical records from Five Points show that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

he was seen again the next day by Defendant Costello. Plaintiff's chart was still not available, and he again requested a prescription for itching, Hepatitis C, and a physical exam. Defendant Costello again noted that she would have to verify his requests and then possibly schedule an appointment. (Bannister Aff. ¶ 9.)

Plaintiff's medical records from Five Points show that he was seen later that day by non-defendant Nurse Gardner at the request of security staff. Plaintiff stated "I was knocked out and beaten everywhere" and claimed that he had a lump on his head. Nurse Gardner examined him and noted no redness, bruising, or bump on head. (Bannister Aff. ¶ 10.)

Plaintiff alleges that Wright, Nephew, Desotelle, and Snyder retaliated against him for his threat to sue them by filing false misbehavior reports. (Dkt. No. 1 ¶¶ 17-18.) Defendant Correction Officer LaClair was assigned to assist Plaintiff with preparing for the subsequent disciplinary hearing. (Defs.' Ex. 14.)

According to a misbehavior report filed by Defendant LaClair, when he went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get him what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant La Clair "informed him the interview was over and left the area." (Defs.' Ex. 15 at 2-3.) Plaintiff alleges that Defendant LaClair "falsified [the] misbehavior report against [Plaintiff] in order to refrain" from assisting Plaintiff. (Dkt. No. 1 ¶ 35.)

*6 On January 15, 2003, Defendant Bullis arrived at Plaintiff's cell and informed him that he would conduct the disciplinary hearing that day. He asked Plaintiff whether he wanted to attend the hearing. Plaintiff said that he did

not because Defendant LaClair had not assisted him, but asked Defendant Bullis to interview Defendant LaClair and an inmate witness about the events leading to Defendant LaClair's refusal to provide assistance. Plaintiff asked Defendant Bullis not to impose a loaf diet as a punishment if he found Plaintiff guilty because the loaf diet caused Plaintiff severe abdominal pains and constipation due to his hepatitis. (Dkt. No. 1 ¶ 36.)

Defendant Bullis did not interview Defendant LaClair or the inmate witness. He found Plaintiff guilty and imposed a penalty of 21 days of the loaf diet. (Dkt. No. 1 ¶ 37.) Plaintiff alleges that Defendants Weissman and Girdich "maliciously" approved the penalty in "reckless disregard" of the pain it would inflict on Plaintiff. (Dkt. No. 1 ¶ 38.) Plaintiff alleges that "[d]ue to the danger that the ... loaf diet posed" to his well-being, he refused to eat it. As a result, he lost 33 pounds and suffered severe abdominal pains and emotional distress that exacerbated his hepatitis. (Dkt. No. 1 ¶ 39.)

Plaintiff alleges that Defendants Brousseau, Donelli, Selsky, Girdich, and Eagen mishandled the grievances and appeals he filed or attempted to file regarding his claims. (Dkt. No. 1 ¶¶ 28-34, 40.)

Plaintiff filed this lawsuit on October 6, 2004. The parties proceeded to discovery, which proved contentious. Plaintiff successfully moved to compel responses to his discovery requests, and thereafter filed four motions for sanctions seeking Defendants' compliance with the order compelling discovery. (Dkt.Nos.56, 73, 94, 103.) I granted each of those motions in part. (Dkt. Nos.62, 79, 99, 107.) As is relevant here, I ruled that because not all of the pages of the Five Points Movement and Control Log Book for November 14, 2003, had been provided to Plaintiff before the original was destroyed, Plaintiff could ask the Court to draw factual inferences favorable to him. (Dkt. No. 99 at 2.) I ruled that because Defendants could not locate the SHU log book for January 2003, Plaintiff could

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

"ask the Court to draw factual inferences favorable to him based upon the missing pages for January 14, 2003" in opposition to Defendants' motion for summary judgment. (Dkt. No. 99 at 1-2.) I noted that Defendants had told Plaintiff that photographs taken of him on January 10, 2003, would be produced but that, without explanation, Defendants could no longer find the photographs. Accordingly, I ruled that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 99 at 2-3.) I ordered that if photographs taken of Plaintiff on January 3, 2003, no longer existed, Plaintiff could similarly request favorable inferences. (Dkt. No. 99 at 3.)

**\*7** On March 16, 2009, Plaintiff again moved for sanctions. (Dkt. No. 103.) I noted that the photographs from January 3 and 10, 2003, were still missing. (Dkt. No. 107 at 1.) I reiterated that Plaintiff could ask the Court to draw factual inferences favorable to him based upon the missing photographs. (Dkt. No. 107 at 2.)

Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 92.) Plaintiff has opposed the motion. (Dkt. No. 109.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Major League Baseball Properties, Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Only after the moving party has met this burden is the non-moving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord,* 467 F.3d 263, 272-73 (2d Cir.2006). The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." [FN9] Rather, "[a] dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN10] In determining whether a genuine issue of material [FN11] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN12]

FN9. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585-86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also* Fed.R.Civ.P. 56(e) ("When a motion for summary judgment is properly made [by a defendant] and supported [as provided in this rule], the [plaintiff] may not rely merely on allegations ... of the [plaintiff's] pleading ....").

FN10. *Ross v. McGinnis,* No. 00-CV-0275, 2004 U.S. Dist. LEXIS 9367, at * 20-21, 2004 WL 1125177, at *8 (W.D.N.Y. Mar.29, 2004) (internal quotations omitted) (emphasis added).

FN11. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN12. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273-74 (2d Cir.1968) (citations omitted); *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Moreover, even where a defendant has not advanced such a failure-to-state-a-claim argument on a motion for summary judgment, a district court may, *sua sponte,* address whether a *pro se* prisoner has failed to state a claim upon which relief may be granted. FN13 For these reasons, it is appropriate to briefly summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

FN13. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint,

or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

**\*8** Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Federal Rule of Civil Procedure 8(a)(2); FN14 or (2) a challenge to the legal cognizability 14 of the claim. FN15

FN14. *See* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") (citations omitted); *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ( "The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN15. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") (citation omitted); *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") (citation omitted); *Util. Metal Research & Generac Power Sys., Inc.,* No. 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993, at *1-2 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 333 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* No. 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12(b)(6) motion-one aimed at the sufficiency of the pleadings under Rule 8(a), and the other aimed at the legal sufficiency of the claims).

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) (emphasis added). By requiring this "showing," Rule 8(a)(2) requires that the pleading contain a short and plain statement that

"give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." [FN16] The main purpose of this rule is to "facilitate a proper decision on the merits." [FN17] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." [FN18]

FN16. *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (citation omitted; emphasis added); *see also Swierkiewicz,* 534 U.S. at 512 (citation omitted); *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (citation omitted).

FN17. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") (citation omitted); *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") (citations omitted).

FN18. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion); *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* No. 98-CV-0293, 1998 U.S. Dist.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

LEXIS 8750, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J.). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 (2d Cir.1996)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.' A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* --- U.S. ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556-57, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged-but has not *shown*-that the pleader is entitled to relief." *Iqbal,* 129 S.Ct. at 1950 (emphasis added).

It should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." FN19 "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "FN20 In other words, while all pleadings are to be construed liberally under Rule 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality.

FN19. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) (citation omitted); *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN20. *Hernandez,* 18 F.3d at 136 (citation omitted); *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) (citations omitted); *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) (citation omitted).

For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.FN21 Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." FN22 Furthermore, when addressing a *pro se* complaint, *generally* a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." FN23 Of course, an opportunity to amend is not required where the plaintiff has already amended his complaint.FN24 In addition, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." FN25

FN21. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* No. 96-CV-7544, U.S. Dist. LEXIS 18131 1997 WL 714878, at * 1, n. 2,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

1997 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) (citations omitted), *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) (citations omitted).

FN22. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted).

FN23. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN24. *Yang v. New York City Trans. Auth.,* No. 01-CV-3933, 2002 U.S. Dist. LEXIS 20223, 2002 WL 31399119, at *2 (E.D.N.Y. Oct.24, 2002) (denying leave to amend where plaintiff

had already amended complaint once); *Advanced Marine Tech. v. Burnham Sec., Inc.,* 16 F.Supp.2d 375, 384 (S.D.N.Y.1998) (denying leave to amend where plaintiff had already amended complaint once).

FN25. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) (citation omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) (citation omitted); *see, e.g., See Rhodes v. Hoy,* No. 05-CV-0836, 2007 U.S. Dist. LEXIS 48370, 2007 WL 1343649, at *3, 7 (N.D.N.Y. May 5, 2007) (Scullin, J., adopting Report-Recommendation of Peebles, M.J.) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the error in his complaint-the fact that plaintiff enjoyed no constitutional right of access to DOCS' established grievance process-was substantive and not formal in nature, rendering repleading futile); *Thabault v. Sorrell,* No. 07-CV-0166, 2008 U.S. Dist. LEXIS 62919, 2008 WL 3582743, at *2 (D.Vt. Aug. 13, 2008) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint because the errors in his complaint-lack of subject-matter jurisdiction and lack of standing-were substantive and not formal in nature, rendering repleading futile) (citations omitted); *Hylton v. All Island Cab Co.,* No. 05-CV-2355, 2005 WL 1541049, at *2 (E.D.N.Y. June 29, 2005) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the errors in his complaint-which included the fact that plaintiff alleged no violation of either the Constitution or laws of the United States, but only negligence-were substantive and not formal in nature, rendering repleading futile); *Sundwall v. Leuba,* No.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

00-CV-1309, 2001 U.S. Dist. LEXIS 737, 2001 WL 58834, at *11 (D.Conn. Jan.23, 2001) (denying *pro se* plaintiff opportunity to amend before dismissing his complaint arising under 42 U.S.C. § 1983 because the error in his complaint-the fact that the defendants were protected from liability by Eleventh Amendment immunity-was substantive and not formal in nature, rendering repleading futile).

**\*9** However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit has observed),[FN26] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Rules 8, 10 and 12.[FN27] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Rules 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN28] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN29]

FN26. *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 U.S.App. LEXIS 17113, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *see also Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") (citation omitted).

FN27. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519, 92 S.Ct.

594, 30 L.Ed.2d 652 (1972), did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) (unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit); *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN28. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") (citation omitted); *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ] or prejudice the adverse party").

FN29. *Stinson v. Sheriff's Dep't of Sullivan County.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

## III. ANALYSIS

### A. Weissman/Richards Health Care

Plaintiff alleges that Defendant Drs. Weissman and Richards violated his Eighth Amendment right to adequate medical care by prescribing an ineffective medication for his body itch, refusing to order an MRI of his left wrist and right ankle, and refusing to refer him to an orthopedist. (Dkt. No. 1 ¶ 12.) Defendants move for summary judgment of these claims, arguing that (1) Plaintiff did not suffer from a serious medical need; and (2) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.)

### 1. Eighth Amendment Standard

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments. The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment. _Estelle v. Gamble,_ 429 U.S. 97, 102-03, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society." _Estelle,_ 429 U.S. at 102. Thus, the Eighth Amendment imposes on jail officials the duty to "provide humane conditions of confinement" for prisoners. _Farmer v. Brennan,_ 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Thus, prison officials must "ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " _Farmer,_ 511 U.S. at 832 (quoting _Hudson v. Palmer,_ 468 U.S. 517, 526-27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)).

A viable Eighth Amendment claim must contain both an objective and a subjective component. _Farmer,_ 511 U.S. at 834. To satisfy the objective component, "the deprivation alleged must be, objectively, 'sufficiently serious.' " _Id._ (quoting _Wilson v. Seiter,_ 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)). Analyzing the objective element of an Eighth Amendment medical care claim requires two inquiries. "The first inquiry is whether the prisoner was actually deprived of adequate medical care." _Salahuddin v. Goord,_ 467 F.3d 263, 279 (2d Cir.2006). The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " _Jones v. Westchester County Dept. of Corr. Med. Dept.,_ 557 F.Supp.2d 408, 413 (S.D.N.Y.2008).

**\*10** The second inquiry is "whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." _Salahuddin,_ 467 F.3d at 280. The focus of the second inquiry depends on whether the prisoner claims to have been completely deprived of treatment or whether he claims to have received treatment that was inadequate. _Id._ If "the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." _Id._ A "serious medical need" is "a condition of urgency, one that may produce death, degeneration, or extreme pain." _Nance v. Kelly,_ 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), _accord, Hathaway v. Coughlin,_ 37 F.3d 63, 66 (2d Cir.1996), _cert. denied,_ 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995); _Chance v. Armstrong,_ 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702-03.

If the claim is that treatment was provided that was inadequate, the second inquiry is narrower. *Salahuddin,* 467 F.3d at 280. For example, "[w]hen the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone in analyzing whether the alleged deprivation" is sufficiently serious. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003).

To satisfy the subjective component of an Eighth Amendment medical care claim, the defendant's behavior must be "wanton." What is considered "wanton" must be determined with "due regard for differences in the kind of conduct against which an Eighth Amendment objection is raised." *Whitley v. Albers,* 475 U.S. 312, 320, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986). Where a prisoner claims that a defendant provided inadequate medical care, he must show that the defendant acted with "deliberate indifference." *Estelle,* 429 U.S. at 105; *Wilson v. Seiter,* 501 U.S. 294, 302-03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)). Thus, to establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually

drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835; *Ross v. Giambruno,* 112 F.3d 505, at *2 (2d Cir.1997).* An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105-06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."). However, malpractice that amounts to culpable recklessness constitutes deliberate indifference. Accordingly, "a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan." *Chance,* 143 F.3d at 703 (citation omitted). Medical decisions that are contrary to accepted medical standards may constitute deliberate indifference if "the doctor has based his judgment on something other than sound medical judgment." *Stevens v. Goord,* 535 F.Supp.2d 373, 385 (S.D.N.Y.2008) (citation omitted). For instance, a doctor may be deliberately indifferent if he opts for an easier and less efficacious treatment plan "not on the basis of [his or her] medical views, but because of monetary incentives." *Chance,* 143 F.3d at 704.

### 2. *Atarax*

**\*11** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to prescribe Atarax. (Dkt. No. 1 ¶¶ 1, 12.) Defendants move for summary judgment, arguing that Plaintiff's claim regarding the Atarax medication fulfills neither the objective nor the subjective prong of a viable Eighth Amendment claim. (Dkt. No. 92-10 at 13-14.)

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Regarding the objective prong, the parties' briefs focus entirely on whether Plaintiff suffered from a serious medical need.[FN30] Applying the analytical framework described above, I must first address whether Plaintiff was actually deprived of adequate medical care. I find that there is a triable issue of fact that the refusal to prescribe Atarax constituted a denial of adequate or reasonable care. I base this finding on the fact that Defendant Dr. Richards twice requested approval to prescribe Atarax, noting that he had already tried treating Plaintiff with Hydroxyzine, Vistril, Allegra, and Zytrec "all of which worsened [Plaintiff's] condition." (Weissman Aff. Ex. A-9.)

> FN30. Defendants argue that Plaintiff's severe body itch was not a serious medical need because it was not a "condition of urgency, one that may produce death, degeneration, or extreme pain". (Dkt. No. 92-10 at 13.) Plaintiff argues that severe body itch was a symptom of his Hepatitis C, which is a serious medical need. (Dkt. No. 109 at 28-30.)

Because Plaintiff alleges that he was provided with inadequate treatment, rather than completely deprived of treatment, the next inquiry is whether the *deprivation* was sufficiently serious. This requires an analysis of what harm, if any, the failure to prescribe Atarax caused or will cause Plaintiff. Here, there is simply no evidence before the Court that being deprived of Atarax harmed or threatened to harm Plaintiff. Rather, the evidence shows that Plaintiff suffered from a severe body itch. While this condition was undoubtedly unpleasant, it simply does not rise to the level of an Eighth Amendment violation. Therefore, I find that Plaintiff has not raised a triable issue of fact regarding the objective prong of his Eighth Amendment claim regarding Defendant Weissman and Richards' failure to prescribe Atarax.

Having found that there is not a triable issue of fact as to the objective prong, it is not necessary to analyze the subjective prong. However, I will briefly address the parties' contentions for the sake of completeness. Defendants argue that the refusal by Defendants Weissman and Richards to prescribe Atarax was not deliberate indifference because the decision of "which medicine to prescribe for a particular condition amount[s] to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 13-14.) Defendants' argument regarding deliberate indifference is based entirely on the affidavit of Dr. Weissman.[FN31] Interestingly, in contrast to her statements regarding Plaintiff's orthopedic care (discussed below), Dr. Weissman does *not* state that the decision not to prescribe Atarax was based on her medical judgment. Rather, she states that Atarax is a "non-formulary" medication and "special approval must be obtained to issue that medication." (Weissman Aff. ¶ 4.) Dr. Weissman does not say who was authorized to approve the use of non-formulary drugs. Dr. Richards twice requested approval to prescribe Atarax to Plaintiff. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) In one of these requests, he stated that the other medications he had tried "worsened" Plaintiff's condition. (Weissman Aff. Ex. A-9.) His requests were denied. (Weissman Aff. ¶¶ 7-8, Ex. A-9 and A-10.) This sequence of events raises two interesting and related issues: does the acquiescence of Dr. Weissman and Dr. Richards to a course of treatment for Plaintiff with which they disagreed constitute deliberate indifference?[FN32] Or does the fact that the decision not to prescribe Atarax was made by someone other than Dr. Weissman and Dr. Richards indicate that they were not personally involved with, and thus not liable for, the decision? *See Johnson v. Wright,* 412 F.3d 398 (2d Cir.2005) (claims against administrators who refused to approve treatment requested by treating physicians survived summary judgment; treating physicians were not named as defendants). The parties have not addressed these issues, and, due to my finding that there is no triable issue of fact as to the objective prong and in the absence of briefing, I decline to do so.

> FN31. Dr. Richards did not file an affidavit

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

supporting Defendants' motion for summary judgment.

FN32. *See Sulton v. Wright,* 265 F.Supp.2d 292 (S.D.N.Y.2003) (holding that a prisoner stated an Eighth Amendment claim against a doctor and physician's assistant who pursued less vigorous treatment than they had originally recommended when their request for approval of knee surgery was denied).

3. *MRI and Orthopedic Referral*

**\*12** Plaintiff claims that Defendants Weissman and Richards violated his Eighth Amendment rights by refusing to take MRIs of his left wrist and right ankle or to refer him to an orthopedist who could determine if medical footwear was necessary to correct his right foot problem. (Dkt. No. 1 ¶ 12.) Defendants argue that (1) any deprivation was not sufficiently serious to trigger Eighth Amendment scrutiny; and (2) they were not deliberately indifferent. (Dkt. No. 92-10 at 13-14.) Defendants are correct.

Even if one assumes that the deprivation was sufficiently serious to trigger Eighth Amendment scrutiny, the evidence does not raise a triable issue of fact that Defendants were deliberately indifferent. Regarding the MRIs, Dr. Weissman declares that "Dr. Richards and I felt, in our medical judgment, that an MRI was not warranted." Because Plaintiff's "pain and numbness was improving with time, Dr. Richards requested, and I approved, physical therapy for [P]laintiff beginning in January 2003." (Weissman Aff. ¶ 11.) In September 2003, Dr. Richards referred Plaintiff to an orthopedist for treatment of his left wrist because, after completing physical therapy, Plaintiff was "still having [a] considerable amount of pain." (Weissman Aff. Ex. A-13.) The orthopedist examined Plaintiff and reported that Plaintiff "seems to be improving at this point and unfortunately, there is not

much else I can suggest for Henry to improve or accelerate his healing." (Weissman Aff. Ex. A-14.)

Plaintiff filed a grievance a year after seeing the orthopedist complaining that Dr. Richards and Dr. Weissman "willfully refused to examine my injuries, to provide medical treatment for said injuries, and to order an MRI test of said injuries conducted ... in an attempt to prevent me from proving the precise nature and extent of my injuries in a court of law and, thus, to dissuade me from suing." (P.'s Decl. in Opp'n to Aff. of Evelyn Weissman, Ex. D.) Plaintiff argues that this grievance proves that he "continued to complain to these defendants about continuing severe pain in his left wrist and right ankle for more than one year after he had been evaluated by the orthopedist." (Dkt. No. 109 at 24-25.) The grievance Plaintiff cites does not mention any "continuing severe pain in his left wrist and right ankle." Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's Eighth Amendment claims against Defendants Weissman and Richards.[FN33]

FN33. Plaintiff's complaint also asserts a retaliation claim against Defendants Weissman and Richards on these facts. (Dkt. No. 1 ¶ 12.) Defendants have not addressed this claim. I find that it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e) (2)(B) because the evidence does not establish that Defendants took adverse action. While the denial of medical care may establish adverse action, *see e.g. Odom v. Poirier,* No. 99 Civ. 4933, 2004 WL 2884409, at * 4 (S.D.N.Y. Dec.10, 2004), I have found that Defendants Weissman and Richards did not deny Plaintiff medical care. Therefore, I recommend that the Court dismiss this claim.

**B. Ham/Grievances**

Plaintiff alleges that Defendant Ham violated his

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Eighth Amendment rights by refusing to loosen or remove his restraints on November 7 and 14, 2002. (Dkt. No. 1 ¶¶ 9-10.) He further alleges that Defendants Brousseau and Donelli violated his constitutional rights by refusing to forward his grievance regarding Defendant Ham for an investigation. (Dkt. No. 1 ¶¶ 28-29.) Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham; (2) Plaintiff's allegations are not "sufficiently serious" to implicate the Eighth Amendment; and (3) Plaintiff's allegations regarding the handling of his grievance do not raise a constitutional claim. (Dkt. No. 92-10 at 21-23, 38.)

1. *Exhaustion of Administrative Remedies*

**\*13** Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his claims against Defendant Ham. (Dkt. No. 92-10 at 21-23.) I find that there is a triable issue of fact that Plaintiff's failure to receive a final decision on the merits of his grievance regarding Defendant Ham was justified.

The Prison Litigation Reform Act ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [FN34] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [FN35] The Department of Correctional Services ("DOCS") has available a well-established three-step inmate grievance program.[FN36]

FN34. 42 U.S.C. § 1997e.

FN35. *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

FN36. 7 N.Y.C.R.R. § 701.7.

Generally, the DOCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances.[FN37] First, an inmate must file a complaint with the facility's IGP clerk within twenty-one (21) calendar days of the alleged occurrence. If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen (16) calendar days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen (16) calendar days of receipt of the grievance, and issues a written decision within two (2) working days of the conclusion of the hearing. Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven (7) calendar days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within twenty (20) calendar days of receipt of the grievant's appeal. Third, a grievant may appeal to the central office review committee ("CORC") within seven (7) working days of receipt of the superintendent's written decision. CORC is to render a written decision within thirty (30) calendar days of receipt of the appeal. It is important to note that any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[FN38] If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006).

FN37. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7; *see also White v. The State of New York,* No.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

00-CV-3434, 2002 WL 31235713, at *2 (S.D.N.Y. Oct.3, 2002).

FN38. 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); Hemphill v. New York, 198 F.Supp.2d 546, 549 (S.D.N.Y.2002), vacated and remanded on other grounds, 380 F.3d 680 (2d Cir.2004); see, e.g., Croswell v. McCoy, 01-CV-0547, 2003 U.S. Dist. LEXIS 3442, at *12, 2003 WL 962534, at *4 (N.D.N.Y. March 11, 2003) (Sharpe, M.J.) ("If a plaintiff receives no response to a grievance and then fails to appeal it to the next level, he has failed to exhaust his administrative remedies as required by the PLRA."); Reyes v. Punzal, 206 F.Supp.2d 431, 433 (W.D.N.Y.2002) ("Even assuming that plaintiff never received a response to his grievance, he had further administrative avenues of relief open to him."); Nimmons v. Silver, 03-CV-0671, Report-Recommendation, at 15-16 (N.D.N.Y. filed Aug. 29, 2006) (Lowe, M.J.) (recommending that the Court grant Defendants' motion for summary judgment, in part because plaintiff adduced no evidence that he appealed the lack of a timely decision by the facility's IGRC to the next level, namely to either the facility's superintendent or CORC), adopted by Decision and Order (N.D.N.Y. filed Oct. 17, 2006) (Hurd, J.).

Here, Plaintiff declares that on the day of the first incident with Defendant Ham, he asked a Five Points Correctional Facility officer for a grievance form. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 17.) The officer did not give Plaintiff a form and told Plaintiff that he would need to file his grievance at Elmira Correctional Facility, where the incident had occurred. Id. Although an April 16, 2004, revision to the inmate grievance procedure specified that grievances "may only be filed at the facility where the inmate is housed even if it pertains to another facility," (Id., at Ex. A), the procedures in effect at the

time Plaintiff asked for a form to file a complaint against Defendant Ham were silent as to which facility should handle a particular grievance. Even if one assumes that the Five Points officer's advice was correct under DOCS practice at the time, it is difficult to see how Plaintiff could have filed a grievance at Elmira. Plaintiff was only at Elmira Correctional Facility for a few hours after receiving these instructions from the officer, during which time he was handcuffed and shackled. (Dkt. No. 1 ¶ 10.)

*14 On December 8, 2002, Plaintiff filed a grievance at Upstate Correctional Facility regarding Defendant Ham's actions. (Dkt. No. 92-4, Ex. 4.) Defendant Brousseau, the IGP supervisor, returned the grievance to Plaintiff because Plaintiff failed to submit it within fourteen days of the incident.[FN39] Id.

FN39. The inmate grievance procedures in place at the time of the incident required inmates to file grievances within 14, rather than 21, days.

On December 18, 2002, Plaintiff submitted a grievance complaining that Defendant Brousseau's refusal to accept the previous grievance violated his constitutional right of access to the courts because it prevented him from exhausting his claims against Defendant Ham. (Dkt. No. 92-4, Ex. 4.) The IGRC denied Plaintiff's grievance on December 26, 2002. Id. The IGRC stated that Defendant Brousseau's refusal was proper because Plaintiff "did not present any mitigating circumstances that would warrant accepting the [untimely] complaint ... [Plaintiff] had been back at the facility since 11/15/02 and had filed one grievance during this time period, this shows he had ample opportunity to file this complaint in a timely manner." Id. The grievance to which the IGRC's decision referred was a grievance regarding Defendant Richards' denial of Atarax. (Dkt. No. 92-4, Ex. 3.) Because that event occurred at Upstate Correctional Facility, there was no ambiguity about where Plaintiff's grievance should be filed.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Plaintiff appealed the IGRC's determination to the Superintendent. (Dkt. No. 92-4, Ex. 4.) Defendant Donelli affirmed the IGRC's determination on January 15, 2003. *Id.*

Defendants assert that Plaintiff "did not appeal [Defendant Donelli's decision] to the CORC." (Dkt. No. 92-3, Stmt. Pursuant to Rule 7.1(a)(3) ¶ 8.) For this proposition, they cite Exhibit 4 and to the Affidavit of Karen Bellamy. *Id.* Exhibit 4 shows that Plaintiff signed an "Appeal Statement" stating that he wished to appeal Defendant Donelli's decision to CORC. (Dkt. No. 92-4, Ex. 4.) The Appeal Statement was signed by a grievance clerk. *Id.* That exhibit also shows that Defendant Brousseau responded to an inquiry regarding the status of the grievance by stating that the grievance had been received by CORC and was being processed. *Id.* However, the record before the Court does include any final disposition from CORC of Plaintiff's appeal. The appeal does not appear in a list provided in the Affidavit of Karen Bellamy of grievances on which Plaintiff received a final decision from CORC. (Bellamy Aff. Ex. B.) Thus, Plaintiff never received a decision from CORC and did not exhaust his administrative remedies. *See Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, at * 4, 2002 WL 313796, at * 2 (S.D.N.Y. Feb.27, 2002). Even if CORC had acted on Plaintiff's appeal, I assume that CORC would have upheld the IGRC's finding and denied Plaintiff's grievance as untimely. In that event, I would find that Plaintiff had not exhausted his administrative remedies because "courts consistently have found that CORC's dismissal of a grievance appeal as untimely constitutes failure to exhaust available administrative remedies." *Soto v. Belcher,* 339 F.Supp.2d 592, 595 (S.D.N.Y.2004).

**\*15** Plaintiff's failure to exhaust, however, does not end the inquiry. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his administrative remedies.[FN40] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." [FN41] Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." [FN42] Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." [FN43] Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Good,* 380 F.3d 670, 678 (2d Cir.2004). Here, the silence of the regulations regarding which facility was the proper venue for Plaintiff's grievance, the bad advice that Plaintiff received from the officer at Five Points, and Plaintiff's inability to follow that advice because he was shackled during his entire tenure at Elmira create a triable issue of fact that Plaintiff's failure to file a timely grievance regarding Defendant Ham's actions was justified. I therefore find that summary judgment is not appropriate on the grounds that Plaintiff failed to exhaust his administrative remedies.

FN40. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford. Chavis v. Goord,* No. 07-4787-pr, 2009 U.S.App. LEXIS 13681, 2009 WL 1803454, at *1 (2d Cir. June 25, 2009).

FN41. *Hemphill,* 380 F.3d at 686 (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

FN42. *Id.* (citations omitted).

FN43. *Id.* (citations and internal quotations omitted).

### 2. *"Sufficiently Serious"*

Defendants argue that there is not a triable issue of material fact regarding Plaintiff's Eighth Amendment claim against Defendant Ham because "Plaintiff's alleged 'enormous pain' is nothing more than *de minimis* for Constitutional purposes." (Dkt. No. 92-10 at 22-23.)

Claims that prison officials applied restraints too tightly are analyzed under the Eighth Amendment as claims of excessive force. *See Davidson v. Flynn,* 32 F.3d 27 (2d Cir.1994). When prison officials are "accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). The extent of any injury suffered by the inmate "is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.,* at 7 (citation and quotation marks omitted).

**\*16** In determining whether the use of force was wanton and unnecessary, it may also be proper to evaluate the need for application of force, the relationship between that need and the amount of force used, the threat

reasonably perceived by responsible officials, and any efforts made to temper the severity of a forceful response. The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it.

*Id.* (citation and quotation marks omitted). In other words, not "every malevolent touch by a prison guard gives rise to a federal cause of action. The Eighth Amendment's prohibition of cruel and usual punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Id.* at 9 (officers who punched and kicked handcuffed and shackled inmate used unconstitutional force although inmate required no medical attention) (citations omitted); *Davidson,* 32 F.3d at 30 n. 1 (officers who placed handcuffs too tightly on inmate in retaliation for filing lawsuits used unconstitutional force where inmate suffered permanent scarring and numbness); *compare Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, at *24, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004) (officers who placed prisoner in tight restraints did not violate constitution where prisoner suffered temporary pain, numbness and swelling and no improper or wanton motive was suggested for the officers' actions).[FN44]

FN44. Defendants served this unpublished case on Plaintiff with their moving papers as required by Local Rule 7.1(a)(1). (Dkt. No. 92-11.)

Plaintiff does not allege that he was permanently injured as a result of Defendant Ham's actions. Plaintiff states that he suffered "enormous pain" and "severe swelling" as a result of being shackled so tightly. (Dkt. No. 109 at 38.) Although this would not end the Eighth Amendment inquiry if Defendant Ham's actions had been more egregious, there is simply no evidence in the record that Defendant Ham applied restraints to Plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

"maliciously and sadistically to cause harm" or in a way that was "repugnant to the conscience of mankind." Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's claims against Defendant Ham.

3. *Grievances*

Plaintiff alleges that Defendants Brousseau and Donelli "refused to forward" his complaint regarding Defendant Ham's actions "for an investigation" (Dkt. No. 1 ¶¶ 28-29), thus violating his First Amendment right to petition the government. (Dkt. No. 109 at 50-51.) Defendants argue that Plaintiff's allegation fails to state a constitutional violation. (Dkt. No. 92-10 at 38.) Defendants are correct.

The First Amendment protects a prisoner's right to meaningful access to the courts and to petition the government for the redress of grievances. *See Bill Johnson's Rest., Inc. v. NLRB,* 461 U.S. 731, 741, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983). However, inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does not give rise to a cognizable § 1983 claim. *Cancel v. Goord,* No. 00 Civ.2042, 2001 WL 303713, *3 (S.D.N.Y. Mar. 29, 2001). If prison officials ignore a grievance that raises constitutional claims, an inmate can directly petition the government for redress of that claim. *See Flick v. Alba,* 932 F.2d 728, 729 (8th Cir.1991). "Therefore, the refusal to process an inmate's grievance or failure to see to it that grievances are properly processed does not create a claim under § 1983." *Cancel,* 2001 WL 303713, at *3; *see also Torres v. Mazzuca,* 246 F.Supp.2d 334, 342 (S.D.N.Y.2003); *Mahotep v. DeLuca,* 3 F.Supp.2d 385, 390 (W.D.N.Y.1998).

**\*17** *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369-370

(W.D.N.Y.2005). Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham.

**C. Frisk Room Incident/Aftermath/Grievances**

Plaintiff alleges that he threatened to sue Defendants Nephew, Desotelle, and Snyder if they used force to put on his coat. (Dkt. No. 1 ¶ 15.) Plaintiff alleges that, in retaliation for this threat, (1) Defendant Wright conspired with Defendant Snyder to subject Plaintiff to excessive force; (2) Defendants Duprat, Snyder, and Bogett used excessive force on Plaintiff; (3) Defendants Wright, Nephew, Desotelle, and Snyder falsified misbehavior reports against Plaintiff; and (4) Defendant Bezio failed to intervene to prevent the use of excessive force.[FN45] (Dkt. No. 1 ¶¶ 16-22.) He further alleges that Defendants Brousseau and Donelli would not allow Plaintiff to file a grievance regarding these events. (Dkt. No. 1 ¶¶ 30-31.) Finally, he alleges that Defendants Girdich and Eagen denied the grievance he filed regarding Defendant Brousseau and Donelli's refusal to process Plaintiff's grievance. (Dkt. No. 1 ¶¶ 32-34.)

FN45. The complaint contains some language that could, very liberally construed, assert a claim against these Defendants for denial of Plaintiff's right of access to the courts on the theory that, at the time of these events, Plaintiff was being transported for a court appearance. Defendants addressed this possible claim in their motion for summary judgment. (Dkt. No. 92-10 at 40-42.) In his opposition to the motion, Plaintiff states that he did not intend to assert a claim for denial of access to the courts. (Dkt. No. 109 at 55.) I have therefore not addressed Defendants' arguments.

1. *Exhaustion of Administrative Remedies*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding any of these claims. (Dkt. No. 92-10 at 25-26, 31.) Plaintiff declares that on January 13, 2003, he attempted to submit a grievance to Defendant Brousseau regarding the claims. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy ¶ 26.) Plaintiff declares that Defendant Brousseau "refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id*. ¶ 27.

On April 3, 2003, Plaintiff submitted a grievance complaining that Defendant Brousseau had refused to accept his January 13 grievance. (Dkt. No. 92-4, Ex. 8.) Plaintiff requested "[t]hat Ms. Brousseau submit the grievance complaint in question to the IGRC. Alternatively, that I be allowed to resubmit a copy of the grievance complaint in issue to the IGRC before moving for judicial intervention." *Id*. CORC denied the grievance on May 28, 2003, stating that it had "not been presented with sufficient evidence to substantiate any malfeasance" by Defendant Brousseau. *Id*.

As discussed above, Second Circuit precedent holds that a defendant may be equitably estopped from raising the exhaustion defense if he or she engaged in conduct that hindered the plaintiff's ability to pursue his or her administrative remedies. *Ziemba v. Wezner,* 366 F.3d 161, 163-64 (2d Cir.2004). A prison official's refusal to accept or forward a prisoner's grievance is conduct that hinders a plaintiff's ability to pursue administrative remedies. *Sandlin v. Poole,* 575 F.Supp.2d 484, 488 (W.D.N.Y.2008). Thus, Plaintiff's declaration that Defendant Brousseau refused to accept his grievance raises a triable issue of fact that Defendants are estopped from asserting the exhaustion defense. Therefore, I recommend that the Court reject Defendants' argument that they are entitled to summary judgment as a result of Plaintiff's failure to exhaust his administrative remedies.

2. *Conspiracy*

**\*18** Defendants move for summary judgment of Plaintiff's conspiracy claim. [FN46] They argue that (a) Plaintiff has not shown that there was any meeting of the minds; and (b) the claim is barred by the intracorporate conspiracy doctrine. [FN47] (Dkt. No. 92-10 at 31-32.)

FN46. Defendants characterize Defendants Wright and Snyder as the only defendants to the conspiracy claim. Read broadly, the complaint also alleges that Defendant Duprat conspired with Defendants Wright and Snyder by calling Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) I will include Defendant Duprat in my analysis of Plaintiff's conspiracy claim.

FN47. Defendants also argue that to the extent Plaintiff's conspiracy claim is brought under 42 U.S.C. § 1985, he has not shown that Defendants were motivated by any class-based animus. (Dkt. No. 92-10 at 31-32.) In his opposition to Defendants' motion, Plaintiff states that he did not intend to raise a claim under 42 U.S.C. § 1985. (Dkt. No. 109 at 44 n. 15.) Therefore, I have not addressed Defendants' argument regarding class-based animus.

a. *Meeting of the Minds*

Defendants argue that Plaintiff has not provided any factual basis for a finding that Defendants had a "meeting of the minds" as required for a conspiracy claim. (Dkt. No. 92-10 at 31-32.) I find that Plaintiff has raised a triable issue of fact.

"To prove a § 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) (citations omitted).

Plaintiff has raised a genuine issue of material fact as to all of the elements of his § 1983 conspiracy claim. Plaintiff states in his verified complaint that Defendant Wright told him that " '[t]ransportation vans don't have cameras. You're going to learn not to spit ... [at] staff and not threaten us with lawsuits.' " (Dkt. No. 1 ¶ 16.) The next day, Defendant Duprat called Defendant Snyder "to arrange a beating" of Plaintiff. (Dkt. No. 1 ¶ 21.) Defendant Snyder entered the transportation van in which Plaintiff was sitting, said "Wright, my boss, doesn't like [you suing us] and sent this as a reminder," and then punched and slapped Plaintiff until Plaintiff lost consciousness. (Dkt. No. 1 ¶¶ 21-22.) A reasonable jury could, if it found Plaintiff's testimony credible, return a verdict for Plaintiff on his conspiracy claim based on this evidence.

b. *Intracorporate Conspiracy Doctrine*

Defendants argue that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine. (Dkt. No. 92-10 at 32.) Under that doctrine, employees of a single corporate entity are legally incapable of conspiring together. *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, at *5, 1999 WL 151702, at *2 (W.D.N.Y. Mar.17, 1999). "This doctrine applies to public entities and their employees." *Lee v. City of Syracuse,* 603 F.Supp.2d 417, 442 (N.D.N.Y.2009) (citations omitted). Although the Second Circuit has recognized the doctrine in the context of 42 U.S.C. § 1985, *see Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir.1978); *Girard v. 94th and Fifth Avenue Corp.,* 530 F.2d 66, 72 (2d Cir.1976), it has not extended its application of the doctrine to conspiracy claims under § 1983. Several district courts in the Second Circuit have, however, applied the doctrine to § 1983 cases.[FN48] The

district court cases cited in the footnote applied the intracorporate conspiracy doctrine to § 1983 without discussing whether it was appropriate to do so. In *Anemone v. Metropolitan Transportation Authority,* 419 F.Supp.2d 602, 604 (S.D.N.Y.2006), the Southern District squarely held that the intracorporate conspiracy doctrine should be applied to § 1983 cases because "the doctrine's logic is sound" and not "a single case within the Second Circuit [has] held the doctrine inapplicable to Section 1983" claims." I will assume that the doctrine applies in § 1983 cases.

FN48. *See Green v. Greene,* No. 9:07-CV-0351 (GTS/DEP), 2009 U.S. Dist. LEXIS 68186, 2009 WL 2424353 (N.D.N.Y. Aug.5, 2009); *Sebast v. Mahan,* No. 09-cv-98 (GLS/RFT), 2009 U.S. Dist. LEXIS 64712, 2009 WL 2256949, at *3 (N.D.N.Y. July 28, 2009); *Lee v. City of Syracuse,* 603 F.Supp.2d 417 (N.D.N.Y.2009); *Lukowski v. County of Seneca,* No. 08-CV6098, 2009 U.S. Dist. LEXIS 14282, 2009 WL 467075 (W.D.N.Y. Feb.24, 2009); *Perrin v. Canandaigua City School Dist.,* No. 08-CV-61536, 2008 U.S. Dist. LEXIS 95280, 2008 WL 5054241 (W.D.N.Y. Nov.21, 2008); *Rodriguez v. City of New York,* --- F.Supp.2d ----, No. 05-CV-5117, 2008 U.S. Dist. LEXIS 9966, 2008 WL 420015 (E.D.N.Y. Feb.11, 2008); *Crews v. County of Nassau,* No. 06-CV-2610, 2009 U.S. Dist. LEXIS 38354, 2007 WL 4591325 (E.D.N.Y. Dec. 27, 2007); *Little v. City of New York,* 487 F.Supp.2d 426 (S.D.N.Y.2007); *Clark v. City of Oswego,* No. 5:03-CV-202 (NAM/DEP), 2006 U.S. Dist. LEXIS 95769, 2007 WL 925724 (N.D.N.Y. March 26, 2007); *Malone v. City of New York,* No. CV-05-2882, 2006 U.S. Dist. LEXIS 61866, 2006 WL 2524197 (E.D.N.Y. Aug. 30, 2006); *Caidor v. M & T Bank,* No. 5:05-CV-297 (FJS/GJD), 2006 U.S. Dist. LEXIS 22980, 2006 WL 839547 (N.D.N.Y. Mar.27, 2006).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 9:09-cv-00734-NAM-DEP   Document 21   Filed 03/02/11   Page 91 of 103


Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

**\*19** Even where the intracorporate conspiracy doctrine applies, there is an exception to the doctrine where "individuals pursue personal interests wholly separate and apart from the entity." *Orafan v. Goord,* 411 F.Supp.2d 153, 165 (N.D.N.Y.2006) (citation and quotation marks omitted), *vacated and remanded on other grounds, Orafan v. Rashid,* No. 06-2951, 249 Fed. Appx. 217 (2d Cir. Sept.28, 2007). I have previously found that a triable issue of fact exists regarding whether officers acted pursuant to their personal interests where a prisoner alleges that officers assaulted him in retaliation for participating in a federal lawsuit. *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008). Other courts have found that the personal interest exception applies, and thus allowed conspiracy claims to proceed, where it was alleged that officers conspired to cover up their use of excessive force. *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719, at \*6 (E.D.N.Y. Dec. 30, 2005). I find that the exception applies here because, as in *Medina,* Defendants allegedly conspired to retaliate against Plaintiff for his exercise of his right to access the courts. Therefore, I recommend that the Court deny Defendants' motion for summary judgment of the conspiracy claim against Defendants Wright, Snyder, and Duprat.

**3.** *Excessive Force*

Defendants move for summary judgment of Plaintiff's excessive force claims. They argue that there is no "objective evidence" that any excessive force was used. (Dkt. No. 92-10 at 33-35.) Specifically, Defendants argue that:

[P]laintiff alleges that ... [D]efendants Snyder, Bogett, and Duprat punched him, slapped him, knocked him unconscious, and caused his ear to bleed. There is no objective evidence to support this conclusory allegation. An unusual incident report was generated because of [P]laintiff's behavior on January 3, 2003, but the report specifically states that no force was used on [P]laintiff.

To the extent [P]laintiff is claiming the alleged force was used in the van, after the incidents described in the unusual incident report, there is no objective evidence to support this conclusion either. Plaintiff's medical records for January 3, 2003, upon arrival at Five Points C.F. indicate "arrived via van with cuffs & chains and spit net-complains of pain and itching," that [P]laintiff was escorted to 12 building, and that [P]laintiff was given Naprosyn and Benadryl. There is no indication of bleeding, or that [P]laintiff reported being assaulted in the January 3, 2003 entry, or the entries for January 4, 5, and 6, 2003. Plaintiff does report being "knocked-out and beaten everywhere" on January 7, 2003, while still at Five Points C.F., but without any record of reporting this type of conduct for the four (4) days prior to January 7, 2003, it is not credible that the incident to which [P]laintiff is referring occurred on January 3, 2003. Moreover, the January 7, 2003, entry does not indicate whether [P]laintiff was claiming to have been "knocked out and beaten everywhere" by staff or other inmates. Plaintiff has no objective evidence to support his claim of excessive force.

**\*20** (*Id.* at 34-35, citations omitted.)

Defendants refer to Plaintiff's allegations as "conclusory." "Conclusory" means to "express[ ] a factual inference without stating the underlying facts on which the inference is based." *Black's Law Dictionary* 284 (7th ed.1999). Plaintiff's allegations are not conclusory. Rather, Plaintiff describes the incident in detail. The ultimate determination of whether or not Defendants used excessive force, then, will rest largely on the finder of fact's judgment regarding Plaintiff's credibility.

Defendants, naturally, do not find Plaintiff credible. In general, of course, "[c]redibility determinations ... are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

1002, 1011 (2d Cir.1996) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment."). Although Defendants do not explicitly say so, their argument that "Plaintiff has no *objective* evidence" is apparently an attempt to invoke a "narrow exception" to the general rule that credibility determinations are not to be made on summary judgment. *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.2005); *Blake v. Race*, 487 F.Supp.2d 187, 202 (E.D.N.Y.2007). In *Jeffreys*, the Second Circuit held that in the "rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete," the court may appropriately conclude at the summary judgment stage that no reasonable jury would credit the plaintiff's testimony. *Jeffreys, 426 F.3d at 554.*

The narrow holding of *Jeffreys* is not applicable here for three reasons. First, in order for the *Jeffreys* exception to apply, the plaintiff must rely "almost exclusively on his own testimony." *Jeffreys, 426 F.3d at 554.* Here, Plaintiff is not relying "almost exclusively on his own testimony." Rather, because of Defendants' conduct during discovery, Plaintiff is relying on his own testimony plus adverse inferences drawn in his favor. As a consequence of Defendants' conduct during discovery, I ordered that Plaintiff could "ask the Court to draw factual inferences favorable to him based upon the missing photographs of January 3 and 10, 2003." (Dkt. No. 107 at 2.) Plaintiff requests that the Court draw the following inference in his favor: "That were the Defendants to provide the Court with the missing photographs taken of [Plaintiff] at Five Points C.F. on January 3, 2003, such photographs would reveal that [Plaintiff] had bruises and lacerations on his face, right ear, and chest." (Dkt. No. 109 at 46-47 n. 15.) The Court grants Plaintiff's request and draws the inference in his favor.

Second, in order for the *Jeffreys* exception to apply, Plaintiff's testimony must be "contradictory or incomplete." *Jeffreys, 426 F.3d at 554.* Here, Plaintiff's

testimony is neither contradictory nor incomplete. In *Jeffreys,* the plaintiff, who alleged that police officers had beaten and defenestrated him, confessed on at least three occasions that he had jumped out of a third-story window rather than having been thrown. *Id.* at 552. The plaintiff did not publicly state that he had been thrown out of a window by police officers until *nine months* after the incident. *Id.* The plaintiff could not identify any of the individuals whom he alleged participated in the attack or describe their ethnicities, physical features, facial hair, weight, or clothing on the night in question. *Id.* Here, in contrast, Plaintiff has never given a contradictory account of the events in the transportation van on January 3, 2003. Although Defendants stress that Plaintiff's medical records do not show that Plaintiff reported the incident upon arrival at Five Points, Plaintiff states in his verified complaint that he informed Defendant Hensel on the day of the incident that he had been beaten by Upstate guards. He further alleges that Defendant Hensel made no record of his complaint. (Dkt. No. 1 ¶ 23.) Plaintiff's claim regarding Nurse Hensel is corroborated by the log book entry that shows that he was taken to see Nurse Hensel on January 3, 2003, and the fact that Defendants did not provide the Court with a medical record of that visit with Plaintiff's other Five Points Medical Records. (Defs.' Resp. to P's 1st Req. for Produc. of Docs., Ex. E at 11; Bannister Aff.) As Defendants admit, Plaintiff's medical records show that within four days of the incident he reported that he had been "knocked-out and beaten everywhere." (Bannister Aff. ¶ 10.) In addition, unlike in *Jeffreys,* Plaintiff has specifically identified the officers whom he alleges beat him.

**\*21** Third, the *Jeffreys* exception is most applicable where the plaintiff's version of events is contradicted by defense testimony. In *Jeffreys,* for instance, one of the arresting officers declared that, contrary to the plaintiff's version of events, he was the only officer who entered the room where the plaintiff was allegedly beaten and that he saw the plaintiff jump out the open window. *Jeffreys,* 426 F.3d at 551-52. Here, Plaintiff's version of events has not been contradicted by an affidavit from any of the officers whom he alleges used excessive force because Defendants' motion for summary judgment is not supported by any

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

affidavit from Defendants Snyder, Duprat, or Bogett. The only proof offered by Defendants that they did *not* use excessive force is a notation on a January 3, 2003, unusual incident report stating "Use of Force: No." (Dkt. No. 92-5, Ex. 16.)

Accordingly, I find that Plaintiff has presented sufficient "objective evidence" to raise a triable issue of fact that Defendants Snyder, Duprat, and Bogett subjected him to excessive force.[FN49] I therefore recommend that the Court deny Defendants' motion for summary judgment of this claim.

> **FN49.** Read broadly, the complaint also asserts an excessive force claim against Wright and retaliation claims against Defendants Snyder, Duprat, Bogett, and Wright. Defendants have not addressed these potential claims. I find that the claims are sufficient to withstand *sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

4. *False Misbehavior Reports*

Plaintiff alleges that Defendants Nephew, Desotelle, Snyder, and Wright filed false misbehavior reports against him "in retaliation for his having threatened to sue them." (Dkt. No. 1 ¶¶ 17-18.) Defendants argue that (a) Plaintiff forfeited his claim by refusing to attend the disciplinary hearing on the charges; and (b) they would have issued the misbehavior reports regardless of any alleged retaliatory motive. (Dkt. No. 92-10 at 25-29.)

a. *Forfeiture*

Defendants argue that Plaintiff "cannot establish a prima facie case of retaliation, because although he claims the misbehavior report[s were] 'falsified,' he has forfeited his opportunity to present any evidence calling into question the truth of the misbehavior report[s] by refusing to attend the disciplinary hearing." (Dkt. No. 92-10 at 26.) Defendants cite *Brewer v. Kamas,* 533 F.Supp.2d 318 (W.D.N.Y.2008). In order to analyze *Brewer,* a review of Second Circuit precedent governing prisoners' allegations regarding false misbehavior reports is required.

A prisoner's claim that a correctional officer filed a false misbehavior report may implicate two separate constitutional provisions: (a) the Fourteenth Amendment right to procedural due process; or (b) the right not to be retaliated against for exercising First Amendment rights such as the right of access to the courts or the right to petition the government for redress of grievances.

In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability. *Freeman,* 808 F.2d at 953-54.

**\*22** Two years after its *Freeman* opinion, the Second Circuit addressed the second variety of false misbehavior claim-a claim that an officer filed a false misbehavior report in retaliation for the exercise of constitutionally protected rights-in *Franco v. Kelly,* 854 F.2d 584 (2d Cir.1988). In *Franco,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for his cooperation with an investigation by the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

state Inspector General into incidents of inmate abuse at Attica Correctional Facility. *Franco,* 854 F.2d at 586. The defendants moved for summary judgment, arguing that Plaintiff could not state a claim because he had received a disciplinary hearing that complied with *Wolff v. McDonnell* and resulted in a guilty finding based on "some evidence." *Id.* The trial court granted the defendants' motion, relying on *Freeman. Id.* The trial court noted, however, "that under [t]his reading of *Freeman,* the mere possibility of procedural due process could eliminate all liability in any case in which prison officials had intentionally filed false and unfounded charges." *Id.* The Second Circuit settled "the substantial and troublesome questions raised in th[e] case" by holding that "[a]lthough our decision in *Freeman* accords prison officials wide latitude in disciplining inmates as long as minimum constitutional procedures are employed, that latitude does not encompass conduct that infringes on an inmate's substantive constitutional rights" such as the prisoner's First Amendment rights of access to the courts and to petition for redress of grievances. *Id.* at 590 (citations omitted). Accordingly, the Second Circuit reversed the trial court's judgment and remanded the matter for further proceedings. *Id.* at 590-91.

In *Jones v. Coughlin,* 45 F.3d 677 (2d Cir.1995), the Second Circuit again clarified that the holding in *Freeman* is doctrinally different and distinct from the type of retaliation claim discussed in *Franco.* In *Jones,* a prisoner alleged that correction officers filed a false misbehavior report against him in retaliation for filing an administrative complaint against one of their colleagues. *Jones,* 45 F.3d at 678. At his disciplinary hearing, the prisoner was denied the opportunity to call witnesses. *Id.* He was found guilty and sentenced to serve 120 days in the SHU. *Id.* After he had served his SHU sentence, DOCS official Donald Selsky reversed the decision and expunged it from the prisoner's record. *Id.* at 679. The prisoner filed suit. *Id.* The trial court granted the prison officials' motion for summary judgment, finding that the prisoner's allegations against the corrections officers failed to state a claim under *Freeman* and that the prisoner's allegations against the hearing officer failed because any procedural due process defects in the hearing had been cured by Selsky's

reversal of the decision. *Id.*

**\*23** On appeal, the Second Circuit stated that *Freeman* did not provide the "proper framework" for a decision in the case for both "factual and doctrinal reasons." *Jones,* 45 F.3d at 679. Factually, the case was distinguishable "if, as alleged, Jones was unfairly denied the right to call key witnesses in defense of the charges against him." *Id.* Doctrinally, the Second Circuit stated that "we have held that a prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of his grievances, and that this right is distinct from the procedural due process claim at issue in *Freeman.*" *Id.* at 679-80. The Second Circuit vacated the trial court's judgment and remanded for further proceedings. *Id.* at 680.

This brings us to *Brewer.* In *Brewer,* a prisoner alleged that correction officers filed false misbehavior reports against him in retaliation for filing grievances. *Brewer,* 533 F.Supp.2d at 323. The prisoner refused to attend his disciplinary hearing and was found guilty. *Id.* He sued the officers in federal court. *Id.* at 324. The officers moved for summary judgment. *Id.* The court granted the motion, finding that the prisoner could not establish that the disciplinary charges were false because (1) he refused to attend his disciplinary hearing; (2) he offered no "explanation as to why he chose not to attend the hearing so as to rebut the charges, or why it was otherwise constitutionally deficient"; and (3) he did not "offer ..., in opposition to [d]efendants' motion, any evidence calling into question the truth of the ... charges." *Id.* at 330. (citation omitted). Based on these three factors, the court stated that the plaintiff "was provided with the requisite opportunity to rebut the alleged false disciplinary charges, as required by due process, and Plaintiff, by failing to do so, has waived his right to further challenge the validity" of the misbehavior report. *Id.* (citation omitted).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

*Brewer* is not applicable here for three reasons. First, the case is factually distinguishable. In *Brewer,* the prisoner did not offer any explanation for his refusal to attend the hearing, did not explain why the hearing was constitutionally deficient, and did not offer any evidence calling into question the truth of the charges. *Brewer,* 533 F.Supp.2d at 330. Here, Plaintiff has explained that he did not attend the hearing because Defendant LaClair refused to assist him prepare a defense, has argued that the hearing was constitutionally deficient because Defendant Bullis did not call Defendant LaClair and an inmate as witnesses, and has offered his own testimony under penalty of perjury to rebut Defendants' version of the events leading to the misbehavior reports.

Second, Defendants overstate the holding of *Brewer.* The court did not hold that the prisoner had forfeited his opportunity to present evidence calling into question the truth of the misbehavior report simply by refusing to attend the disciplinary hearing. Rather, the court held that the prisoner had waived his right for three reasons, with the refusal to attend being only one of them. *Brewer,* 533 F.Supp.2d at 330.

*24 Third, because the prisoner in *Brewer* asserted a retaliation claim rather than a procedural due process claim, the precedent relied upon by the *Brewer* court is puzzling. The portion of the decision cited at length by Defendants relies on (1) *Freeman,* which is a procedural due process case; (2) language from *Jones* that discusses the ways in which *Jones* was *factually* distinguishable from *Freeman,* rather than the language in *Jones* clarifying that a retaliation claim is *doctrinally* different from the type of procedural due process claim at issue in *Freeman;* and (3) quotes from *Franco* that summarize the procedural due process holding in *Freeman,* rather than quotes from *Franco* discussing the proper analysis of a retaliation claim. Thus, although the prisoner in *Brewer* raised a retaliation claim, the court analyzed it as a procedural due process claim.

Because I find that *Brewer* is factually distinguishable from Plaintiff's case, that the holding in *Brewer* is not as broad as Defendants suggest, and that *Brewer's* legal analysis rests on a line of cases to which the Second Circuit has referred as the improper framework for analyzing a retaliation claim, I recommend that the Court reject Defendants' argument that Plaintiff waived his claim regarding the allegedly false and retaliatory misbehavior reports by failing to appear at his disciplinary hearing.[FN50]

FN50. I note that *Howard v. Wilkerson,* 768 F.Supp. 1002 (S.D.N.Y.1991) holds that "[a]n inmate's refusal to attend a disciplinary hearing waives his *due process objections* ... only when it occurs through no fault of prison officials." *Howard,* 768 F.Supp. at 1006 (citation and quotation marks omitted) (emphasis added). *Howard* is cited in *Nance v. Villafranca,* No. 91-CV-717, 1994 U.S. Dist. LEXIS 11114 (N.D.N.Y. June 20, 1994), which Defendants cite for a different proposition. (Dkt. No. 92-10 at 39.)

b. *Regardless of retaliatory motive*

Defendants argue that there is "ample evidence" that Defendants "would have issued the misbehavior report[s] regardless of whether [P]laintiff threatened to sue them." (Dkt. No. 92-10 at 28, 30.)

"An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right ... states a claim under § 1983. A plaintiff alleging retaliatory punishment bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

officials' decision to discipline the plaintiff. The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Gayle v. Gonyea,* 313 F.3d 677, 682 (2d Cir.2002) (citations and quotation marks omitted).

Here, the misbehavior reports by Defendants Nephew, Desotelle, and Snyder charged Plaintiff with creating a disturbance, committing an unhygenic act, refusing a direct order, and making threats. (Dkt. No. 92-5, Ex. 11.) As the Second Circuit explained in *Hynes v. Squillace,* 143 F.3d 653 (2d Cir.1998), the "most serious charge" in a misbehavior report that includes charges of creating a disturbance, making threats, and refusing a direct order is the direct order charge. *Hynes,* 143 F.3d at 655, 657. Here, Plaintiff admits that he did not put on his coat when Defendant Nephew ordered him to do so. (Dkt. No. 1 ¶ 15.) Thus, Defendants have met their burden of showing that Plaintiff would have received the same punishment even absent the allegedly retaliatory motive by demonstrating that there is no dispute that Plaintiff committed the most serious of the prohibited conduct charged in the misbehavior report. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss the retaliation claims against Defendants Nephew, Desotelle, and Snyder arising from the January 2, 2003, misbehavior reports.

**\*25** The misbehavior report by Defendant Wright charged Plaintiff with committing an unhygenic act, harassment, and threats.[FN51] (Dkt. No. 92-5, Ex. 11.) The most serious of these charges was the threat charge.

FN51. Although Defendants assert that Wright charged Plaintiff with disobeying a direct order, the evidence before the court does not support

that assertion. (Dkt. No. 92-5, Exs.11-12.)

Plaintiff admits that when Defendant Wright asked him to explain what happened in the frisk room, Plaintiff "responded that Wright would not believe his account of the incident, that Wright had unjustifiably interfered with [his] court trip ... and that [Plaintiff] would sue Wright and Snyder for their unlawful acts and actions." (Dkt. No. 1 ¶ 16.) This is certainly an admission to the harassment charge. DOCS Rule 107.11 provides as follows: "An inmate shall not harass an employee or any other person verbally or in writing. Prohibited conduct includes, but is not limited to, using insolent, abusive, or obscene language or gestures." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B)(8)(ii). However, it is not an admission to the threat charge, which requires that "[i]nmate[s] shall not ... make any threat, spoken, in writing, or by gesture." N.Y. Comp.Codes R. & Regs., tit. 7, § 270.2(B) (3)(I). Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the retaliation claim against Defendant Wright.

5. *Failure to Intervene*

Plaintiff alleges that Defendant Bezio violated his constitutional rights by failing to intervene to protect Plaintiff from Defendants Duprat, Bogett, and Snyder. (Dkt. No. 1 ¶¶ 19-20.) Defendants move for summary judgment, arguing that there was no underlying constitutional violation with which to intervene. (Dkt. No. 92-10 at 36-37.)

Law enforcement officials can be held liable under § 1983 for not intervening in a situation where another officer is violating an inmate's constitutional rights. *Jean-Laurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008) (citation omitted). A state actor may be held liable for failing to prevent another state actor from committing a constitutional violation if "(1) the officer had a realistic opportunity to intervene and prevent the harm;

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

(2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer does not take reasonable steps to intervene." *Id.* (citation omitted); *see also Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 129 (2d Cir.1997) ("Failure to intercede to prevent an unlawful arrest can be grounds for § 1983 liability."). Whether an officer can be held liable on a failure to intervene theory is generally a question of fact for the jury to decide. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994) ("Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.").

Here, a jury could determine that Defendant Bezio failed to intervene to protect Plaintiff. Plaintiff's verified complaint states that on the day before the incident he asked Defendant Bezio to protect him while he was being transported to court. (Dkt. No. 1 ¶ 19.) Plaintiff alleges that Defendant Duprat made a threatening comment as he escorted Plaintiff to the transportation van and that Plaintiff informed Defendant Bezio of the threat before they reached the van. (Dkt. No. 1 ¶ 20.) Defendant Bezio merely shrugged his shoulders. *Id.* None of the defendants has filed an affidavit contradicting Plaintiff's version of events. As discussed above, there is a triable issue of fact that a constitutional violation occurred with which Defendant Bezio could have intervened. Therefore, I recommend that the Court deny Defendants' motion for summary judgment regarding the failure to intervene claim against Defendant Bezio.[FN52]

FN52. Read broadly, the complaint asserts a retaliation claim against Defendant Bezio based on these same events and a failure to intervene claim against Defendant Duprat because he was present when Defendant Snyder initially beat Plaintiff. (Dkt. No. 1 ¶ 21.) Defendants have not moved for summary judgment of these claims. I find that these claims are sufficient to withstand

*sua sponte* review under 28 U.S.C. § 1915(e)(2)(B).

### 6. *Grievances*

**\*26** Plaintiff alleges that Defendants Brousseau, Donelli, Girdich, and Eagen violated his constitutional rights by refusing to allow him to file a grievance regarding the events of January 2 and 3, 2003. (Dkt. No. 1 ¶¶ 30-34.) Defendants move for summary judgment, arguing that Plaintiff has not stated a constitutional claim. (Dkt. No. 92-10 at 38.) As discussed above in Section III(B)(3), Defendants are correct. Therefore, I recommend that the Court grant Defendants' motion and dismiss the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding the handling of Plaintiff's grievances.

### D. Disciplinary Hearing/Sentence

Plaintiff raises several claims regarding the conduct of his disciplinary hearing, his disciplinary sentence, and his appeal of the sentence. Specifically, he claims that (1) Defendant LaClair violated his right to due process by falsifying a misbehavior report against Plaintiff to avoid serving as Plaintiff's pre-hearing assistant (Dkt. No. 1 ¶ 35); (2) Defendant Bullis violated his due process rights by failing to call an inmate and Defendant LaClair as witnesses (Dkt. No. 1 ¶¶ 36-37); (3) Defendant Bullis violated his Eighth Amendment rights by sentencing him to a 21-day loaf diet (Dkt. No. 1 ¶ 36-37) and Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the loaf diet (Dkt. No. 1 ¶ 38); and (4) Defendant Selsky violated Plaintiff's right to due process by affirming Defendant Bullis' disposition (Dkt. No. 1 ¶ 40).

### 1. *LaClair*

Plaintiff alleges that Defendant LaClair falsified a misbehavior report against him in order to avoid serving

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

as Plaintiff's pre-hearing assistant "and for the purpose of depriving Benitez of due process." [FN53] (Dkt. No. 1 ¶ 35.)

> FN53. The only version of the events between Defendant LaClair and Plaintiff in evidence before the Court is Defendant LaClair's misbehavior report. According to that report, when Defendant LaClair went to Plaintiff's cell to assist him, Plaintiff "stated ... that [LaClair] was to get [him] what he wanted." Defendant LaClair "informed him that what he needed had to be pertained (sic) to the misbehavior report. [Plaintiff] then stated "Get what I want or I'll fuck you up." Defendant LaClair "informed him the interview was over and left the area." (Dkt. No. 92-5, Ex. 15 at 2-3.) Although Plaintiff states in his verified complaint that Defendant LaClair "intentionally and maliciously falsified" the report, he does not offer any other version of what happened. (Dkt. No. 1 ¶ 35.) He alleges that he asked Defendant Bullis to "interview inmate Rolan and LaClair regarding the acts and actions of LaClair that caused him not to provide Benitez pre-hearing assistance," but he does not provide any information about what those interviews might have revealed. (Dkt. No. 1 ¶ 36.) Due to Defendants' failure to provide Plaintiff with pages of the SHU log book for January 14, 2003, Plaintiff asks the Court to draw an adverse inference that "were Defendants to provide the Court with the missing pages of the ... log book ... such pages would not support any of the allegations of misconduct set out in the misbehavior report that LaClair filed against Benitez on that date." (Dkt. No. 109 at 41 n. 14.) Plaintiff does not explain, however, why such an inference is logical.

In order to state a claim for violation of his procedural due process rights, a plaintiff must allege facts plausibly suggesting that he was deprived of a liberty interest without due process of law. *Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir.2000).

Punishment implicates a protected liberty interest where (1) the state has granted its inmates, by regulation or statute, an interest in remaining free from that particular punishment; and (2) the punishment imposes "an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *Tellier,* 280 F.3d at 80; *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

Here, no liberty interest is implicated. As a result of being found guilty of the disciplinary charges, Plaintiff was sentenced to a loaf diet. The Second Circuit has held that the imposition of a loaf diet does not impose an atypical and significant hardship on inmates, even where the inmate alleges that the diet caused severe stomach pain and weight loss. *McEachin v. McGuinnis,* 357 F.3d 197 (2d Cir.2004). Therefore, I recommend that the Court dismiss Plaintiff's due process claim against Defendant LaClair. [FN54]

> FN54. Although Defendants argue, in regard to Plaintiff's other claims regarding his disciplinary hearing, that due process was not required because no liberty interest was implicated by the imposition of the loaf diet, they did not assert that argument regarding the claim against Defendant LaClair. Rather, Defendants argue that Plaintiff waived Defendant LaClair's assistance by threatening him. (Dkt. No. 92-10 at 38-39.) Due process requires that prison officials provide pre-hearing assistance to a prisoner facing disciplinary charges who is confined to the SHU. *Eng v. Coughlin,* 858 F.2d 889 (2d Cir.1988). "An assistant's role is to act as merely a surrogate for the inmate, not a legal advisor or advocate. [A]n assistant's role is to perform tasks like interviewing witnesses that the inmate would

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

perform himself if her were in the general population." *Jackson v. Johnson,* 30 F.Supp.2d 613, 619 (S.D.N.Y.1998) (citations and punctuation omitted). The assistance "must be provided in good faith and in the best interests of the inmate." *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998) (citation omitted). An "assigned assistant who does nothing to assist a ... prisoner ... has failed to accord the prisoner his limited constitutional due process right of assistance." *Eng,* 858 F.2d at 898. Defendants cite several cases holding that an inmate may waive his right to assistance by remaining silent when assistance is offered or by refusing to sign a form requesting assistance. (Dkt. No. 92-10 at 39, citing *inter alia, Jackson,* 30 F.Supp.2d at 619.) However, Defendants have not cited any cases holding that an inmate waives his right to assistance by threatening his assistant. In light of my finding that Plaintiff was not deprived of a liberty interest, it is not necessary to reach this issue.

### 2. *Failure to Call Witnesses*

**\*27** Plaintiff alleges that Defendant Bullis violated his right to due process by failing to call the witnesses that Plaintiff requested. (Dkt. No. 1 ¶ 37.) Defendants move for summary judgment, arguing that Plaintiff cannot state a due process claim because he was not deprived of a liberty interest. (Dkt. No. 92-10 at 39-40.) As discussed above, Defendants are correct. *McEachin,* 357 F.2d at 200. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss this claim.

### 3. *Imposition of Loaf Diet*

Plaintiff alleges that Defendant Bullis violated his Eighth Amendment rights by imposing the loaf diet on him and that Defendants Weissman and Girdich violated his Eighth Amendment rights by approving the punishment.

(Dkt. No. 1 ¶¶ 37-38.) Defendants move for summary judgment of the claim, arguing that (a) Plaintiff failed to exhaust his administrative remedies; and (b) Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 14-20.)

### a. *Exhaustion of Administrative Remedies*

Defendants argue that Plaintiff did not exhaust his administrative remedies regarding his Eighth Amendment claims against Defendant Bullis because he did not appeal the grievance he filed regarding Defendant Bullis' imposition of the loaf diet to the CORC. (Dkt. No. 92-10 at 14.) Defendants argue that Plaintiff failed to exhaust his administrative remedies regarding his Eighth Amendment claim against Defendants Weissman and Girdich because he did not file a grievance at all. (*Id.* at 15.)

DOCS has a separate and distinct administrative process for inmates to appeal the result of disciplinary hearings, which is not referred to as a "grievance" process. N.Y. Comp.Codes R. & Regs. tit.7, § 701.3(e)(1)-(2). For Tier III superintendent hearings, such as Plaintiff's, the inmate must file an appeal with Donald Selsky, DOCS Director of Special Housing/Inmate Disciplinary Program, pursuant to New York Compilation of Codes, Rules and Regulations, title 7, section 254.8. The appeal must be filed within 30 days of the inmate's receipt of the hearing officer's written disposition. N.Y. Comp.Codes R. & Regs. tit.7, § 254.8. Plaintiff raised the issue of the loaf diet in his appeal of the disciplinary sentence. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, Ex. D.) Defendant Selsky denied the appeal. *Id.* at Ex. E. Therefore, Plaintiff exhausted his administrative remedies as to his claim against Defendant Bullis.

Plaintiff declares that on January 18, 2003, he submitted a grievance to Defendant Brousseau complaining about Defendant Bullis' imposition of, and Defendants Weissman and Girdich's approval of, the loaf

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

diet. (P.'s Decl. in Opp'n to Aff. of Karen Bellamy, ¶ 26.) He declares that Defendant Brousseau "deliberately refused to file and process the grievance ... in order to prevent me from suing the officials named in the grievance." *Id.* ¶ 27. Therefore, as discussed above, there is a question of fact that Defendants are estopped from asserting the exhaustion defense.

*b. Deliberate Indifference*

**\*28** Defendants argue that Plaintiff has not raised a triable issue of fact that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they ordered and approved that the loaf diet be imposed on Plaintiff. (Dkt. No. 92-10 at 15-20.) Defendants are correct.

Where a prisoner claims that punishment imposed following a disciplinary hearing violates his Eighth Amendment rights, the proper analysis of the subjective prong of the claim requires the court to "consider whether the [o]rder was reasonably calculated to restore prison discipline and security and, in that ... context, whether the officials were deliberately indifferent to [the prisoner's] health and safety." *Trammell v. Keane,* 338 F.3d 155, 163 (2d Cir.2003).

Here, the order imposing the loaf diet on Plaintiff was reasonably calculated to restore prison discipline and security. DOCS regulation allow the imposition of the loaf diet as punishment where, *inter alia,* the inmate is found guilty of committing unhygenic acts in the SHU or the inmate is a long-term SHU inmate who is disruptive and who has lost all other available privileges. (Dkt. No. 92-8, Bezio Aff., ¶ 5.) Here, Plaintiff was found guilty of committing unhygenic acts in the SHU. Moreover, Plaintiff is a long-term SHU inmate (he will remain in the SHU until June 3, 2021, and in keeplock until July 1, 2025) who has lost package, commissary, and phone privileges and has lost 11 years worth of good time

credits. (Bezio Aff., ¶ 6.) Therefore, the imposition of the loaf diet was reasonably calculated to restore prison discipline.

There is no evidence that Defendants Bullis, Weissman, and Girdich acted with deliberate indifference when they imposed and approved of the loaf diet. To establish deliberate indifference, an inmate must prove that (1) the defendant was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the defendant actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702-703. Here, although Plaintiff told Defendant Bullis that the loaf diet would cause him severe abdominal pains and constipation due to his hepatitis (Dkt. No. 1 ¶ 36), his medical record did not support his assertion. Dr. Weissman declares that "there is nothing in his medical record that indicates that [Plaintiff] is medically unable to receive the restricted diet penalty ... [T]he fact that [P]laintiff is Hepatitis C positive does not mean he cannot receive the restricted diet because Hepatitis C is not a contraindication for the restricted diet." (Weissman Aff. ¶¶ 14-15.) Thus, there is no evidence in the record indicating that Defendants Bullis, Weissman, and Girdich were aware of facts from which the inference could be drawn that the loaf diet would harm Plaintiff or that they drew that inference. Moreover, Plaintiff admits that he refused to eat the loaf diet. (Dkt. No. 1 ¶ 39.) Accordingly, any weight loss and pain that he experienced could not have resulted from the loaf diet itself. Accordingly, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's Eighth Amendment claims against Defendants Bullis, Weissman, and Girdich.

*4. Selsky*

**\*29** Plaintiff alleges that Defendant Selsky affirmed Defendant Bullis' "disciplinary determination, even though he knew or should have known that Bullis violated [Plaintiff]'s clearly established due process rights." (Dkt. No. 1 ¶ 40.) Defendants' motion for summary judgment does not directly address this claim. However, I find that

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

it is subject to *sua sponte* dismissal pursuant to 28 U.S.C. § 1915(e)(2)(B) because, as discussed above, Defendant Bullis did not violate Plaintiff's due process rights. Therefore, I recommend that the Court dismiss the claim against Defendant Selsky.

**E. Five Points Health Care**

Plaintiff alleges that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by failing to provide adequate medical care at Five Points Correctional Facility following the alleged beating by Defendants Snyder, Duprat, and Bogett. (Dkt. No. 1 ¶¶ 23-26.) Defendants move for summary judgment, arguing that (1) Plaintiff failed to serve Defendant Kuhlman; and (2) Plaintiff cannot raise a triable issue of fact that these Defendants violated his Eighth Amendment rights because Plaintiff did not suffer from a serious medical need and Defendants were not deliberately indifferent. (Dkt. No. 92-10 at 6, 20.)

1. *Failure to Serve Defendant Kuhlman*

Defendants argue that the claim against Defendant Kuhlman must be dismissed because she was not served within 120 days of the filing of the amended complaint on October 6, 2004. (Dkt. No. 92-10 at 6.) Under the Federal Rules of Civil Procedure, a defendant must be served with the summons and complaint within 120 days [FN55] after the filing of the complaint. Fed.R.Civ.P. 4(m). The court "must" extend the time for service for an appropriate period if the plaintiff shows good cause for the failure to serve. *Id.*

FN55. This 120-day service period is shortened, or "expedited," by the Court's Local Rules of Practice (and the Court's General Order 25), which provide that all defendants must be served with the summons and complaint within sixty (60) days of the filing of the complaint. N.D.N.Y. L.R. 4.1(b) (emphasis added).

Here, on June 24, 2005, the summons was returned unexecuted as to Defendant "Coleman." (Dkt. No. 21.) On May 22, 2007, the Clerk's office sent Plaintiff a letter informing him that the Marshals Service had not been able to serve the defendant because there was no one by that name at Five Points Correctional Facility. The Clerk's office provided Plaintiff with another USM-285 form and asked for more information about the defendant. (Dkt. No. 54.) Plaintiff states that he was not able to ascertain Defendant Kuhlman's correct identity until after I issued orders on May 2, 2007, and October 3, 2007, compelling defendants to respond to discovery. (Dkt. No. 109 at 7-8.) The docket shows that on January 31, 2008, Plaintiff attempted to file an amended complaint "correctly identif[ying] defendant Kulhman by substituting the name 'Coleman' ... for 'Kuhlman.'" (Dkt. No. 74.) On February 4, 2008, I ordered Plaintiff's motion stricken from the record because the deadline for filing motions to amend had expired on January 30, 2006. (Dkt. No. 75.) I find, therefore, that Plaintiff has demonstrated good cause for his failure to serve Nurse Kuhlman.

2. *Merits*

**\*30** Plaintiff claims that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment rights by refusing to treat him for head pain, pain in his liver, pain in his left wrist, and severe body itch. Plaintiff also alleges that he informed Defendant Hensel that "he had ... lost blood from within his right ear." (Dkt. No. 1 ¶¶ 23-26.) Defendants argue that Plaintiff has not raised a triable issue of fact as to either the objective or subjective prong of his Eighth Amendment medical care claim. (Dkt. No. 92-10 at 20.)

As discussed above, the objective prong of an Eighth Amendment medical claim requires the court to determine whether the prisoner was deprived of adequate medical care and, if so, whether the inadequacy was sufficiently

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

serious. *Salahuddin,* 467 F.3d at 279-80. Where the prisoner alleges that he was completely deprived of treatment, the court must examine whether the inmate's medical condition is sufficiently serious. *Id.* at 280. Here, because Plaintiff alleges that he was totally deprived of medical care, I must consider whether the bleeding in his inner right ear, head pain, pain in his liver, pain in his left wrist, and severe body itch are "serious medical conditions," in other words, whether they are conditions "of urgency that may produce death, degeneration, or extreme pain." *Id.; Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting).

Defendants argue, without analysis, that none of Plaintiff's "conditions constitute a condition of urgency, one that may produce death, degeneration, or extreme pain." (Dkt. No. 92-10 at 20.) As discussed above in regard to Plaintiff's claims against Defendant Weissman and Richardson, I agree that Plaintiff's severe body itch is not a serious medical condition. However, Plaintiff's bleeding inner ear, head pain, and liver pain, as alleged, appear urgent and capable of producing extreme pain. *See Bjorkstrand v. DuBose,* No. CIV. S-08-1531, 2008 WL 5386637, at * 3 (E.D.Cal. Dec.24, 2008) (finding that dried blood in ear was not a serious medical condition because "there was no emergency problem with the left ear, such as active bleeding."). I therefore find that Defendants have not met their burden of showing that they are entitled to judgment as a matter of law on the issue of whether Plaintiff suffered from a serious medical condition.

Defendants argue that Plaintiff cannot raise a triable issue of material fact as to deliberate indifference because the issue of "[w]hether or not [P]laintiff needed treatment or to be seen by a physician amounts to nothing more than a disagreement with the course of treatment-not deliberate indifference." (Dkt. No. 92-10 at 20.) As Plaintiff notes (Dkt. No. 109 at 37), none of the named Five Points Defendants has filed an affidavit supporting Defendants' motion for summary judgment. They have therefore not established that their treatment of Plaintiff was based on

their medical judgment. The evidence, when viewed in the light most favorable to Plaintiff, indicates that he arrived at Five Points on January 3 complaining of severe pain inflicted through excessive force and that he received absolutely no treatment for his injuries until Nurse Gardner examined him on January 7. Therefore, I find that Plaintiff has raised a triable issue of fact that Defendants Hensel, Goodwin, Kuhlman, and Costello violated his Eighth Amendment right to adequate medical treatment.

**\*31 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 92) be **GRANTED IN PART AND DENIED IN PART;** and it is further

**RECOMMENDED** that the following claims be dismissed pursuant to Defendants' motion for summary judgment: (1) the Eighth Amendment claims against Defendants Weissman and Richards arising from their treatment of Plaintiff's severe body itch, left wrist, and right ankle; (2) the claims against Defendant Ham; (3) the claims against Defendants Brousseau and Donelli for their handling of Plaintiff's grievance regarding Defendant Ham; (4) the retaliation claim against Defendants Nephew, Desotelle, and Snyder based on their filing of misbehavior reports against Plaintiff; (5) the claims against Defendants Brousseau, Donelli, Girdich, and Eagen regarding their handling of Plaintiff's grievances regarding the events of January 2 and 3, 2003; (6) the claim against Defendant LaClair; (7) the claims against Defendant Bullis; and (8) the Eighth Amendment claim against Defendants Weissman and Girdich for approving the imposition of the loaf diet; and it is further

**RECOMMENDED** that the following claims be dismissed *sua sponte* pursuant to 28 U.S.C. § 1915(e)(2)(B): (1) Plaintiff's retaliation claim against

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

(Cite as: 2009 WL 3486379 (N.D.N.Y.))

Defendants Weissman and Richards; and (2) the claim against Defendant Selsky; and it is further

**RECOMMENDED** that the following claims survive summary judgment and *sua sponte* review and proceed to trial: (1) the conspiracy claim against Defendants Wright, Snyder, and Duprat; (2) the excessive force claim against Defendants Snyder, Duprat, Bogett, and Wright; (3) the retaliation claim against Defendants Snyder, Duprat, Bogett, and Wright arising from the use of excessive force; (4) the retaliation claim against Wright arising from his filing of a misbehavior report against Plaintiff; (5) the failure to intervene claims against Defendants Bezio and Duprat; (6) the retaliation claim against Defendant Bezio; and (7) the Eighth Amendment claims against Defendants Hensel, Goodwin, Kuhlman, and Costello; and it is further

**ORDERED** that the Clerk provide Plaintiff with Form USM 285 for service on Defendant Kuhlman; and it is further

**ORDERED** that the Clerk serve copies of *Miller v. Bailey,* No. 05-CV-5493, 2008 U.S. Dist. LEXIS 31863, 2008 WL 1787692 (E.D.N.Y. Apr. 17, 2008); *Odom v. Poirier,* No. 99 Civ. 4933, 2004 U.S. Dist. LEXIS 25059, 2004 WL 2884409 (S.D.N.Y. Dec.10, 2004); *Warren v. Purcell,* No. 03 Civ. 8736, 2004 U.S. Dist. LEXIS 17792, 2004 WL 1970642 (S.D.N.Y. Sept.3, 2004); *Bond v. Board of Educ. of City of New York,* 97-cv-1337, 1999 U.S. Dist. LEXIS 3164, 1999 WL 151702 (W.D.N.Y. Mar.17, 1999); *Medina v. Hunt,* No. 9:05-CV-1460, 2008 U.S. Dist. LEXIS 74205, 2008 WL 4426748 (N.D.N.Y. Sept.25, 2008); *Hill v. City of New York,* No.03 CV 1283, 2005 U.S. Dist. LEXIS 38926, 2005 WL 3591719 (E.D.N.Y. Dec. 30, 2005); and *Mendez v. Artuz,* No. 01 CIV. 4157, 2002 U.S. Dist. LEXIS 3263, 2002 WL 313796 (S.D.N.Y. Feb.27, 2002) on Plaintiff in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

**\*32** Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,2009.

Benitez v. Ham

Slip Copy, 2009 WL 3486379 (N.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.